Richard Miller Declaration

Civil Action No. 06-01071 (GK)

Exhibit ___*1*___

**Richard L. Miller**
1515 S. Arlington Ridge Road; Apartment #304
Arlington, V.A. 22202
202-365-1061 (C); 703-685-3709 (H)
Email: RMiller707@yahoo.com

---

**Objective:** Seek position in areas of budget, oversight, financial management, international relations, transportation, or Congressional affairs. Additionally, I would like to be considered for organizations that could use both the skills of a former elected County Commissioner (community/regional development, economic development, or working with local and state officials) or a former agency Co-Chair of previous White House Private Sector Initiatives (Volunteerism, "Adopt a School" Program, "Adopt-A-Senior" Center, Mentoring, Day Care Center).

## Financial Management Specialist, National Transportation Safety Board (NTSB), Washington, D.C. (June 2000-July 2006)

Developed NTSB's Purchase and Travel Card Programs to establish financial accountability within the agency. Agency Coordinator for both Purchase and Travel Card Programs which were recognized as some of the best government-wide. As member of the CFO Management Team, advised the Chief Financial Officer (CFO) on various issues including financial management, CitiBank Travel and Purchase Cards, PriceWaterhouse Study, strategic planning within the CFO organization, the selection of a new Travel Management contract, management and accountability issues. Assisted the CFO in review of the DOT IG Report and the PriceWaterhouse drafts. Developed and promoted importance of written "rules," communication and accountability with Approving Officials, Office Directors, and employees. Assisted the CFO in the preparation and presentation of a 50-page PowerPoint Presentation on Financial Management at NTSB: Spending Government Funds, the DOT IG Audit and Investigation and Government Credit Cards. Developed and assisted in "Small Purchase Training" for the agency. Produced a CFO web page. Served as lead on agency's response to possible contracting out (FAIR ACT). Re-wrote the Board's Travel Order and Purchase Card Order. Established new cross servicing initiative at the agency. Chosen to serve on the NTSB Training Academy Development Team.

## TWA 800 Project Coordinator, NTSB, Washington, D.C. (June 1999-June 2000)

Simultaneously managed three complex government contracts to relocate the TWA Flight 800 Wreckage from the main hangar at the Calverton facility in New York. These tasks were an integral component for saving the government $3 million annually. This assignment involved weekly liaison and coordination with agency management, state and local officials, and contractors. These contracts entailed the movement of the largest wreckage reconstruction in the world, one that will serve as part of the primary focus for the NTSB Training Academy. Also managed the contract with a film documentary company to provide historical documentation of the recovered wreckage and to film interviews for Board presentations.

## Elected County Commissioner, Yadkin County Board of Commissioners, Yadkinville, N.C. (1996-2000)

Brought accountability to both County government and Regional Economic Development organization (Rural Transportation, Head Start, Meals on Wheels, Regional Economic Development, After School Program). Provided direct oversight for $24 million budget of the county's financial plans and management. Reviewed and approved/disapproved budget request from county agencies based on independent analysis. Provided leadership and guidance on county administrative policies. Reviewed contract submissions and approved/disapproved, as determined; including infrastructure investments and personnel management issues. Directed the development of policies and practices to insure county-wide compliance with Federal and state rules and regulations. Spoke at public events on behalf of the County and County Commissioners as well as regional planning initiatives. Served on numerous local, regional, state and national organizations to advance opportunities for citizens of both the county and regions. Established Heritage 2000. Focused efforts on charting the county's transition from a rural, tobacco-

dominated economy to a fast growing high technology environment. Actively involved in State and national County Commissioner's organizations.

## Enterprise Agent, Micro Enterprise Lending Program, Yadkin Valley Economic Development District, Boonville, N.C. (1992-1994)

With an eye towards community empowerment, marketed, and supervised, the adoption of a program that promoted self-employment, small business expansion, and economic independence throughout a four-county district in North Carolina. Developed targeted training activities with the community college, trained groups and identified financial resources to promote local employment, business creation and economic independence for disadvantaged individuals traditionally excluded from entrepreneurial ventures. Cooperatively worked with diverse regional organizations and developed partnerships with community colleges, civic organizations, volunteers, and businesses to broaden access to the banking community for individuals who wanted to own small businesses. Succeeded in identifying financial resources for individuals to create businesses without government subsidized loans. Served on a statewide committee to develop and identify additional assistance opportunities for micro-business industries. Established a 15-member Loan Review Committee composed of bankers, successful business entrepreneurs and community leaders who made monetary commitments to finance loans. Reviewed business plans. Assisted on county/regional strategic planning and economic development programs. Advised the Director on financial management and financial reporting systems for various programs, including Head Start, federal/state Rural Transportation Delivery Grants, Regional Senior Centers, and USDA's Meals on Wheels program. Fought for better delivery of services and accountability in these multi-faceted county, state, and Federal programs.

## Chairman/Chief Financial/Operations Officer, Yadkin Lumber Company, Yadkinville, N. C. (1990-1992)

Served as Chairman and Chief Financial Officer of a 40-year old family-owned lumber company. Initiated a complete review of the company's operating procedures and analyzed the business' financial controls. Established accountability. Met with business development experts and market analysts. Revived business relationships with home contractors and developed new relationships with commercial contractors/developers based on personal construction and economic development experience. Based on independent research and review, as well as many meetings with company employees and management officials, designed and implemented a plan to expand commercial sales and create more efficient inventory practices. As a result of the plan's implementation, gross sales increased by 14%, gross profits rose by 47 percent, and net profit improved by 44 percent. These improvements were achieved despite an economic downturn in the regional economy. Introduced computers and financial reporting systems that greatly enhanced productivity and overall customer service.

## Financial Advisor, Ministry of Finance & National Economy, Kingdom of Saudi Arabia (1988-1990)

As a member of the Joint US/Saudi Economic Commission team, served as a principal U. S. advisor on a project in the Kingdom of Saudi Arabia to create a systems-based, unified budget for the country. Identified methods for the Saudi Arabian government to accurately assess the short- and long-term budget effect of infrastructure development projects and various financial management and financial reporting systems. Development of the budget tracking system was necessary because Saudi oil revenues were not keeping pace with the growing government expenditures. Both diplomatic tact and budget management expertise were required in order to bring the project to its successful competition.

## Special Assistant for Budget and Programs, U.S. Department of Transportation, Washington, D.C. (1982-1987)

Served as advisor to the Assistant Secretary for Budget and Programs on the development, review, and presentation of the Department's budget and programs. Responsible for reviewing the impact and programs in achieving their objectives, advising the Assistant Secretary on major problem areas that impede attainment of departmental program plans and objectives, and advising the Assistant Secretary and Secretary on program and legislative changes necessary to resolve them. Responsible for coordinating the impact on departmental resources of legislative and other proposals, establishing procedures for

development of long-range budgetary resource planning, and making recommendations on the budget and program aspects. Recommended program, budget, and legislative changes necessary to resolve them. Prepared, reviewed, and recommended budget resource requirements for the Secretary, OMB, and the Congress. Made recommendations on the budget and program aspects of proposals for acquisitions of major technical systems. Monitored Congressional action on appropriation and authorization legislation.

Led management program evaluation review for the Secretary of the U. S. Coast Guard program operation, particularly its safety role with emphasis on the search and rescue program. Served as member of Secretary's major Department program evaluation task forces (Safety Task Force and Anti-Drug Task Force). Co-chaired the Secretary's Private Sector Initiative and Volunteerism (Volunteerism programs, mentoring, "Adopt a School," "Adopt a Senior Center," Day Care) nation-wide. Served as a representative for D.O.T. at White House meetings. Our "Adopt a School" program received the DC Award for Excellence. Established the first non-Federally funded government day care center.

### Senior Budget Analyst, Congressional Budget Office (CBO), Washington, D.C.
(1975-1982)
Assisted in formulating the Congressional Budget process from infancy to full maturity. Established goals and measurable performance objectives with the Congressional Committees to achieve the financial accountability requirement of the Congressional Budget and Impoundment Act of 1974. Planned development strategies, defined relationships between various parts of the organization and interaction with OMB and the U.S. Congress. Coordinated efforts with budget, authorizing and appropriations committees. Coordinated alternative program funding proposals based on differing economic assumptions. Directed analyses of Congressional management information.

**Education:** Masters in Public Administration, Southern Illinois University (1974);
Bachelor of Arts, University of North Carolina at Chapel Hill (1971)

**Memberships/Training:** Transportation & Telecommunications Steering Committee of National Association of County Officials (NACO); Intergovernmental Steering Committee, Long Range Strategic Planning Steering Committee and Tax and Finance Committee of the N.C. Association of County Commissioners; Piedmont Triad Partnership/State Regional Economic Development Member.

**Selected to participate in the following professional leadership endeavors:** Piedmont Triad Leadership Program, Rural Economic Development Leadership Institute, Regional Appalachian Regional Commission Leadership Program, and the Institute of Political Leadership Program; Appointed to the following: Northwest Regional Library Board, Yadkin County Library Board; Yadkin Arts Council; Northwest Piedmont Council of Governments; Block Grant Committee; Northwest Regional Aging Council; Surry County Housing Consortium; Community Block Grant Committee; Yadkin County Sesquicentennial Commission; E-911 Committee; Smart Start Partnership, and Rural Transportation Advisory Committee; Founder, Heritage 2000.

Richard Miller Declaration

Civil Action No. 06-01071 (GK)

Exhibit   2

**EXHIBIT F28**

## POSITION DESCRIPTION (Please Read Instructions on the Back)

01747SCPU1

| 2. Reason for Submission | 3. Service | 4. Employing Office Location | 5. Duty Station | 6. OPM Certification No. |
|---|---|---|---|---|

☐ Redescription  ☑ New  
☐ Reestablishment  ☐ Other  
Explanation (Show any positions replaced)

3. Service: ☑ Hdqtrs  ☐ Field

4. Employing Office Location: Washington, DC

5. Duty Station: Washington, DC

**7. Fair Labor Standards Act**  
☑ Exempt  ☐ Nonexempt

**8. Financial Statements Required**  
☐ Executive Personnel Financial Disclosure  
☑ Employment and Financial Interest

**9. Subject to IA Action**  
☐ Yes  ☑ No

**10. Position Status**  
☐ Competitive  
☐ Excepted (Specify in Remarks)  
☐ SES (Gen.)  ☐ SES (CR)

**11. Position Is**  
☐ Supervisory  
☐ Managerial  
☑ Neither

**12. Sensitivity**  
☐ 1—Non-Sensitive  ☐ 3—Critical  
☑ 2—Noncritical Sensitive  ☐ 4—Special Sensitive

**13. Competitive Level Code**

**14. Agency Use**

| 15. Classified/Graded by | Official Title of Position | Pay Plan | Occupational Code | Grade | Initials | Date |
|---|---|---|---|---|---|---|
| a. Office of Personnel Management | | | | | | |
| b. Department, Agency or Establishment | Financial Management Specialist | GS | 501 | 14 | | |
| c. Second Level Review | | | | | | |
| d. First Level Review | | | | | | |
| e. Recommended by Supervisor or Initiating Office | | | | | | |

**16. Organizational Title of Position (if different from official title)**

**17. Name of Employee (if vacant, specify)**  
Richard L. Miller

**18. Department, Agency, or Establishment**  
National Transportation Safety Board

**a. First Subdivision**  
Office of the Chief Financial Officer

**b. Second Subdivision**  
Office of the Director

**c. Third Subdivision**

**d. Fourth Subdivision**

**e. Fifth Subdivision**

**Signature of Employee (optional)**

**19. Employee Review**-This is an accurate description of the major duties and responsibilities of my position.

**20. Supervisory Certification.** *I certify that this is an accurate statement of the major duties and responsibilities of this position and its organizational relationships, and that the position is necessary to carry out Government functions for which I am responsible. This certification is made with the knowledge that* this information is to be used for statutory purposes relating to appointment and payment of public funds, and that false or misleading statements may constitute violations of such statutes or their implementing regulations.

**a. Typed Name and Title of Immediate Supervisor**  
Donald P. Libera  
Deputy Chief Financial Officer

Signature | Date 5/9/02

**b. Typed Name and Title of Higher-Level Supervisor or Manager (optional)**  
Steven E. Goldberg  
Chief Financial Officer

Signature | Date 5/9/02

**21. Classification/Job Grading Certification.** *I certify that this position has been classified/graded as required by Title 5, U.S. Code, in conformance with standards published by the U.S. Office of Personnel Management or, if no published standards apply directly, consistently with the most applicable published standards.*

**Typed Name and Title of Official Taking Action**  
Bernard W. Moffett  
Personnel Management Specialist

Signature | Date 5-9-02

**22. Position Classification Standards Used in Classifying/Grading Position**

**Information for Employees.** The standards, and information on their application, are available in the personnel office. The classification of the position may be reviewed and corrected by the agency or the U.S. Office of Personnel Management. Information on classification/job grading appeals, and complaints on exemption from FLSA, is available from the personnel office or the U.S. Office of Personnel Management.

| 23. Position Review | Initials | Date | Initials | Date | Initials | Date | Initials | Date | Initials | Date |
|---|---|---|---|---|---|---|---|---|---|---|
| a. Employee (optional) | | | | | | | | | | |
| b. Supervisor | | | | | | | | | | |
| c. Classifier | | | | | | | | | | |

**24. Remarks**  
Full Performance Level: GS-14

**25. Description of Major Duties and Responsibilities (See Attached)**

NSN 7540-00-634-4265     Previous Edition Usable     5008-106     OF 8 (Rev. 1-85)  
U.S. Office of Personnel Management  
FPM Chapter 295

POSITION DESCRIPTION

**Financial Management Specialist**          PD# 017475CF01
GS-501-14
Office of the Chief Financial Officer
Washington, DC

## I. INTRODUCTION

The position is located in the Office of the Chief Financial Officer.  This office manages the Board's financial resources, oversees all financial management activities relating to the programs and operations of the Board, both foreign and domestic; develops, prepares, and coordinates annual budget requests to the Office of Management and Budget (OMB) and the Congress; develops budget and financial policies; recommends the allocation of resources to various Board programs and activities; conducts periodic financial reviews of the operating budgets of the Board's offices; and assures the accurate accounting of the agency's financial resources by developing and maintaining an integrated agency-wide financial management system.

The incumbent of this position has responsibility for the administrative and operational aspects of the agency's credit card programs.  In this capacity, the incumbent provides broad programmatic guidance and assistance to the CFO, identifies issues and conducts technically competent analyses on agency-wide financial management issues with special emphasis on the agency's credit card programs.

The incumbent also represents the concerns of the CFO in outside meetings, maintains liaison with vendors, and cultivates a working relationship with headquarters' and regional representatives.

## II. MAJOR DUTIES AND RESPONSIBILITIES

- The incumbent of this position identifies, considers, and resolves a variety of policy issues, questions and problems related to the agency's credit card programs.  Communicates with colleagues, agency management and other contacts outside the agency to gather, analyze, and compile data to provide advisory services and to convey information in a variety of forms in support of these programs.  Monitors card activity to ensure compliance with policies and regulations.  Works with computer systems, programs, and software typically used in the financial field.

- Provides advice and performs specialized support to the CFO and to internal agency program offices, including monitoring of card activities.

**Interprets Reports and Data**

Interprets reports and other data for program review and analysis. Serves as expert in analyzing and resolving complex issues related to the travel and purchase card programs. Prepares recommendations the CFO.

**Supplies Reports and Data**

Supplies reports and data to operating program officials for informational and planning purposes. Independently prepares reports from a variety of sources identifying problem areas and containing an analysis and recommendations for improvement.

**Special Projects**

- Plans and/or accomplishes special projects. Advises the Chief Financial Officer on major credit card issues. Leads, conducts or participates in management studies and reviews. Organizes assigned projects; plans and organizes team study work. Selects qualitative and/or quantitative methodologies appropriate to the subject under examination.

- Identifies and collects necessary data; assembles and assesses information gathered; formulates findings, conclusions, and recommendations; presents results in written and/or oral form, which are well organized, supportable, and clearly expressed.

**Audits, Inspections, and Management Controls**

- Develops procedures and systems for establishing, operating, and assessing the effectiveness of administrative control systems for the travel and purchase card program and the accomplishment, evaluation, and/or monitoring of related audits, inspections, or internal control reviews. Resolves agency-wide audit/inspection issues.

- Reviews travel voucher audit reports and ensures the prompt resolution of audit findings, including the collection of overpayments.

## III. FACTOR LEVELS

Factor 1-8 1550 Points                    Knowledge Required by Position

Incumbent has expert knowledge of applicable legislation, statutes, regulations, policies, and procedures in order to develop policy documents, technical assistance papers, and other materials related to the credit card programs.

Incumbent has knowledge of the organization and the ability to develop and apply management techniques and methodologies to plan, execute, or review the credit card activities of the agency.    Incumbent demonstrates ability to write in order to develop performance specifications and standards for credit card programs and activities.  Incumbent demonstrates the ability to deal tactfully and convincingly with staff members from outside offices regarding the coordination of policies and procedures.


Factor 2-5 650 Points                    Supervisory Controls


The employee is subject only to administrative and policy direction concerning overall program priorities and objectives.  The employee is typically delegated complete responsibility and authority to plan, schedule, and carry out major programs.  Incumbent develops program guidance, policies, and implementation strategies that are normally reviewed by management officials only for potential influence on broad agency policy objectives and program goals.  Findings and recommendations are normally accepted without significant change.


Factor 3-5 650 Points                    Guidelines


Guidelines consist of general policy statements for the program and may include reference to pertinent legislative history, related court decisions, state and local laws, or policy initiatives of agency management.  The employee uses judgment and discretion in determining intent, and in interpreting and revising existing policy and regulatory guidance for use by others within or outside the employing organization.


Factor 4-5 325 Points                    Complexity


The work involves the analysis of complex, interrelated, and multi-faceted issues. Options, recommendations, and conclusions take into account and give weight to uncertainties about data and other variables that affect long-range performance. Work at this level is characterized by (a) intensive efforts in planning, coordination, or problem definition, or (b) intensive efforts in problem solving or analysis for an area where the incumbent functions as a designated authority. Programs and systems under review are broad in scope, complex, and interrelated.  When functioning as a designated authority in a specialty area, the incumbent addresses problems that have been referred by other staff, or otherwise functions in an advisory capacity.  Decisions regarding what needs to be done are complicated by the extreme diversity of functional program and operations and their related control systems, the conflicting requirements inherent in issues when addressing major agency programs, or the need to establish criteria when advising others.

Factor 5-5 325 Points                    Scope and Effect

Identifies and develops ways to resolve problems or cope with issues which directly affect the accomplishment of principal program goals and objectives. Develops new ways to resolve major program management problems. Develops administrative regulations or guidelines for the conduct of program operations or new criteria for measuring program accomplishments. Reports contain information of major significance to agency management.


Factor 6-3 60 Points                     Personal Contacts

Personal contacts are with officials, managers, professionals, and employees and executives of other agencies and outside organizations. Typical of these contacts are representatives of contractors, lawyers and staff of business firms, administrators, and representatives of state and local governments or other Federal agencies.


Factor 7-3 120 Points                    Purpose of Contacts

The purpose of contacts is to influence others to accept critical or controversial observations, findings, and recommendations. Often the contacts are strong adherents of opposing views and are influential.


Factor 8-1 5 Points                      Physical Demands

The work is principally sedentary.


Factor 9-1 5 Points                      Work Environment

The work is usually performed in an office setting.

This position is exempt from coverage under the Fair Labor Standards Act.

Richard Miller Declaration

Civil Action No. 06-01071 (GK)

Exhibit  3

**Libera Don**

From:          Levine, Mitchell (CIT) [mitchl@mail.nih.gov]
Sent:          Wednesday, December 12, 2001 9:44 AM
To:            'Miller Richard'
Subject:       RE: Input to Richard Miller's rating

Yes,

Here is what I want you to give to Don concerning your performance:

During the performance period from July 2000 to my departure, Richard miller
was a key player in helping me to move forward on several fronts to correct
NTSB business practices, and to streamline others.  Richard provided
exceptional support to:
        o Helping me to prepare a PowerPoint presentation given to all
managers and employees concerning NTSB's financial management issues and
setting the stage for clearly delineating oversight responsibilities for
credit card activities.  He not only helped me prepare the presentation, he
also assured that meetings were scheduled and well attended and that
questions raised were followed up on.

        o Richard took a leadership role in helping to design and contract
for a procurement course for all employees involved in purchasing.  The
course was superb and well attended and received high marks.

        o Richard worked with the credit card vendor to develop helpful
reports on delinquencies dealing the use of travel cards that helped us
manage the problem and help managers deal with employees that had problems.
Because of his work, delinquent debt stopped growing, and problems were
dealt with timely.

        o Richard worked on the team that dealt with the roll out of an
internet based travel management system. He was one of the folks who
identified deficiencies with DVA's work, and he helped us make the decision
to terminate and move to BPD for support.

        o Richard was one of the folks involved in the selection of a new
Travel management firm to handle NTSB travel, and was a productive member of
the team that made a reasoned decision.

        o Richard took a leadership role in reviewing PWCs drafts dealing
with credit card processing, and found many areas where PWC needed to
correct and improve their report

Overall, Richard showed a can do effort in helping meet attack a plethora of
issues and problems.  He fully deserves an outstanding rating.  His work
contributed to my receiving an outstanding rating and a significant award.

Mitch Levine
Associate Director for Management/
Executive Officer
Center for Information Technology
National Institutes of Health
12 South Drive
Bldg. 12 A (Room 3049)
Bethesda, MD 20892
phn:301-496-0513
fax: 301-496-5009
mitchL@mail.nih.gov

1

Exhibit 3



**National Transportation Safety Board**

Washington, D.C. 20594

Office of the Chairman

November 3, 2001

Honorable Henry A. Waxman
Ranking Democratic Member
Committee on Government Reform
House of Representatives
Washington, D. C. 20515

Dear Congressman Waxman:

Following the discovery by the National Transportation Safety Board (NTSB) of embezzlement by two NTSB employees, the NTSB engaged the Department of Transportation Inspector General (DoT IG) to conduct an investigation and audit. Subsequently, the General Accounting Office (GAO) was asked by the House Committee on the Budget and the House Task Force on Housing and Infrastructure to review the NTSB's internal controls over selected types of fiscal year (FY) 1999 expenditures. On September 28, 2001, GAO provided the NTSB with a copy of its report "National Transportation Safety Board, Weak Internal Control Impaired Financial Accountability." As required by 31 U.S.C. 720, detailed comments concerning the GAO's report recommendations are enclosed. In an effort to provide a more balanced picture of the NTSB's internal control system, below are some of the numerous improvements undertaken by the NTSB since FY 1999.

- *Cancellation of the Rapid Draft Program* -- Upon the Safety Board's discovery of embezzlement by two NTSB employees, the Rapid Draft program was cancelled. In addition, the NTSB engaged PricewaterhouseCoopers (PwC), a public accounting firm, to examine the Rapidraft transactions for other evidence of fraudulent activity. PwC reviewed more than 10,500 transactions. They did not identify any additional instances of questionable transactions.

- *Review of Internal Financial Controls* -- PwC also reviewed the NTSB's internal financial controls. Based on this review, the firm made 55 specific recommendations and five general comments to remedy identified control weaknesses. The NTSB used this report as the foundation to create an action plan that subdivided these recommendations into 106 separate tasks. The Safety Board's senior management is monitoring progress on the action plan's tasks.

- *Implemented the Government Purchase Card Program* -- Before receiving a purchase card, employees must attend training on small purchases. In addition, cardholders must take GSA's SmartPay Training for the Purchase Card program. A centralized review of the purchase card activity is performed monthly.



Honorable Henry A. Waxman
Page 2

- *Entered into a Cross-Servicing Agreement with the National Business Center -- Department of Interior* – The NTSB's financial system did not meet current Joint Financial Management Improvement Program (JFMIP) financial system requirements. Consequently, NTSB entered into a cross-servicing agreement with the Department of Interior to provide the agency's core financial system, procurement, payroll, and human resources services. We expect the new system to be operational no later than September 30, 2002.

- *Entered into a Cross-Servicing Agreement for Travel Processing with Bureau of Public Debt* -- All travel claims are routed through a travel processing system that performs a number of edits on each claim filed. A number of the claims are then selected for audit by Bureau of Public Debt examiners, including all travel claims for foreign travel.

- *Reimbursable Agreement with the Department of Transportation Inspector General* -- The NTSB has entered into a reimbursable agreement with the DoT IG for oversight activities. The DoT IG has the authority to review the financial management, property management, and business operations of the NTSB, including internal accounting and administrative control systems, to determine our compliance with applicable federal laws, rules, and regulations.

- *Heightened Senior Management Attention to Internal Control Issues* -- Senior management has fully supported the changes resulting from the actions noted above. In addition, the Chief Financial Officer (CFO) provides regular briefings to senior management on various control issues.

- *Staff Augmentation and Resources* -- At the time of the embezzlements, there were 12 employees working in NTSB's finance and procurement areas. The Safety Board has since increased the CFO's staff to 18. In addition, we have hired contract and inventory specialists.

If you have questions regarding this matter, please do not hesitate to contact me.

Sincerely,

*Marion Blakely*

Marion C. Blakely
Chairman

Enclosure

53

Richard Miller Declaration

Civil Action No. 06-01071 (GK)

Exhibit __4__



**AN EQUAL OPPORTUNITY AND REASONABLE ACCOMMODATION EMPLOYER**

**NATIONAL TRANSPORTATION SAFETY BOARD**

DATE OPENED:   10/27/00

DATE CLOSED:   12/01/00

NO. OF VACANCIES: 1

## *SENIOR EXECUTIVE SERVICE*
## *POSITION VACANCY ANNOUNCEMENT*

**AGENCY CONTACT:**    Human Resources Division 1-800-573-0937 or 202 314-6239
World wide Web Address: http://www.ntsb.gov

**POSITION TITLE, SERIES, AND GRADE:**    **Chief Financial Officer, ES-501**

**LOCATION:**    **Office of the Chief Financial Officer**
**Washington, D.C.**

**SALARY RANGES:**

| | | | |
|---|---|---|---|
| ES-1 | $115,811 | ES-4 | $130,200* |
| ES-2 | $121,264 | ES-5 | $130,200* |
| ES-3 | $116,495 | | |

*Includes locality pay adjustment for Washington-Baltimore pay area.
Rate is limited to the rate for Level III of the Executive Schedule.

**AREA OF CONSIDERATION:**    Nationwide; all groups of qualified individuals.   This is a Career Reserved Position.   **NTSB may or may not pay relocation (PCS) expenses.**

**REGULATIONS:**    Financial interest in certain transportation enterprises is prohibited.   The appointee will be required to file a Public Financial Disclosure Report (SF-278) in accordance with the Ethics in Government Act of 1978.

**DUTIES:** The incumbent is the key advisor to the Chairman of the National Transportation Safety Board (NTSB) on all financial management issues.   The incumbent serves as the Chief Financial Officer for the agency and provides direction and executive leadership for its financial management programs which include: budget formulation, presentation and execution; accounting operations; and design and maintenance of accounting systems, with primary responsibility for managing professional personnel and providing appropriate management controls over the use and application of financial management resources.

The CFO is responsible for providing stewardship over and assuring the financial integrity of NTSB's activities and providing guidance and oversight for mechanisms used to fund and procure goods and services to support the Board's mission including and not limited to the government credit card programs and Interagency Agreements.    The CFO appears before the Office of Management and Budget (OMB), Congress, and  Appropriation and Oversight Committees on

**PRIVACY ACT REQUIREMENTS (P.L.93-579):**  The referenced forms are used to determine qualifications for promotion or employment and are authorized under Title 5 of the U.S. Code, Sections 3302 and 3361. Each form must be submitted to consider you for the position noted. The social security number is not required for this purpose and may be deleted.

**EVALUATION METHODS:** Review or evaluation of applications or personnel folders, performance appraisals, training, awards, and if necessary, personnel inquires, pre-employment reference checks, interviews, written tests, potential appraisals, and personnel investigations.

the agency's budget requests and reauthorizations, and must regularly communicate with the staffs of these organizations.

**QUALIFICATIONS:** There are five mandatory Executive Core qualifications that are common to all positions in the Senior Executive Service. There are also technical qualifications that are unique to this position. In order to be considered basically qualified, applicants must provide detailed evidence that their knowledge, skills, and abilities meet the mandatory executive core qualifications listed below.

## MANDATORY EXECUTIVE CORE QUALIFICATIONS (5):

1. **Leading Change** This core qualification encompasses the ability to develop and implement an organizational vision, which integrates key national and program goals, priorities, values, and other factors. Inherent to it is the ability to balance change and continuity--to continually strive to improve customer service and program performance within the basic Government framework, to create a work environment that encourages creative thinking, and to maintain focus, intensity and persistence, even under adversity. Key Characteristics of this qualification are as follows: (a) Exercising leadership and motivating managers to incorporate vision, strategic planning, and elements of quality management into the full range of the organization's activities; encouraging creative thinking and innovation; influencing others toward a spirit of service; designing and implementing new or cutting edge programs/processes; (b) Identifying and integrating key issues affecting the organization, including political, economic, social, technological, and administrative factors; (c) Understanding the roles and relationships of the components of the national policy making and implementation process, including the President, political appointees, Congress, the judiciary, state and local governments, and interest groups; and formulating effective strategies to balance those interests consistent with the business of the organization; (d) Being open to change and new information; tolerating ambiguity; adapting behavior and work methods in response to new information, changing conditions, or unexpected obstacles; adjusting rapidly to new situations warranting attention and resolution; (e) Displaying a high level of initiative, effort, and commitment to public service; being proactive and achievement-oriented; being self-motivated; pursuing self- development; seeking feedback from others and opportunities to master new knowledge; (f) Dealing effectively with pressure; maintaining focus and intensity and remaining persistent, even under adversity; recovering quickly from setbacks.

2. **Leading People** This core qualification involves the ability to design and implement strategies, which maximize employee potential and foster high ethical standards in meeting the organization's vision, mission, and goals. Key Characteristics of this qualification are as follows: (a) Providing leadership in setting the workforce's expected performance levels commensurate with the organization's strategic objectives; inspiring, motivating, and guiding others toward goal accomplishment; empowering people by sharing power and authority; (b) Promoting quality through effective use of the organization's performance management system (e.g., establishing performance standards, appraising staff accomplishments using the developed standards, and taking action to reward, counsel, or remove employees as

appropriate); (c) Valuing cultural diversity and other differences; fostering an environment where people who are culturally diverse can work together cooperatively and effectively in achieving organizational goals; (d) Assessing employees' unique developmental needs and providing developmental opportunities which maximize employees' capabilities and contribute to the achievement of organizational goals; developing leadership in others through coaching and mentoring; (e) Fostering commitment, team spirit, pride, trust, and group identity; taking steps to prevent situations that could result in unpleasant confrontations; (f) Resolving conflicts in a positive and constructive manner; this includes promoting labor/management partnerships and dealing effectively with employee relations matters, attending to morale and organizational climate issues, handling administrative, labor management, and EEO issues, and taking disciplinary actions when other means have not been successful.

3. **Results Driven** This core qualification stresses accountability and continuous improvement. It includes the ability to make timely and effective decisions and produce results through strategic planning and the implementation and evaluation of programs and policies. Key Characteristics of this core qualification are as follows: (a) Understanding and appropriately applying procedures, requirements, regulations, and policies related to specialized expertise; understanding linkages between administrative competencies and mission needs; keeping current on issues, practices, and procedures in technical areas; (b) Stressing results by formulating strategic program plans which assess policy/program feasibility and include realistic short- and long-term goals and objectives; (c) Exercising good judgment in structuring and organizing work and setting priorities; balancing the interests of clients and readily readjusting priorities to respond to customer demands; (d) Anticipating and identifying, diagnosing, and consulting on potential or actual problem areas relating to program implementation and goal achievement; selecting from alternative courses of corrective action, and taking action from developed contingency plans; (e) Setting program standards; holding self and others accountable for achieving these standards; acting decisively to modify them to promote customer service and/or the quality of programs and policies; (f) Identifying opportunities to develop and market new products and services within or outside of the organization; taking risks to pursue a recognized benefit or advantage.

4. **Business Acumen** This core qualification involves the ability to acquire and administer human, financial, material, and information resources in a manner which instills public trust and accomplishes the organization's mission, and to use new technology to enhance decision making. Key Characteristics of this core qualification are as follows: (a) Assessing current and future staffing needs based on organizational goals and budget realities. Applying merit principles to develop, select, and manage a diverse workforce; (b) Overseeing the allocation of financial resources; identifying cost-effective approaches; establishing and assuring the use of internal controls for financial systems; (c) Managing the budgetary process, including preparing and justifying a budget and operating the budget under organizational and Congressional procedures; understanding the marketing expertise necessary to ensure appropriate funding levels; (d) Overseeing procurement and contracting procedures and processes; (e) Integrating and coordinating logistical operations; (f) Ensuring the efficient and cost-effective development and utilization of management information systems and other

technological resources that meet the organization's needs; understanding the impact of technological changes on the organization.

5. **Building Coalitions/Communication** This core qualification involves the ability to explain, advocate and express facts and ideas in a convincing manner, and negotiate with individuals and groups internally and externally. It also involves the ability to develop an expansive professional network with other organizations, and to identify the internal and external politics that impact the work of the organization. Key Characteristics of this core qualification are as follows: (a) Representing and speaking for the organizational unit and its work (e.g., presenting, explaining, selling, defining, and negotiating) to those within and outside the office (e.g., agency heads and other Government executives; corporate executives; Office of Management and Budget officials; Congressional members and staff; the media; clientele and professional groups); making clear and convincing oral presentations to individuals and groups; listening effectively and clarifying information; facilitating an open exchange of ideas; (b) Establishing and maintaining working relationships with internal organizational units (e.g., other program areas and staff support functions); approaching each problem situation with a clear perception of organizational and political reality; using contacts to build and strengthen internal support bases; getting understanding and support from higher level management; (c) Developing and enhancing alliances with external groups (e.g., other agencies or firms, state and local governments, Congress, and clientele groups); engaging in cross-functional activities; finding common ground with a widening range of stakeholders; (d) Working in groups and teams; conducting briefings and other meetings;  gaining cooperation from others to obtain information and accomplish goals; facilitating 'win-win' situations; (e) Considering and responding appropriately to the needs, feelings, and capabilities of different people in different situations; is tactful and treats others with respect; (f) Seeing that reports, memoranda, and other documents reflect the position and work of the organization in a clear, convincing, and organized manner.

## MANDATORY TECHNICAL/PROFESSIONAL QUALIFICATION (3)

1. In-depth knowledge of and experience with governmental financial management including: the federal budget process, and financial accounting and reporting concepts and principles.

2. Broad knowledge of modern financial management techniques involved in the design, implementation, integration, operation, or evaluation of financial management systems.

3. Knowledge of Federal financial management programs and legislation.

## DESIRABLE TECHNICAL QUALIFICATIONS (3)

1. Demonstrated success in leading a financial management organization and implementing JFMIP guidance and the intent of major legislation impacting this discipline including: FMFIA, CFO Act, GPRA, GMRA and FFMIA.

2. An understanding of the roles and relationships of various national financial management policy making and implementation processes involving components such as the Office of the General Accounting Office, the Office of Management and Budget, Treasury, Joint Financial Management Improvement Program, General Services Administration, etc.

3. Experience in managing financial operations activities particularly accounting operations and budget execution. Experience in conducting internal audits and reviews and meeting FMFIA requirements.

## EVALUATION OF CANDIDATES:

1. The Human Resources representative will review all applications to determine whether basic eligibility has been met. To meet basic eligibility, applicants must possess the mandatory Executive Core qualifications.

2. All basically qualified candidates will be referred to the NTSB Executive Resources Board (ERB) for further consideration. The ERB will group the candidates into broad categories of best qualified, qualified and not qualified. The best qualified candidates will be forwarded to the selecting official for selection.

3. The selecting official may interview any or all of the best qualified candidates and will forward a recommendation to the Chairman or his designee for final approval. The Chief, Human Resources Division will forward the selection to the Office of Personnel Management for qualifications approval, if required.

4. Applicants with career appointments in the SES, SES reinstatement eligibles and certified SES Candidate Development Program Graduates need only address the professional/technical qualification requirements as their overall executive qualifications have already been certified.

## OTHER SIGNIFICANT FACTS:

- U.S. citizenship required.

- The NTSB is an equal opportunity employer. Non-merit factors such as sex, race, age, color, national origin, religion, etc., will not be considered. Interviews and qualification inquiries will be required.

- The law authorizes the granting of special recognition, awards, and incentive payment to members of the SES to help retain, recognize, reward, and motivate highly competent executives. Specifically, these payments and forms of recognition include: Presidential Distinguished and Meritorious rank awards; agency performance awards (bonuses), and superior accomplishment incentive awards.

- Appointees newly selected for appointment to the SES must have their executive core qualifications approved by the Office of Personnel Management and will be subject to a one year probationary period.

- Veterans preference does not apply in the SES.

- **All eligibility requirements must be met by the closing date of this announcement.**

- **Applications must be postmarked by the closing date of the announcement.**

## HOW TO APPLY:

All applicants must submit an application for consideration.   The following documents are acceptable: OF-612, Optional Application for Federal Employment, a resume or other available application format.  Be brief and concise, but inclusive in the description of your work experience. Forward application to:  National Transportation Safety Board,   Human Resources Division (MD-30), 490 L'Enfant Plaza, East, S.W., Washington, D.C.  20594.

1.   Submit three (3) copies of the application.

2.   Submit three (3) copies of a Qualifications Brief, which is a statement indicating how your experience, education, training, awards, and/or self-development activities meet the qualifications requirements listed above.  The Qualifications Brief must cover the Mandatory Executive Core Qualifications, Mandatory Professional/Technical Qualifications and the Desirable Technical Qualifications.  Format the brief so that each requirement is individually addressed.  It must provide sufficient information, including examples of work assignments, projects, etc., to determine whether or not you are qualified for the position.

3.   Submit three (3) copies of your most recent performance appraisal.

4.   Include the following information in your application package:

**JOB INFORMATION:**   Announcement number, job title and grade level of the position for which you are applying.

## PERSONAL INFORMATION:

- Full Name, mailing address (with zip code) and day and evening telephone numbers (with area code).

- Social Security Number.

- Country of Citizenship.

- Your highest Federal civilian grade, job series and the dates held, if applicable.

- Eligibility under special hiring authority. (Indicate the basis for any eligibility and attach appropriate documentation).

## EDUCATION:

- High School information - Name of School, City, State, (Zip Code, if known) and date of diploma or GED.

- College/University information - Name of School(s), City, State, (Zip Code, if known), majors, type of degree(s) received (if no degree, show total credits earned and indicate whether semester or credit hours).

- If you qualify based on education, submit a transcript or list of courses (with credit hours), majors and grade-point average or class rank.

## WORK EXPERIENCE:

Describe your paid and non-paid work related to the position for which you are applying, including the knowledge, skills, abilities identified for this position and how you meet them. The qualification requirements must be evident in experience and/or training. For each position, include the following information:

- Your Position title (including job series and grade, if a Federal job).

- Employer's name and address.

- Supervisor's name and telephone number. (Indicate whether we may contact your current supervisor for reference purposes).

- Dates you started and ended each job.

- The number of hours worked per week.

- Your starting and ending salaries.

- Duties and accomplishments.

## OTHER QUALIFICATIONS:

- Job-related training courses completed within the last 3 years (list title, hours and date completed).

- Job-related skills (other languages, computer software/hardware skills, etc.).

- Job-related honors, awards and special accomplishments received within the last 3 years. For example: publications, memberships in professional or honor societies, leadership activities, public speaking and performance awards (give dates but do not send documents unless requested).

## CONDITIONS OF EMPLOYMENT:

- Job finalist will be asked to sign and certify the accuracy of all information they provide and to authorize a background investigation.

- A false statement in a part of your application may be grounds for not hiring you, or for firing you after you begin work, and may be punishable by law.

- Males born after December 31, 1959, must be registered with the Selective Service System or have a valid exemption to be eligible for Federal employment. If you receive a military or civilian annuity from the Federal government, your salary or annuity may be reduced if you take a Federal job.

- If you have any delinquent debts, you must repay those debts or face garnishment of your salary.

- Subject to satisfactory completion of a background investigation and eligibility for a security clearance.

**The NTSB is an Equal Opportunity and Reasonable Accommodation Employer: Except where otherwise provided by law, all candidates will be considered without discrimination for any non-merit reason such as race, color, religion, gender, sexual orientation, age, national origin, political affiliation, marital status, disability, or membership or non-membership in an employee organization.**

\* \* \*

**EXHIBIT F20**

OPTIONAL APPLICATION FOR FEDERAL EMPLOYMENT

(OF 612 -- Form Approved: OMB No. 3206-021)

You may apply for most jobs with a resume, this form, or other written
format.  If your resume or application does not provide all the
information requested on this form and in the job vacancy announcement,
you may lose consideration for a job.

==================================================================

1.  JOB TITLE IN ANNOUNCEMENT: Chief Financial Officer, ES-501

2.  GRADE(S) APPLYING FOR:  ES-1 $115,811  ES-4 $130,200

3.  ANNOUNCEMENT NUMBER:  WA-TB-1-007

4.  LAST NAME: Miller               FIRST, MIDDLE: Richard Lloyd

5.  SOCIAL SECURITY NUMBER:

6.  MAILING ADDRESS:

    CITY/STATE/ZIP:

7.  PHONE NUMBERS (include area code)  DAYTIME: 202/314-6041

                              EVENING:

==================================================================

8.  WORK EXPERIENCE: Describe your paid and nonpaid work experience
        related to the job for which you are applying. (Do not attach job
        descriptions)

1)  JOB TITLE (If Federal,
    include series and grade):    Financial Management Specialist/TWA Management
Coordinator

        FROM (MM/YY): 06/99        TO (MM/YY): Present

        SALARY: $ Daily-GS-14/10 Rate per yr.    HOURS PER WEEK: 50+

        EMPLOYER'S NAME:  National Transportation Safety Board

        AND ADDRESS:  490 L'Enfant Plaza East, SW
                      Washington, D.C. 20594

        SUPERVISOR'S NAME:  Mitch Levine

            AND PHONE:  314-6210

------------------------

Miller, R. ████████████

### DESCRIBE YOUR DUTIES AND ACCOMPLISHMENTS:

As member of the CFO Management Team, advised the Chief Financial Officer (CFO) on various issues including financial management, CitiBank, Price Waterhouse, strategic planning within the CFO organization and the subsequent off-site planning sessions, the selection of a new Travel Management contract, management issues, and accountability issues.

Assisted the CFO in review of the DOT IG Report and Price Waterhouse drafts in response to the IG's report and the follow-up requirements.

Developed and promoted importance of written "rules", communication and accountability with Approving Officials, Office Directors, and employees. Assisted the CFO in the preparation of a 50-page Power Point Presentation on Financial Management at the NTSB: Spending Government Funds, the DOT IG Audit and Investigation and Government Credit Cards. Twelve information/training sessions were conducted at Headquarters with video conferencing to the Regions. My role during the training was that of subject matter expert.

After an extensive needs assessment of NTSB employees, it was determined that agency-wide training was needed on small purchases. In addition to acquiring a contractor, we also developed a small purchase manual. The delivery modality here also included video conferencing and overseeing overall logistics.

Produced a CFO Web page that is inclusive of the most pertinent CFO information including budget, accounting, travel, travel card, purchase card and Small Purchase issues.  The Web site includes electronic access to the NTSB Budget, GSA's Federal Travel Regulations, necessary financial forms, Small Purchases Training Manual, and NTSB financial orders. In the planning stages are sections for the financial management systems (SMS), and frequently-asked questions.

Established further understanding of the CitiBank Travel Card/Purchase Card with the Approving Official, Office Directors, and employees.  This was done in Approving Official meetings, scheduled training, and on an individual basis.

Established a good working relationship with CitiBank and its training contractor, AOL.  Promoted and secured direct account access on site for card users.  We have held four sessions of training for Approving Officials and employees who are now able to access their CitiBank Government Card accounts on line from anywhere in the world.  Working with the Labor Relations staff, assisted in reducing the number of suspensions, late payments, and delinquencies of the Credit Cards.  We have been told that we have one of the best Purchase Card programs in the Federal government.

Rewrote the Board's Travel Order and Purchase Card Order (currently ready for MD's review). Key advisor on the rewrite of the Travel Order (currently in MD review). These are three of the approximately 4 Board Orders that have been revised since 1995. The Purchase Card Order was the result of a comprehensive analysis and review of the Purchase Card policies and procedures of selected agencies, i.e., Interior, GAO, FBI, Smithsonian, and VA.

Miller, R

In response to the DOT IG report, promoted the use of "cross servicing" of some financial systems by another Federal agency. We have signed a contract with the Veteran's Administration's Financial Service Center in Austin Texas to cross service and audit FY 2000 travel vouchers and to service current travel needs through Travel Manager. We began a pilot in August and provided training for users. Due to some unsettled problems at VA with Travel Manager, we are now scheduled to begin this pilot before the end of the year and scheduled for full production by March 1. This cross servicing will provide greater financial accountability, quicker (3-day) reimbursement for employees, and post audit of travel vouchers. Worked closely with the financial systems accountant for future needs, between the two data bases. When this work in progress in finished, NTSB will be one of the first federal agencies using Travel Manager with access through the Internet. This will move the NTSB from an almost completely manual use of Travel Manager to a fully interactive electronic system capability.

Promoted some of the first use of the video conferencing at NTSB. We had weekly video conferencing with the TWA site in Long Island during the summer of 1999. More recently, we have had the conferencing to the nine regional offices for the Small Purchase Training. The video conferencing allows back and forth questions between the instructor and the employees in the regions. The later conferencing saved the agency approximately $20,000.

Assisted with the Senate Commerce Committee in the passage of the five-year NTSB Reauthorization Bill.

Simultaneously managed three complex government contracts to relocate the TWA Flight 800 Wreckage out of the main hangar at the Calverton facility in New York. These tasks were an integral component of saving the government $3 million annually. These contracts entailed the movement of the largest wreckage reconstruction in the world, one which will serve as part of the primary focus for the NTSB Training Academy. This three-month field assignment involved daily liaison and coordination between state and local officials, contractors, the Investigator-In-Charge and other agency officials. As the on-site coordinating official, I was responsible for ensuring that the wreckage was relocated safely and within the contracts' schedule and budget parameters. This task required daily conferences with contractor and agency officials to ensure that the necessary actions were being taken to ensure that the wreckage was properly crated in sea containers, key components such as the reconstructed 747 and engines were retained for use at the future NTSB Training Academy, and that other wreckage components were properly documented for storage. Simultaneously managed contract on scene with a film documentary company that the Board hired to provide historical documentation of each recovered wreckage piece and film multiple interviews with the Materials Laboratory Division Chief for possible use at the TWA Board meeting. Assisted the Managing Director in developing this necessary documentation process and the statement of work. Since successfully completing these tasks, I developed the agency's procedures to bring it into compliance with the requirements of the Federal Activities Inventory Reform (FAIR) Act of 1998. Researched the statute, reviewed OMB guidelines, and analyzed compliance procedures developed by other Federal agencies. Drafted the transmittal letter to OMB for signature. These procedures were developed in coordination with the General Counsel's office and in consultation with Office Directors and the Managing Director's office. These procedures fulfilled NTSB reporting requirements under the law.

Miller, R. ▓▓▓▓▓▓▓▓▓

Implemented and now manage the agency federal credit card programs. Developed oversight policies and procedures for both the CitiBank Purchase Card/Convenience Checks and Travel Card Programs. Formulated the training strategy on the purchase cards and presented the majority of the training sessions given to IICs and Administrative Officers.  Coordinated regional office training and conducted one-on-one training sessions with individuals responsible for complying with CitiBank Purchase Card requirements.

Assisted the CFO on various budget, administrative, and board-wide management issues. Management coordinator for the CitiBank Individual Travel and Centrally Billed Travel Cards and formulated policy guidelines and training on card use procedures.  Evaluated the effectiveness of agency-wide financial management initiatives and ensured integrity of the program.  Participated in the preparation and evaluation of NTSB Requests for Proposals (RFPs) and Memorandums of Understandings, including those issued on soliciting location sites for Training Academy, procuring private audit services with Price Waterhouse, and VA Cross-Servicing from other agencies.

One of four individuals chosen to serve on the Training Academy Development Team.  This team was charged with identifying and analyzing the development needs of the Training Academy. Obtained, and reviewed, the available academy documentation including six statements of work. Evaluated the proposals to determine weaknesses and strengths. Reviewed the Board's capability to issue an RFP, and reestablished the Board's relationship on the Training Academy with the General Services Administration (GSA).  Assisted the Project Leader on the development of a new statement of work and Memorandum of Understanding for GSA to issue an RFP on the Training Academy.

Miller, R. ~~████████~~

2) JOB TITLE (If Federal,
include series and grade):  Special Assistant for Budget & Programs, GS-15

FROM (MM/YY):  03/82        TO (MM/YY):  08/88
           ------------            ------------

SALARY: $ 56,000      per year      HOURS PER WEEK:  +50
        ------------    --------                    --------

EMPLOYER'S NAME:  U.S. Department of Transportation
                 ------------------------------------------------------

AND ADDRESS:      400 7th Street, S.W.
                  Washington, D.C.  20590
                 ------------------------------------------------------

SUPERVISOR'S NAME:  Janet Hale
                   ----------------------------------

        AND PHONE:  N/A


DESCRIBE YOUR DUTIES AND ACCOMPLISHMENTS:


Assisted the Assistant Secretary for Budget & Programs, and at selected times
the Deputy Secretary and Secretary, as advisor on development, review, and
presentation of the Department's budget resource requirements and on the
evaluation and oversight of the Department's programs.  Responsible for
reviewing the impact and programs in achieving their objectives, advising on
major problem areas that impede attainment of departmental program plans and
objectives, and advising on program and legislative changes necessary to resolve
them.  Responsible for coordinating the impact on departmental resources of
legislative and other proposals, establishing procedures for development of
long-range budgetary resource planning, making recommendations on the budget and
program areas, and various other financial management systems issues.

As Special Assistant to the Assistant Secretary for Budget and Programs
performed a variety of high priority, sensitive and complex assignments
involving transportation policy, planning, application of economic analysis,
financial management, and decision-making matters.

Developed, coordinated, staffed and reviewed materials for pending Secretarial
decisions.  Supported the Assistant Secretary in policy formulation and decision
making in selected areas.  Reviewed, assessed, and recommended policy option
proposals presented to the Assistant Secretary by other Office of the Secretary
(OST) offices or operating administrations.  Assured that documents were well
coordinated staffed out for appropriate input from all concerned parties and set
stringent response deadlines.  Represented the Assistant Secretary, and as
assigned, the Deputy Secretary's Office in Departmental meetings involving
senior officials.  Managed the Department's Reception and Representation Fund
for the Assistant Secretary.  Prepared, coordinated and reviewed Secretarial
briefing materials and Congressional testimony as well as speeches for the
Assistant Secretary.

Miller, R. ~~███████████~~

Developed and coordinated the Financial Plan for the Office of the Secretary which contributed significantly to the effective and prudent management of OST funds. Reviewed, analyzed and presented recommendation on all reprogramming of funds to the Assistant Secretary. Prepared monthly status reports on budget execution including a mid-year fiscal policy review which incorporated discussion of fiscal management implications for future spending plans. Assisted the Assistant Secretary in the development of the organizational structure, the associated grade assignments and staffing patterns and procurement contract for the two newly created OST offices—Delegation on Multilateral Pricing and Commercial Space Transportation.

Represented the Assistant Secretary on the Departmental University Research Board, Historical Black Colleges, the General Services Administration (GSA)'s Federal Field Structure Intra-Agency Working Group; served as point man and coordinator for the Assistant Secretary in his role as Chairman of the DOT Navigation Council. Represented the Chairman at Departmental, Inter-Agency and private sector meetings and reviewed inter-agency policy proposals on future navigation systems.

Prepared, reviewed and coordinated Secretarial trip briefing materials, Congressional testimony, speeches, budget justifications, and issue "one pagers" for the Secretary's 30-60-90 Day Agenda and the Secretary's General Issues Book in a timely, professional and exacting manner.

As Co-Chair of the DOT's Private Sector Initiative (Government-wide White House's Initiative) prepared, coordinated, and reviewed documents relating to the Department's program; prepared quarterly reports to the White House on these agency-wide matters. Established "Adopt a Seniors" program at Headquarters and "Adopt a School" and Volunteerism program at Headquarters and in the regional offices. At that time, it was noted that DOT's Volunteerism program was a model for other federal agencies; in fact, the "Adopt a School" program received the District of Columbia Award for Excellence.

Selected to lead a management review for the Secretary of the operation of the U. S. Coast Guard, particularly its safety role with emphasis on the Search and Rescue Program.

Organized the first Federal agency day care center without using government operational funding. Analyzed financial requirements for the operation of the center and established day care fees based on that examination. A sliding fee based on income was created for the employees. Prepared, coordinated, and reviewed documents relating to the Department's Private Sector Initiatives and assisted in the preparation of reports for the White House on the Department's program.

Miller, R. ~~XXXXXXXXXX~~

9.  MAY WE CONTACT YOUR CURRENT SUPERVISOR? (If we need to        YES [x]
    contact your current supervisor before making an offer,
    we will contact you first.)                                  NO  [ ]


    EDUCATION

10.  MARK HIGHEST LEVEL COMPLETED: Some HS  [] Bachelor []HS/GED [] Master   [x]
                                    Associate []      Doctoral []


11.  LAST HIGH SCHOOL or GED SCHOOL:   Yadkinville High School
                 ------------------------------------
            CITY/STATE/ZIP(if ZIP known): Yadkinville, North Carolina  27055
                                 ------------------------------------
            YEAR DIPLOMA or GED RECEIVED: 1967
                                 -------

12.  COLLEGES AND UNIVERSITIES ATTENDED (Do not attach a copy of your
     transcript unless requested.)

     1)  NAME:   Southern Illinois University/Edwardsville
             ------------------------------------------------------------
         CITY/STATE/ZIP: Edwardsville, Illinois  62029
                         ----------------------------------------
         SEMESTER CREDITS EARNED:         MAJOR(S): Public Administration
                     (or)        ------        ----------------------

         QUARTER CREDITS EARNED:
                                 ------        ----------------------
         DEGREE (If any): MPA         YEAR RECEIVED: 1974
                          --------------------------        -------


     2)  NAME:  University of North Carolina at Chapel Hill
             ------------------------------------------------------------
         CITY/STATE/ZIP:  Chapel Hill, North Carolina  27541
                         ---------------------------------------------
         SEMESTER CREDITS EARNED:         MAJOR(S): English
                     (or)        ------        ----------------------
         QUARTER CREDITS EARNED:
                                 ------        ----------------------
         DEGREE (If any): BA          YEAR RECEIVED: 1971
                          -------        -------

Miller, R~~████████████~~

3) NAME:                   -----------------------------------------------------

                CITY/STATE/ZIP:
                                -----------------------------------------------------
                SEMESTER CREDITS EARNED:        MAJOR(S):
                      (or)           ------              ----------------------
                QUARTER CREDITS EARNED:
                                      ------              ----------------------
                DEGREE (If any):                     YEAR RECEIVED:
                                ------------------------         -------

                ===================================================================

        OTHER QUALIFICATIONS


13. Job-related training courses (give title and year).  Job-related
    skills (other languages, computer software/hardware, tools,
    machinery, typing speed, etc.).  Job-related certificates and
    licenses (current only).  Job-related honors, awards, and special
    accomplishments (publications, memberships in professional/honor
    societies, leadership activities, public speaking, and performance
    awards).  Give dates, but do not send documents unless requested.

Training: Piedmont Triad Leadership Program Graduate (1999); Rural Economic
Development Leadership Institute Graduate (1998); Regional Appalachian Regional
Commission Leadership Institute Graduate (1998); Institute of Political
Leadership Program Graduate (1997); Various Management Courses at University of
NC-Chapel Hill's Institute of Government;

Computer Skills: Proficient in: MSWord, Excel, WordPerfect, Lotus 123, Outlook,
and Internet use.  Knowledge of: PowerPoint, Access

Memberships:  National Association of County Officials: National Transportation
& Telecommunications Steering Committee; North Carolina Association of County
Commissioners: Intergovermental Steering Committee, Long Range Strategic
Planning Steering Committee, Tax and Finance Committee; Piedmont Triad
Partnership/State Regional Economic Development; Yadkin County Public Library
Board; Northwest Regional Library Board: Finance and Nominating Committee;
Yadkin County Arts Council; Yadkin County Historical Society; Northwest Piedmont
Council of Governments; Northwest Regional Aging Council; Surry County Housing
Consortium; Community Block Grant Committee; Founder, Yadkin Heritage 2000;
Founder, Vice-Chairman Yadkin County Sesquicentennial Commission;  E-911
Committee; Smart Start Partnership; Rural Transportation Advisory Committee.

Miller, R. ▓▓▓▓▓▓▓▓

Other:  Frequent guest presenter, symposium.


GENERAL:

14.  ARE YOU A U.S. CITIZEN? ....................... YES [x ]  NO [ ]
     If NO, give the country of your citizenship:

                                        ----------------------

15.  DO YOU CLAIM VETERANS' PREFERENCE? ............ YES [ ]  NO [x ]
     If YES, mark your claim of 5 or 10 points below:
               5 POINTS [ ] -- Attach your DD 214 or other proof.
              10 POINTS [ ] -- Attach an Application for 10-Point Veterans'

               Preference (SF 15) and proof required.


16.  WERE YOU EVER A FEDERAL CIVILIAN EMPLOYEE? ..... YES [x ]  NO [ ]
     If YES, for Highest Civilian Grade give:

     SERIES:  301     GRADE: 15-3     FROM (MM/YY): 1/86    TO (MM/YY): 1/90
              -------         -----            ------              ------


17.  ARE YOU ELIGIBLE FOR REINSTATEMENT BASED ON
     CAREER OR CAREER-CONDITIONAL FEDERAL STATUS? ... YES [ ]  NO [x ]
     If requested, attach SF 50 proof.



APPLICANT CERTIFICATION

18.  I certify that, to the best of my knowledge and belief, all of the
     information on and attached to this application is true, correct,
     complete and made in good faith.  I understand that false or fraud-
     ulent information on or attached to this application may be grounds
     for not hiring me or for firing me after I begin work, and may be
     punishable by fine or imprisonment.  I understand that any informa-
     tion I give may be investigated.




     SIGNATURE: _Richard L. Miller_____     DATE SIGNED: _12/01/00_

Supplemental Information for OF 612 Application

Name: Name: Richard L. Miller
      S.S. Number: ▮▮▮▮▮▮▮▮▮▮

Job Title:  Commissioner, Yadkin County Board of Commissioners (Elected)
From: (11-96)    To: (present)    Salary: N/A    Hours per week:

Elected in the December 1996 general election to a four-year term (expires
December 2000, top vote numbers in both the primary and general election).
Provide direct oversight for $24 million budget of the county's financial plans
and management.  Review and approve, or disapprove, budget requests from county
agencies based on independent analysis.  Provide leadership and guidance on
county administrative policies.  Review contract submissions and approve, or
disapprove, as determined including infrastructure investments and personnel
management issues.  Direct the development of policies and practices to insure
countywide compliance with Federal and state rules and regulations.  Speak at
public events on behalf of the County, County Commissioners, and regional
planning initiatives.  Serve on numerous local, regional, state and national
organizations to advance opportunities for citizens of both the county and the
region.  Focus efforts on charting the county's transition from a rural,
tobacco-dominated economy to a fast growing high-tech environment.

Job Title:  Financial Advisor, Ministry of Finance & National Economy, Kingdom
of Saudi Arabia

From:  (9/88-1/90)    Grade: FC12/GS-15    Salary: $65,000  Hours per week: 40

Served as the principal U.S. advisor on a project in the Kingdom of Saudi Arabia
to create a systems-based, unified budget for Saudi Arabia.  Identified methods
for the Saudi Arabian government to accurately assess the short- and long-term
budget effect of infrastructure development projects and various financial
management and financial reporting systems.  Development of the budget tracking
system was necessary because Saudi oil revenues were not keeping pace with
government expenditures.  Both diplomatic tact and budget management expertise
were required in order to bring the project to its successful completion.

Job Title:  Chairman/Chief Financial Officer
From: (1989)    To: (1992)        Salary: Family Business Hours per week: 50+

Employers's name and address:  Yadkin Lumber Company
                               Yadkinville, N.C. 27055

Served as Chairman, and Chief Financial Officer, of a 40-year old lumber
company.  Initiated a complete review of the company's operating procedures and
analyzed the business' financial controls.  Met with business development
experts and market analysts.  Revived business relationships with home
contractors and developed new relationships with commercial
contractors/developers based on personal construction and economic development
experience.  Based on independent research and review, as well as many meetings
with company employees and management officials, designed and implemented a plan
to expand commercial sales and create more efficient inventory practices at the
company.  As a result of the plan's implementation, gross sales increased by 14
percent, gross profits rose by 47 percent, and net profit improved by 44
percent.  These improvements were achieved despite an economic downturn in the
regional economy.  Introduced computers and reporting financial systems that
greatly enhanced productivity and overall customer service.

Supplemental Information for OF 612 Application

Name: Name: Richard L. Miller
      S.S. Number: ▆▆▆▆▆▆▆▆

Job Title: Senior Budget Analyst
From (01/75)    To: (02/82) Salary: $40,000    Hours per week +40

Employer's name and address:   Congressional Budget Office
                               Washington, D.C. 20515

Helped develop procedures to implement the requirements of the Congressional
Budget and Impoundment Act of 1974 at the newly created Congressional Budget
Office.  These duties included identifying difficulties committees/agencies
could experience in complying with the law's fiscal year change and developing
financial models and systems to track agency budget authority and outlays.
Established goals and measurable performance objectives to achieve the financial
accountability requirements of the Act.  Created procedures to systematically
coordinate Federal budget requirements with the Office of Management and Budget,
Federal Agencies, and House and Senate Budget Committees which helped enable the
successful implementation of the new budget process and a smooth transition.
Reviewed Office of Management and Budget submissions for technical accuracy and
consistency while working with OMB resource management offices to resolve any
identified problems.  Directed an analysis of Congressional budget management
information systems and its inter-relationship with OMB databases.


Job Title:  Enterprise Agent (part-time), Micro Enterprise Lending Program
From: (1992)    To: (1994)       Salary: $8 per hr   Hours per week: 30

Employer's name address:       Yadkin Valley Economic Development District
                               Boonville, N. C. 27065

Marketed, and supervised, the adoption of a program that promoted self-
employment, small business expansion, and economic independence throughout a
four-county area in North Carolina.  Developed targeted training activities with
the community college, trained groups and identified financial resources to
promote local employment, business creation and economic independence for
disadvantaged individuals traditionally excluded from entrepreneurial ventures.
Cooperatively worked with diverse regional organizations and developed
partnerships with community colleges, civil organizations, volunteers, and
businesses to broaden access to the banking community for individuals who wanted
to open small businesses.  Succeeded in identifying financial resources for
individuals to create businesses without government subsidized loans.  Served on
a statewide committee to develop and identify additional assistance
opportunities for micro-business industries.  Established a 15-member Loan
Review Committee composed of bankers, successful business entrepreneurs and
community leaders who made monetary commitments to finance loans.  Assisted on
county/regional strategic planning and economic development programs.  Advised
the Director on financial management, financial reporting systems for various
programs, including Head Start and Meals on Wheels.

Job Title:  Private Consultant
From:  (1995)    To: (1999)         Salary:        Hours per week: 50+

Established a private consultant company that provided strategic planning
advice, financial management and communication services for small businesses.

Miller, R

# Qualifications Brief

## Mandatory Executive Core Qualifications

### Leading Change

**1.)** As member of the CFO Management Team, advised the Chief Financial Officer (CFO) on various issues including financial management, CitiBank, Price Waterhouse, strategic planning within the CFO organization and the subsequent off-site planning sessions, the selection of a new Travel Management contract, management issues, and accountability issues.

Assisted the CFO in review of the DOT IG Report and Price Waterhouse drafts in response to the IG's report and the follow-up requirements.

Developed and promoted importance of written "rules", communication and accountability with Approving Officials, Office Directors, and employees. Assisted the CFO in the preparation of a 50-page Power Point Presentation on Financial Management at the NTSB: Spending Government Funds, the DOT IG Audit and Investigation and Government Credit Cards. Twelve information/training sessions were conducted at Headquarters with video conferencing to the Regions. My role during the training was that of subject matter expert.

After an extensive needs assessment of NTSB employees, it was determined that agency-wide training was needed on small purchases. In addition to acquiring a contractor, a Small Purchase manual was developed. The delivery modality here also included video conferencing and overseeing overall logistics.

Produced a CFO Web page that is inclusive of the most pertinent CFO information including budget, accounting, travel, travel card, purchase card and Small Purchase issues. The Web site includes electronic access to the NTSB Budget, GSA's Federal Travel Regulations, necessary financial forms, Small Purchases Training Manual, and NTSB financial orders. In the planning stages are sections for the financial management systems (FMS), and frequently-asked questions.

I assisted with the development and implementation of a decentralized budget process by working with the various Office Directors ensuring their comfort level with the new budgetary authority bestowed on them through the decentralization process.

Miller, R███████████

With an eye towards creating community empowerment, I marketed, and supervised, the adoption of a program that promoted self-employment, small business expansion, and economic independence throughout a four-county area in North Carolina. Developed targeted training activities with the community college, trained groups and identified financial resources to promote local employment, business creation and economic independence for disadvantaged individuals traditionally excluded from entrepreneurial ventures. Cooperatively worked with diverse regional organizations and developed partnerships with community colleges, civil organizations, volunteers, and businesses to broaden access to the banking community for individuals who wanted to open small businesses. Succeeded in identifying financial resources for individuals to create businesses without government subsidized loans. Served on a statewide committee to develop and identify additional assistance opportunities for micro-business industries. Established a 15-member Loan Review Committee composed of bankers, successful business entrepreneurs and community leaders who made monetary commitments to finance loans. Assisted on county/regional strategic planning and economic development programs.

In keeping with the GPRA and related initiatives, I led the revamping of internal financial accounting guidelines and procedures, resulting in uniform practices and savings of considerable funds. One example, exposed and corrected probable fraud and irregularities through internal audit and analysis of financial accounting systems in double counting in the federal Head Start Program, the federal/state USDA "Meals-on-Wheels" Program, senior citizen centers, and the federal/state Rural Transportation Delivery Grants.

In response to the DOT's IG investigations, particular concern was raised over the use of Rapid Drafts. Working with appropriate staff and program managers, I quickly responded by designing and developing a Purchase Card Program with accompanying training. This program has grown and evolved into one of the best in the federal government.

Selected to participate in the following professional leadership endeavors: Piedmont Triad Leadership Program Graduate (1999); Rural Economic Development Leadership Institute Graduate (1998); Regional Appalachian Regional Commission Leadership Institute Graduate (1998); Institute of Political Leadership Program Graduate (1997); Various Management Courses at University of NC-Chapel Hill's Institute of Government.

Miller, R

## Leading People

**2.)** Elected in the December 1996 general election to a four-year term (expires December 2000, top vote numbers in both the primary and general election). Provide direct oversight for $24 million budget of the county's financial plans and management. Review and approve, or disapprove, budget requests from county agencies based on independent analysis. Provide leadership and guidance on county administrative policies. Review contract submissions and approve, or disapprove, as determined including infrastructure investments and personnel management issues. Direct the development of policies and practices to insure countywide compliance with Federal and state rules and regulations. Speak at public events on behalf of the County, County Commissioners, and regional planning initiatives. Serve on numerous local, regional, state and national organizations to advance opportunities for citizens of both the county and the region. Focus efforts on charting the county's transition from a rural, tobacco-dominated economy to a fast growing high-tech environment and within the existing budget.

Marketed, and supervised, the adoption of a program that promoted self-employment, small business expansion, and economic independence throughout a four-county area in North Carolina. Developed targeted training activities with the community college, trained groups and identified financial resources to promote local employment, business creation and economic independence for disadvantaged individuals traditionally excluded from entrepreneurial ventures.

Developed and promoted importance of written "rules", communication and accountability with Approving Officials, Office Directors, and employees. Assisted the CFO in the preparation of a 50-page Power Point Presentation on Financial Management at the NTSB: Spending Government Funds, the DOT IG Audit and Investigation and Government Credit Cards.

After an extensive needs assessment of NTSB employees, it was determined that agency-wide training was needed on small purchases. In addition to acquiring a contractor, a Small Purchase manual was developed. The delivery modality here also included video conferencing and overseeing overall logistics. Twelve information/training sessions were conducted at Headquarters with video conferencing to the Regions. My role during the training was that of subject matter expert.

Simultaneously managed three complex government contracts to relocate the TWA Flight 800 Wreckage out of the main hangar at the Calverton facility in New York. These tasks were an integral component of saving the government $3 million annually. These contracts entailed the movement of the largest wreckage reconstruction in the world, one which will serve as part of the primary focus for the NTSB Training Academy. This three-month field assignment involved daily liaison and coordination between state and local officials, contractors, the Investigator-In-Charge and other agency officials. As the on-site coordinating official, I was responsible for ensuring that the wreckage was relocated safely and within the contracts' schedule and budget parameters. This task

Miller, R████████████

required daily conferences with contractor and agency officials to ensure that the necessary actions were being taken to ensure that the wreckage was properly crated in sea containers, key components such as the reconstructed 747 and engines were retained for use at the future NTSB Training Academy, and that other wreckage components were properly documented for storage. Simultaneously managed contract on scene with a film documentary company that the Board hired to provide historical documentation of each recovered wreckage piece and film multiple interviews with the Materials Laboratory Division Chief for possible use at the TWA Board meeting. Assisted the Managing Director in developing this necessary documentation process and the statement of work.

Established "Adopt a Seniors" program at Headquarters and
"Adopt a School" and Volunteerism program at Headquarters and in the regional offices. At that time, it was noted that DOT's Volunteerism program was a model for other federal agencies; in fact, the "Adopt a School" program received the District of Columbia Award for Excellence.

## Results Driven

**3.)** Simultaneously managed three complex government contracts to relocate the TWA Flight 800 Wreckage out of the main hangar at the Calverton facility in New York. These contracts entailed the movement of the largest wreckage reconstruction in the world, one which will serve as part of the primary focus for the NTSB Training Academy. This three-month field assignment involved daily liaison and coordination between state and local officials, contractors, the Investigator-In-Charge and other agency officials. As the on-site coordinating official, I was responsible for ensuring that the wreckage was relocated safely and within the contracts' schedule and budget parameters. This task required daily conferences with contractor and agency officials to ensure that the necessary actions were being taken to ensure that the wreckage was properly crated in sea containers, key components such as the reconstructed 747 and engines were retained for use at the future NTSB Training Academy, and that other wreckage components were properly documented for storage. Simultaneously managed contract on scene with a film documentary company that the Board hired to provide historical documentation of each recovered wreckage piece and film multiple interviews with the Materials Laboratory Division Chief for possible use at the TWA Board meeting. Assisted the Managing Director in developing this necessary documentation process and the statement of work.

Implemented and now manage the agency federal credit card programs. Developed oversight policies and procedures for both the CitiBank Purchase Card/Convenience Checks and Travel Card Programs. In response to the DOT's IG investigations, particular concern was raised over the use of Rapid Drafts. Working with appropriate staff and program managers, I responded by designing and developing a Purchase Card Program with accompanying training. This program has grown and evolved into one of the best in the federal government. Formulated the training strategy on the purchase cards and presented the majority of the training sessions given to IICs and Administrative Officers.
Miller, R████████████

Coordinated regional office training and conducted one-on-one training sessions with individuals responsible for complying with CitiBank Purchase Card requirements.

Furthermore, I addressed Emergency Medical Service (EMS) funding. EMS is a politically sensitive issue, which undeniably must run efficiently. Through self-initiated research, I discovered that our county's share of program expenses had increased significantly over the past few years, rising to $1 million annually. To determine how to bring those costs down, I met with other county commissioners, county managers, county and state EMS officials, and other officials on the state and federal level. I learned that the EMS program was self-supporting in other counties and that North Carolina's statewide reimbursement rates for Medicare cases were much lower than adjacent states. Through research and analysis, I brought this to the attention of our State County Commissioner's Association, where, after intense lobbying, it became one of the Association's top priorities. I next contacted several state elected representatives, the Governor's office, the State EMS Association, our National Association, three US Congressmen, and the Health Care Financing Administration. This research also led to the development of a revised billing procedure at the county level. My initiative at the local level resulted in a national review at which the Governor and state association were awarded a seat on the decision making panel at the national level. As a result, the county that I represent, and others in the state, now receive a more equitable Medicare re-imbursement rate.

## Business Acumen

4.) From 1989 to 1992, while in the private sector, I served as the Chairman and Chief Financial Officer of a 40-year old lumber/building supply company. One of my most notable accomplishments in this position, was the conducting of a comprehensive review of the company's management structure. I analyzed the effectiveness of the company's financial controls and operational/personnel procedures. Based on this examination, I established enhanced financial controls in order to improve the company's inventory management and bill-paying procedures so as to reconcile delivery invoices with actual deliveries, and not for undelivered items; thereby, ensuring payments were for only actual deliveries. This examination and subsequent accounting evaluation along with ongoing consultation with the Company's accountant, we revealed approximately a $300,000 loss of supposedly-delivered lumber in one year.

I targeted new business opportunities and identified initiatives to enhance the business' economic performance. I analyzed the profitability and unique advantage of dressing pine lumber and its profit relationship to shipped lumber. I subsequently developed a multi-year marketing plan to implement the identified changes. Additionally, I conducted a review of the personnel costs, culture, management style and interrelationships between management and employees. After my financial and organizational principles were totally implemented, the company's economic performance significantly improved -- gross sales increased by 14 percent, gross profit rose by 47 percent, and net profit increased 44 percent.

## Building Coalitions/Communication

5.) In 1996, I was elected to serve as a County Commissioner in a small rural county that had performed under the same administration for 18 years. My general election victory is proof of my ability to work with representatives of all organizations in pursuit of a common goal. The operation of county government was conducted on the basis of "whom you knew" rather than oriented around policies and priorities. Prior to my election, there had been little, or no, training available on the proper administration of a multi-million dollar budget. For the first two years of my term, I spent 60-80 hours a week incorporating generally accepted public financial/administrative principles and budget-setting guidelines into this previously lacking county administration.

I first determined what financial planning procedures the Commissioners should follow to administer and operate county programs. I lobbied, inside and outside county government, for the need to make financial decisions in the context of an annual budget. I discovered that county office directors were continuously able to submit many requests for additional funding to the County and have the Commissioners approve those requests as "budget amendments" outside the fiscal year planning process. This "accepted" practice was, in my opinion, completely uncontrollable. As a result of my efforts, the submission and approval of these "amendments" was made much more difficult and any additional funding requests must now be accompanied by budget justifications.

The work successfully completed on the FAIR Act project at the NTSB serves as another example of my capability to negotiate with individuals at all organizational levels. Working in partnership with the offices involved, I coordinated activities with agency personnel liaisons and negotiated with Office Directors. Quantitative information was developed in the process to document how the NTSB would accurately project which services could be performed by a commercial source. The final report was submitted to the Managing Director and subsequently filed after relatively few changes with the Office of Management and Budget.

Following are selected examples of professional endeavors involving leadership in management studies: Piedmont Triad Leadership Program Graduate (1999); Rural Economic Development Leadership Institute Graduate (1998); Regional Appalachian Regional Commission Leadership Institute Graduate (1998); Institute of Political Leadership Program Graduate (1997); Various Management Courses at University of NC-Chapel Hill's Institute of Government.

As a part of my professional growth and development, I have maintained an expansive network of associations with fellow colleagues, external associates and others. Following is a selected listing of memberships and/or affiliations: National Association of County Officials: National Transportation & Telecommunications Steering Committee; North Carolina Association of County Commissioners: Intergovernmental Steering Committee, Long Range Strategic Planning Steering Committee, Tax and Finance Committee; Piedmont Triad Partnership/State Regional Economic Development; Yadkin County

Public Library Board; Northwest Regional Library Board: Finance and Nominating
Committee; Yadkin County Arts Council; Yadkin County Historical Society; Northwest

Piedmont Council of Governments; Northwest Regional Aging Council; Surry County
Housing Consortium; Community Block Grant Committee; Founder, Yadkin Heritage
2000; Founder, Vice-Chairman Yadkin County Sesquicentennial Commission; E-911
Committee; Smart Start Partnership.

## Mandatory Technical/Professional Qualifications

**In-depth knowledge of and experience with governmental financial management
including: the federal budget process, and financial accounting and reporting
concepts and principles.**

**1.)** In my NTSB position as the Financial Management Specialist, I wrote a new draft
Board order governing the new CitiBank Travel Card, in accordance with relevant
Federal Regulations, and Approving Officials responsibilities.  Surveyed the agency and
provided a new process to list and review employees on Annual Travel Orders, resulting
in a significant reduction of reconciled travel card expenditures to the individual
authorized by the Board.  Briefed and advised the CFO on all NTSB credit card
programs and other financial management issues.

At US DOT, served as advisor to the Assistant Secretary for Budget and Programs on the
development, review, and presentation of the Department's programs.  Responsible for
reviewing the impact and programs in achieving their objectives, advising the Assistant
Secretary on major problem areas that impede attainment of departmental program plans
and objectives, and advising the Assistant Secretary and Secretary on program and
legislative changes necessary to resolve them.  Responsible for coordinating the impact
on departmental resources of legislative and other proposals, establishing procedures for
development of long-range budgetary resource planning, and making recommendations
on the budget and program aspects of proposals for acquisitions of major new technical
systems.  Reviewed, coordinated, documented budget briefing material and financial
accounting reports for the Assistant Secretary, Deputy Secretary and Secretary, Office of
Management and Congress justifying DOT's annual budget requests.  Monitored
Congressional action on appropriation and authorization legislation and advised
Committee staff to ensure that the Agency's requests received positive consideration.

Managed the R & R funds for the agency, chaired an inter-agency team created by the
Secretary to evaluate the effectiveness of the Coast Guard's Search and Rescue program,
and co-chaired the Deputy's Task Force on Private Sector Initiatives and Volunteerism
Programs. I also, while still with the Department of Transportation (DOT) developed and
coordinated the Financial Plan for the Office of the Secretary which contributed
significantly to the effective and prudent management of OST funds.  Reviewed,
Miller, R███████████████

analyzed and presented recommendation on all reprogramming of funds to the Assistant Secretary. Prepared monthly status reports on budget execution including a mid-year fiscal policy review which incorporated discussion of fiscal management implications for future spending plans. Assisted the Assistant Secretary in the development of the organizational structure, the associated grade assignments and staffing patterns and procurement contract for the two newly created OST offices—Delegation on Multilateral Pricing and Commercial Space Transportation.

Helped develop procedures to implement the requirements of the Congressional Budget and Impoundment Act of 1974 at the newly created Congressional Budget Office. These duties included identifying difficulties committees/agencies could experience in complying with the law's fiscal year change and developing financial models and systems to track agency budget authority and outlays. Established goals and measurable performance objectives to achieve the financial accountability requirements of the Act. Created procedures to systematically coordinate Federal budget requirements with the Office of Management and Budget, Federal Agencies, and House and Senate Budget Committees which helped enable the successful implementation of the new budget process and a smooth transition. Reviewed Office of Management and Budget submissions for technical accuracy and consistency while working with OMB resource management offices to resolve any identified problems. Directed an analysis of Congressional budget management information systems and its inter-relationship with OMB data bases.

In 1996, elected to serve as a County Commissioner in a small rural county that had performed under the same administration for 18 years. Spending 60-80 hours a week, established policy and procedures for the proper administration of a multi-million-dollar budget and provided formal training was to in-house staff.

**Broad knowledge of modern financial management techniques involved in the design, implementation, integration, operation, or evaluation of financial management systems.**

**2.)** In 1999, analyzed all available information on purchase card programs utilized in other Federal agencies, determining that the Department of Veterans Affairs (VA) had an effective Purchase Card system and modified and customized it to meet the needs of the NTSB a much smaller agency..

Assisted in the development and presentation of a 50-page PowerPoint program entitled, "Financial Management at the NTSB: Spending Government Funds, the DOT IG Audit & Investigation, and Government Credit Cards." Attendance by NTSB employees is mandatory.

While serving as the agency's lead on CitiBank's computer access, the CitiDirect Program, and the development of a webpage on the Intranet were successfully
Miller, R. ▬▬▬▬▬

implemented. Rewrite of the agency's Board Order on the Purchase Card was another end product of this assignment.

In developing a plan to bring the NTSB into compliance with reporting requirements under the Federal Activities Inventory Reform (FAIR) Act, I accessed Internet web sites to research the law's legislative background and determine how Federal agencies were implementing the statute's provisions. I manipulated several computer programs, including Microsoft Excel, Word and Outlook, to develop electronic information tools to identify NTSB activities that could be considered inherently governmental and those that could be considered commercial activities. The NTSB's submission, including the Excel spreadsheet, was sent to OMB and Congress, was published in the Federal Register, and is on the agency's web site.

Served as Chairman, and Chief Financial Officer, of a 40-year old lumber company. Initiated a complete review of the company's operating procedures and analyzed the business' financial controls. Met with business development experts and market analysts. Revived business relationships with home contractors and developed new relationships with commercial contractors/developers based on personal construction and economic development experience. Based on independent research and review, as well as many meetings with company employees and management officials, designed and implemented a plan to expand commercial sales and create more efficient inventory practices at the company. As a result of the plan's implementation, gross sales increased by 14 percent, gross profits rose by 47 percent and net profit improved by 44 percent. These improvements were achieved despite an economic downturn in the regional economy.

**Knowledge of federal financial management programs and legislation.**

**3.)** In developing a plan to bring the NTSB into compliance with reporting requirements under the Federal Activities Inventory Reform (FAIR) Act, my technical skills were useful as several Internet web sites were accessed to research the law's legislative background and determine how Federal agencies were implementing the statute's provisions. This required manipulation of several computer programs, including Microsoft Excel, Word and Outlook, to develop electronic information tools to identify NTSB activities that could be considered inherently governmental and those that could be considered commercial activities. The NTSB's submission, including the Excel spreadsheet, was sent to OMB and Congress, was published in the Federal Register, and is on the agency's web site.

Was responsible for successfully developing the FAIR Act procedures to ensure compliance with requirements of the FAIR Act of 1998 that established several procedures which government agencies must follow. While independently analyzing the statute, reviewing OMB guidelines, and researching the compliance procedures developed by other Federal agencies, my plan was formed to bring the agency into compliance with the law's reporting requirements. Coordinating with the General

Counsel's office, modal and administrative offices were contacted and functions that could be carried out by private industries were identified. As a result, tasks that could be performed elsewhere were identified.

# Desirable Technical Qualifications

**Demonstrated success in leading a financial management organization and implementing JFMIP guidance and the intent of major legislation impacting this discipline including: FMFIA, CFO Act, GPRA, GMRA, and FFMIA.**

**1.)** Recently served on the review panel for the selection of bidders under the MOBIS Supply Schedule to conduct a review and analysis of financial management controls, processes, and systems of the Board. Contributed to the preparation of the initial Statement of Work and evaluated three vendors who submitted proposals to assist the Board in conducting a closet review of the Rapidraft Payment System; evaluating current financial management processes, and identifying areas that require strengthened internal controls.

Was elected in 1996 to serve as a County Commissioner in a small rural county that had performed under the same administration for 18 years. In my role as a County Commissioner, was responsible for reviewing the annual budget submissions of county offices; also monitored the financial performance of these county agencies to identify ways to improve their budget execution procedures and enhance the delivery of services. Wrote, and obtained, a state grant of $25,000 for several projects, including the construction of a community amphitheater. Furthermore, through my efforts an additional $25,000 was obtained from a private foundation for the project. Identified a qualified architect to draw the building plans with little cost to the county and formally submitted the construction plan to the state where it currently is moving through the state approval process.

**An understanding of roles and relationships of various national financial management policy making and implementation processes involving components such as the Office of General Accounting Office, OMB, Treasury, JFMIP, GSA, etc.**

**2.)** Successfully developed the FAIR (Federal Activities Inventory Reform) Act procedures to ensure compliance with requirements of the FAIR Act of 1998 that established several procedures which government agencies must follow. After independently analyzing the statute, reviewing OMB guidelines, and researching the compliance procedures developed by other Federal agencies, my plan was formed to bring the agency into compliance with the law's reporting requirements. Coordinating with the General Counsel's office, modal and administrative offices were contacted and functions that could be carried out by private industries were identified. As a result, tasks that could be performed elsewhere were identified.

Was instrumental in developing procedures to implement the requirements of the
Congressional Budget and Impoundment Act of 1974 at the newly created Congressional
Budget Office. These duties included identifying difficulties committees/agencies could
experience in complying with the law's fiscal year change and developing financial
models to track agency budget authority and outlays. Established goals and measurable
performance objectives to achieve the financial accountability requirements of the Act.
Created procedures to systematically coordinate Federal budget requirements with the
Office of Management and Budget, Federal Agencies, and House and Senate Budget
Committees which helped enable the successful implementation of the new budget
process and a smooth transition to a new fiscal year start date. Reviewed Office of
Management and Budget submissions for technical accuracy and consistency while
working with OMB resource management offices to resolve any identified problems.
Directed an analysis of Congressional budget management information systems and the
interrelationships of the CFO and OMB databases.

**Experience in managing financial operations activities particularly accounting
operations and budget execution. Experience in conducting internal audits and
reviews and meeting FMFIA requirements.**

**3.)** While functioning as an elected county commissioner for Yadkin county, my first
move was to determine what financial planning procedures the Commissioners should
follow to administer and operate county programs. I lobbied, inside and outside county
government, for the need to make financial decisions in the context of an annual budget.
Discovered that county office directors were continuously able to submit many requests
for additional funding to the County and have the Commissioners approve those requests
as "budget amendments" outside the fiscal year planning process. This "accepted"
practice was, in my opinion, completely uncontrollable. As a result of my efforts the
county focused more on analysis of annual budget submissions and actuals based on
improved accounting and report-generating systems.

Exposed and corrected probable fraud and irregularities through internal audit and
analysis of financial accounting systems in double counting in the federal Head Start
Program, the federal/state "Meals-on-Wheels" program, senior citizen centers, and the
federal/state Rural Transportation Delivery Grants.

Assisted the Assistant Secretary for Budget & Programs in managing agency budget
operations, while with the U.S Department of Transportation (DOT). Identified potential
weaknesses within the DOT budget and coordinated with the Assistant Secretary
activities that resolved the identified financial problems. Prepared memorandums and
associated briefing materials that the Secretary could use to assess policy and
management proposals presented for funding. Reviewed and coordinated budget briefing
materials, Congressional testimony and speeches for the Assistant Secretary and Deputy
Assistant Secretary. Prepared documentation for the Secretary, Office of Management
and Budget, and Congress justifying annual budget requests. Monitored Congressional
action on appropriations and authorization legislation and worked with relevant
Committee staffs to insure that the Agency's requests received successful consideration.

Chaired an inter-agency team created by the Secretary to evaluate the effectiveness of the Coast Guard's Search and Rescue program.  Co-chaired the Deputy's Task Force on Private Sector Initiatives and Volunteerism Programs.



**AN EQUAL OPPORTUNITY AND REASONABLE
ACCOMMODATION EMPLOYER**

**NATIONAL TRANSPORTATION SAFETY BOARD**

# POSITION VACANCY ANNOUNCEMENT

**DATE OPENED:   03-21-2001**

**DATE CLOSED:   05-31-2001**

**NO. OF VACANCIES: 1**

**AGENCY CONTACT:**   Human Resources Division 1-800-573-0937 or 202 314-6239
World Wide Web Address: http://www.ntsb.gov

**POSITION TITLE, SERIES, AND GRADE:**   **Budget Officer, GS-560-15**

**LOCATION:**   Office of the Chief Financial Officer
Budget Division, Washington, D.C.

**SALARY RANGES:**   GS-15 is $87,864 to $114,224 Per Annum

The above salaries include locality pay adjustment for the
Washington, D.C. pay areas.

## PROMOTION POTENTIAL WITHOUT FURTHER COMPETITION:

**AREA OF CONSIDERATION:**   Applicants with competitive Civil Service Status.   Qualified applicants who are eligible under special hiring authorities such as the (i.e Veterans Readjustment Appointment (VRA) program.) may also apply.  Veterans who are preference eligible or who have been separated from the armed forces under honorable conditions after 3 years or more of continuous active service may apply.  **Relocation (PCS) expenses will not be paid.**

**\*\*EARLY RATING AND REFERRAL DATES:**  We have established early referral dates. **The initial cutoff under this announcement will be 04-11-2001.**  Applications postmarked by this date will be rated and referred for consideration first.  If a selection is not made, applications postmarked by May 11, 2001 will be subsequently rated and referred for consideration. Applications postmarked after May 11, 2001, will be processed after the closing date of this announcement. It is to your advantage to apply early.  For consideration, applications must be postmarked by the closing date of this announcement

**REGULATIONS:**   **Financial interest in certain transportation enterprises is prohibited. The person selected will be required to complete a SF-450, Confidential Financial Report.**

---

**PRIVACY ACT REQUIREMENTS (P.L.93-579): The referenced forms are used to determine qualifications for promotion or employment and are authorized under Title 5 of the U.S. Code, Sections 3302 and 3361. Each form must be submitted to consider you for the position noted.**

**EVALUATION METHODS: Review or evaluation of applications, performance appraisals, training, awards, and if necessary, personnel inquires, pre-employment reference checks, interviews, written tests, potential appraisals, and personnel investigations.**

**DUTIES:**     Incumbent serves as the Chief of the Budget Division, with responsibility for the development, preparation and coordination of the annual budget requests to the Office of Management and Budget (OMB) and the Congress, as well as the execution of the budget resources received through appropriations, reimbursements, or other offsetting collections.

- Administers an efficient system to control  staffing and funds in consultation with management officials;
- Develops budget and financial policies to ensure efficient and effective use of Board resources;
- Identifies, considers and resolves a variety of financial and/or budget-related policy issues and inquiries.
- Supervises a staff of employees to accomplish the work of the Division.   Exercises supervisory authorities and responsibilities involving work assignment and review, as well as the administrative and personnel management functions relative to the staff supervised.
- Works with other financial managers of the Office to ensure an integrated system of financial services.
- Communicates with colleagues, agency management and contacts outside the agency to gather, analyze, and compile financial data to provide financial advisory services and to convey financial information in a variety of written forms such as cost and budget reports.

**QUALIFICATIONS:**   One year of specialized experience equivalent to the next lower grade level is required. **Specialized experience** is experience that is directly related to the position to be filled and has equipped the candidate with the particular knowledge, skills, and abilities to successfully perform the duties of this position.   To be creditable, this experience must be at least equivalent to the next lower level in the normal line of progression for the occupation in the organization and must demonstrate that the applicant has an expert knowledge of the OMB and Congressional budget process, an ability to interpret legislative and regulatory policy guidance to determine the effect on an agency's budget and programs, and knowledge of the strategies of developing sound budget presentations and consolidating/editing convincing budget justifications for both OMB and the Congress.

**SELECTIVE FACTORS:**    The following knowledge, skills or abilities (KSAs) are essential to the successful performance of the duties described. **APPLICANTS WHO FAIL TO MEET THESE KSAs WILL NOT BE ELIGIBLE FOR REFERRAL.    Candidates should submit a supplemental statement describing his/her possession of each of these KSAs.**

1. Experience that demonstrates expert knowledge and understanding of the OMB and Congressional budget process.
2. Experience that demonstrates supervisory, managerial or leadership skill in the performance of Federal budget-related work assignments, group projects, or new initiatives.

**QUALITY RANKING FACTORS:** The following KSAs are desirable in the performance of the duties of this position.  Possession of these KSAs could directly affect the applicant's competitive

standing and enhance referral potential. Candidates should submit a supplemental statement describing his/her possession of each of these KSAs.

1. Experience in an operating budget office that demonstrates the following:

   - Skill in interpreting complex legislative and regulatory policy guidance to determine the effects on the organization's budget and programs.
   - Ability to provide expert advice and guidance to peers and management in all phases of the OMB and Congressional budget process.
   - Skill in the development and implementation of budget guidelines, strategies, and fiscal control systems for the purpose of budget formulation and execution.
   - Skill in the execution, formulation and presentation of a budget for a Federal agency.

2. Experience that demonstrates expert knowledge of the operating principles, concepts, policies and interrelationships of an agency's financial management program.

3. Skill in the use of automated tools to present and analyze financial data and information.

4. Experience developing workable solutions to management, personnel and/or technical problems.

5. Experience that demonstrates the successful development of programs and/or procedures that meet the changing needs of an agency.

6. Ability to produce results through planning. Examples should reflect accountability, continuous improvement, and making timely and effective decisions.

7. Experience that demonstrates the ability to explain, advocate, and express facts and ideas in a convincing manner, and negotiate with individuals and groups internally and externally. Examples should include oral and written communication.

## OTHER SIGNIFICANT FACTS:

- Candidates must demonstrate that they possess or have the potential to develop the qualities for successful supervision as indicated. Applicable experience and training must be included in the application.

- The candidate selected for this position may be required to complete a supervisory/managerial probationary period. (Employees who, as of August 11, 1979, have served in a supervisory or managerial position in the Federal government are exempt from the comparable probationary period requirement.)

**EVALUATION PROCEDURES:**

Applicants who meet the qualifications will be further evaluated to determine the extent to which their experience, training/education, and awards indicate that they possess or have the potential to acquire the knowledge, skills and abilities required to perform the duties and responsibilities described above.

Status candidates will be ranked to determine the highly qualified based on values assigned to candidates experience (considering the knowledge, skills and abilities (KSAs)), training and awards. Supervisory appraisals will be considered in the ranking process.

Applications received from non-status candidates will be considered under the agency delegated examining unit. Status candidates who wish to be considered under both merit promotion and OPM competitive procedures must submit two complete applications.   When only one application is received, it will be considered under merit promotion procedures only.

**OPM TIME-IN-GRADE RESTRICTIONS APPLY.   APPLICANTS MUST SUBMIT THEIR LATEST PERFORMANCE EVALUATION.**

**HOW TO APPLY:**  All applicants must submit an application for consideration.   The following documents are acceptable: OF-612, Optional Application for Federal Employment, a resume or other available application format.  All applications must contain all of the information as described below. Submission of an incomplete application may result in a low rating or losing consideration for the position.  Applications will not be duplicated or returned; they will remain part of the official file. Copies of applications are acceptable with signature and date.   **ALL DOCUMENTS MUST BE POSTMARKED AND MAILED TO THE ADDRESS INDICATED BELOW BY THE CLOSING DATE OF THIS ANNOUNCEMENT: National Transportation Safety Board, 490 L'Enfant Plaza East, S.W., Washington, D.C. 20594-2000, Attn: Human Resources Division, MD-30.**

**CTAP AND ICTAP APPLICANTS**

1.    Career Transition Assistance Program (CTAP) or Interagency Career Transition Assistance Program (ICTAP) must submit a copy of their specific RIF notice and documentation from their human resources office reflecting the promotion potential of their most recent Federal position.

2.    Selection priority will be given to well-qualified CTAP or ICTAP applications.

3.    Well qualified candidates are those who address and meet the minimum qualifications (including selective factors) and meet the fully satisfactory level in each of the quality ranking factors.

**JOB INFORMATION:**    Announcement number, job title and grade level of the position for which you are applying.

**PERSONAL INFORMATION:**

- Full name, mailing address (with zip code) and day and evening telephone numbers, (with area code).
- Social Security Number.
- Country of Citizenship.
- Veterans' Preference. (see additional information on Veterans' Preference below and under the Area of Consideration)
- Reinstatement eligibility OR competitive status if applicable (attach a copy of latest SF-50, Notification of Personnel Action, as proof of your career or career-conditional status).
- Your highest Federal civilian grade, job series and the dates held, if applicable.
- Eligibility under special hiring authority. (Indicate the basis for any eligibility and attach appropriate documentation.)

**EDUCATION:**

- High School information - Name of School, City, State (Zip Code if known) and date of diploma or GED.
- College/University information - Name of School(s), City, State (Zip Code if known), majors, type of degree(s) received (if no degree, show total credits earned and indicate whether semester or quarter hours).
- If you qualify based on education, submit a transcript or list of courses (with credit hours), majors, and grade-point average or class rank.

**WORK EXPERIENCE:**   Describe your paid and non-paid work related to the position for which you are applying including the knowledge, skills, abilities identified for this position and how you meet them.   The selective factors must be evident in experience and/or training.   (DO NOT SEND JOB DESCRIPTION).   For each position, include the following information:

- Your Position title (include job series and grade if a Federal job).
- Employer's name, address,
- Supervisor's name and telephone number (indicate whether we may contact your current supervisor for reference purposes).
- Dates you started and ended each job.
- The amount of hours you work per week.
- Your starting and ending salaries.
- Duties and accomplishments.

**OTHER QUALIFICATIONS:**

- Job-related training courses completed within the last 3 years (list title, hours and date completed).
- Job-related skills (other languages, computer software/hardware skills, typing speed, etc.).
- Job-related honors, awards, and special accomplishments received within the last 3 years. For example: publications, memberships in professional or honor societies, leadership activities, public speaking, and performance awards (give dates but do not send documents unless requested).

**ALL ELIGIBILITY REQUIREMENTS MUST BE MET BY THE CLOSING DATE OF THIS ANNOUNCEMENT.**

**CONDITIONS OF EMPLOYMENT:**

- Job finalist will be asked to sign and certify the accuracy of all information they provide and to authorize a background investigation.
- A false statement in a part of your application may be grounds for not hiring you, or for firing you after you begin work, and may be punishable by law.
- Males born after December 31, 1959, must be registered with the Selective Service System or have a valid exemption to be eligible for Federal employment. If you receive a military or civilian annuity from the Federal government, your salary or annuity may be reduced if you take a Federal job.
- If you have any delinquent debts, you must repay those debts or face garnishment of your salary.
- Subject to satisfactory completion of a background investigation.

**VETERANS' PREFERENCE IN HIRING:**

- If you served honorably in the U.S. Armed Forces in certain periods or campaigns, or if you are a disabled veteran, you may be entitled to veterans' preference. (i.e. Gulf War from August 2, 1990, through January 2, 1992, or Bosnia campaign service November 20, 1995 to present.) *If you are applying for reinstatement, transfer, or under a merit promotion announcement, you do not need to claim veterans' preference.* If you are the spouse, widow, widower, or mother of a totally disable veteran or of a veteran who died in service, you may be entitled to veterans' preference.
- You cannot receive veterans' preference if you are retired or will retire at or above the rank of major or lieutenant commander, unless you are disabled or you retired from the active military reserve. If you claim veterans' preference, state your preference claim and attach documentation: "5-Points Veterans' Preference: DD 214 attached," or "10-Points Veterans Preference: SF-15 attached."

**SPECIAL HIRING AUTHORITY:** In addition to the above criteria, there are Special Hiring Employment authorities under which individuals who meet qualifications and evaluation criteria cited for the position may be considered. For these Special Employment programs, applicant does not have to be a current or former civilian Federal government employee. These individuals could include persons with disabilities, Peace Corps and Vista Volunteers. For these Special Employment programs, applicant must furnish required proof or certification of eligibility. Additional information on these Special Employment authorities may be obtained from the NTSB.

**The NTSB is an Equal Opportunity and Reasonable Accommodation Employer: Except where otherwise provided by law, all candidates will be considered without discrimination for any non-merit reason such as race, color, religion, gender, sexual orientation, age, national origin, political affiliation, marital status, disability, or membership or non-membership in an employee organization.**

**ALL APPLICATIONS MUST BE POSTMARKED BY THE ABOVE CLOSING DATE TO RECEIVE CONSIDERATION.**

Richard Miller Declaration

Civil Action No. 06-01071 (GK)

Exhibit __5__

**Miller Richard**

| | |
|---|---|
| **From:** | Hall Jim |
| **Sent:** | Tuesday, March 28, 2000 8:04 AM |
| **To:** | All Hands NTSB |
| **Subject:** | New EEO Director |

I am pleased to announce the appointment of Fara Guest as our new Equal Employment Opportunity (EEO) Director.  She reported to the Board on March 27, 2000.

Fara has worked in the areas of human resources and equal employment for the federal government since 1983.  She began her career as an intern in the Department of Defense.  After eight years of work as a personnel specialist, she turned to equal employment opportunity and eventually became a program manager, focusing on diversity recruitment and other special emphasis programs.

In that role, she advised managers on the EEO complaint process, directed her staff as they developed an operating manual for handling complaints, presented information at EEO and Diversity workshops, and developed EEO tools and handbooks for supervisors.  In addition, she has had experience in planning, managing, organizing, and directing creative career development and outreach programs designed to recruit and retain highly qualified and diverse scientific and technical personnel.

Please join me in welcoming Fara to the Safety Board family.  Fara's office will be on the sixth floor, Room 6541.

I also want to publicly thank Bob Barlett for stepping in and serving as our interim EEO Director for these many months.

Richard Miller Declaration

Civil Action No. 06–01071 (GK)

Exhibit _____ 6 _____

Budget Officer 1-055

Page 1 of 6



**AN EQUAL OPPORTUNITY AND REASONABLE ACCOMMODATION EMPLOYER**

**NATIONAL TRANSPORTATION SAFETY BOARD**

**POSITION VACANCY ANNOUNCEMENT**

**NUMBER:**
WA-TB-1-055

**DATE OPENED:**
03-21-2001

**DATE CLOSED:**
05-31-2001

**NO. OF VACANCIES: 1**

**AGENCY CONTACT:** Human Resources Division 1-800-573-0937 or 202 314-6239
World Wide Web Address: http://www.ntsb.gov .

**POSITION TITLE, SERIES, AND GRADE: Budget Officer, GS-560-15**

**LOCATION:** Office of the Chief Financial Officer
Budget Division, Washington, D.C.

**SALARY RANGES:** GS-15 is $87,864 to $114,224 Per Annum
The above salaries include locality pay adjustment for the Washington, D.C. pay areas.

**PROMOTION POTENTIAL WITHOUT FURTHER COMPETITION:**

**AREA OF CONSIDERATION:** Applicants with competitive Civil Service Status. Qualified applicants who are eligible under special hiring authorities such as the (i.e Veterans Readjustment Appointment (VRA) program.) may also apply. Veterans who are preference eligible or who have been separated from the armed forces under honorable conditions after 3 years or more of continuous active service may apply. **Relocation (PCS) expenses will not be paid.**

**\*\*EARLY RATING AND REFERRAL DATES:** We have established early referral dates. **The initial cutoff under this announcement will be 04-11-2001.** Applications postmarked by this date will be rated and referred for consideration first. If a selection is not made, applications postmarked by May 11, 2001 will be subsequently rated and referred for consideration. Applications postmarked after May 11, 2001, will be processed after the closing date of this announcement. It is to your advantage to apply early. For consideration, applications must be postmarked by the closing date of this announcement

**REGULATIONS: Financial interest in certain transportation enterprises is prohibited. The person selected will be required to complete a SF-450, Confidential Financial Report.**

**DUTIES:** Incumbent serves as the Chief of the Budget Division, with responsibility for the development, preparation and coordination of the annual budget requests to the Office of Management and Budget (OMB) and the Congress, as well as the execution of the budget resources received through appropriations, reimbursements, or other offsetting collections.

· Administers an efficient system to control staffing and funds in consultation with management officials;

· Develops budget and financial policies to ensure efficient and effective use of Board resources;

· Identifies, considers and resolves a variety of financial and/or budget-related policy issues and inquiries.

· Supervises a staff of employees to accomplish the work of the Division. Exercises supervisory authorities and responsibilities involving work assignment and review, as well as the administrative and personnel management functions relative to the staff supervised.

· Works with other financial managers of the Office to ensure an integrated system of financial services.

· Communicates with colleagues, agency management and contacts outside the agency to gather, analyze, and compile financial data to provide financial advisory services and to convey financial information in a variety of written forms such as cost and budget reports.

**QUALIFICATIONS:** One year of specialized experience equivalent to the next lower grade level is required. **Specialized experience** is experience that is directly related to the position to be filled and has equipped the candidate with the particular knowledge, skills, and abilities to successfully perform the duties of this position. To be creditable, this experience must be at least equivalent to the next lower level in the normal line of progression for the occupation in the organization and must demonstrate that the applicant has an expert knowledge of the OMB and Congressional budget process, an ability to interpret legislative and regulatory policy guidance to determine the effect on an agency's budget and programs, and knowledge of the strategies of developing sound budget presentations and consolidating/editing convincing budget justifications for both OMB and the Congress.

**SELECTIVE FACTORS:** The following knowledge, skills or abilities (KSAs) are essential to the successful performance of the duties described. **APPLICANTS WHO FAIL TO MEET THESE KSAs WILL NOT BE ELIGIBLE FOR REFERRAL. Candidates should submit a supplemental statement describing his/her possession of each of these KSAs.**

1. Experience that demonstrates expert knowledge and understanding of the OMB and Congressional budget process.

2. Experience that demonstrates supervisory, managerial or leadership skill in the performance of Federal budget-related work assignments, group projects, or new initiatives.

**QUALITY RANKING FACTORS:** The following KSAs are desirable in the performance of the duties of this position. Possession of these KSAs could directly affect the applicant's competitive standing and enhance referral potential. Candidates should submit a supplemental statement describing his/her possession of each of these KSAs.

1. Experience in an operating budget office that demonstrates the following:

· Skill in interpreting complex legislative and regulatory policy guidance to determine the effects on the organization's budget and programs.

· Ability to provide expert advice and guidance to peers and management in all phases of the OMB and Congressional budget process.

· Skill in the development and implementation of budget guidelines, strategies, and fiscal control systems for the purpose of budget formulation and execution.

· Skill in the execution, formulation and presentation of a budget for a Federal agency.

1. Experience that demonstrates expert knowledge of the operating principles, concepts, policies and interrelationships of an agency's financial management program.

2. Skill in the use of automated tools to present and analyze financial data and information.

3. Experience developing workable solutions to management, personnel and/or technical problems.

4. Experience that demonstrates the successful development of programs and/procedures that meet the changing needs of an agency.

5. Ability to produce results through planning. Examples should reflect accountability, continuous improvement, and making timely and effective decisions.

6. Experience that demonstrates the ability to explain, advocate, and express facts and ideas in a convincing manner, and negotiate with individuals and groups internally and externally. Examples should include oral and written communication.

**OTHER SIGNIFICANT FACTS:**

· Candidates must demonstrate that they possess or have the potential to develop the qualities for successful supervision as indicated. Applicable experience and training must be included in the application.

· The candidate selected for this position may be required to complete a supervisory/managerial probationary period. (Employees who, as of August 11, 1979, have served in a supervisory or managerial position in the Federal government are exempt from the comparable probationary period requirement.)

**EVALUATION PROCEDURES:**

Applicants who meet the qualifications will be further evaluated to determine the extent to which their experience, training/education, and awards indicate that they possess or have the potential to acquire the knowledge, skills and abilities required to perform the duties and responsibilities described above.

Status candidates will be ranked to determine the highly qualified based on values assigned to candidates experience (considering the knowledge, skills and abilities (KSAs)), training and awards. Supervisory appraisals will be considered in the ranking process.

Applications received from non-status candidates will be considered under the agency delegated examining unit. Status candidates who wish to be considered under both merit promotion and OPM competitive procedures must submit two complete applications. When only one application is received, it will be considered under merit promotion procedures only.

**OPM TIME-IN-GRADE RESTRICTIONS APPLY. APPLICANTS MUST SUBMIT THEIR LATEST PERFORMANCE EVALUATION.**

**HOW TO APPLY:** All applicants must submit an application for consideration. The following documents are acceptable: OF-612, Optional Application for Federal Employment, a resume or other available application format. All applications must contain all of the information as described below. Submission of an incomplete application may result in a low rating or losing consideration for the position. Applications will not be duplicated or returned; they will remain part of the official file. Copies of applications are acceptable with signature and date. **ALL DOCUMENTS MUST BE POSTMARKED AND MAILED TO THE ADDRESS INDICATED BELOW BY THE CLOSING DATE OF THIS ANNOUNCEMENT: National Transportation Safety Board, 490 L'Enfant Plaza East, S.W., Washington, D.C. 20594-2000, Attn: Human Resources Division, MD-30.**

## CTAP AND ICTAP APPLICANTS

1. Career Transition Assistance Program (CTAP) or Interagency Career Transition Assistance Program (ICTAP) must submit a copy of their specific RIF notice and documentation from their human resources office reflecting the promotion potential of their most recent Federal position.

2. Selection priority will be given to well-qualified CTAP or ICTAP applications.

3. Well qualified candidates are those who address and meet the minimum qualifications (including selective factors) and meet the fully satisfactory level in each of the quality ranking factors.

**JOB INFORMATION:** Announcement number, job title and grade level of the position for which you are applying.

## PERSONAL INFORMATION:

- Full name, mailing address (with zip code) and day and evening telephone numbers, (with area code).

- Social Security Number.

- Country of Citizenship.

- Veterans' Preference. (see additional information on Veterans' Preference below and under the Area of Consideration)

- Reinstatement eligibility OR competitive status if applicable (attach a copy of latest SF-50, Notification of Personnel Action, as proof of your career or career-conditional status).

- Your highest Federal civilian grade, job series and the dates held, if applicable.

- Eligibility under special hiring authority. (Indicate the basis for any eligibility and attach appropriate documentation.)

## EDUCATION:

- High School information - Name of School, City, State (Zip Code if known) and date of diploma or GED.

- College/University information - Name of School(s), City, State (Zip Code if known), majors, type of

degree(s) received (if no degree, show total credits earned and indicate whether semester or quarter hours).

- If you qualify based on education, submit a transcript or list of courses (with credit hours), majors, and grade-point average or class rank.

**WORK EXPERIENCE:** Describe your paid and non-paid work related to the position for which you are applying including the knowledge, skills, abilities identified for this position and how you meet them. The selective factors must be evident in experience and/or training. (DO NOT SEND JOB DESCRIPTION). For each position, include the following information:

- Your Position title (include job series and grade if a Federal job).

- Employer's name, address,

- Supervisor's name and telephone number (indicate whether we may contact your current supervisor for reference purposes).

- Dates you started and ended each job.

- The amount of hours you work per week.

- Your starting and ending salaries.

- Duties and accomplishments.

**OTHER QUALIFICATIONS:**

- Job-related training courses completed within the last 3 years (list title, hours and date completed).

- Job-related skills (other languages, computer software/hardware skills, typing speed, etc.).

- Job-related honors, awards, and special accomplishments received within the last 3 years. For example: publications, memberships in professional or honor societies, leadership activities, public speaking, and performance awards (give dates but do not send documents unless requested).

**ALL ELIGIBILITY REQUIREMENTS MUST BE MET BY THE CLOSING DATE OF THIS ANNOUNCEMENT.**

**CONDITIONS OF EMPLOYMENT:**

- Job finalist will be asked to sign and certify the accuracy of all information they provide and to authorize a background investigation.

- A false statement in a part of your application may be grounds for not hiring you, or for firing you after you begin work, and may be punishable by law.

- Males born after December 31, 1959, must be registered with the Selective Service System or have a valid exemption to be eligible for Federal employment. If you receive a military or civilian annuity from the Federal government, your salary or annuity may be reduced if you take a Federal job.

- If you have any delinquent debts, you must repay those debts or face garnishment of your salary.

- Subject to satisfactory completion of a background investigation.

## VETERANS' PREFERENCE IN HIRING:

- If you served honorably in the U.S. Armed Forces in certain periods or campaigns, or if you are a disabled veteran, you may be entitled to veterans' preference. (i.e. Gulf War from August 2, 1990, through January 2, 1992, or Bosnia campaign service November 20, 1995 to present.) *If you are applying for reinstatement, transfer, or under a merit promotion announcement, you do not need to claim veterans' preference.* If you are the spouse, widow, widower, or mother of a totally disable veteran or of a veteran who died in service, you may be entitled to veterans' preference.

- You cannot receive veterans' preference if you are retired or will retire at or above the rank of major or lieutenant commander, unless you are disabled or you retired from the active military reserve. If you claim veterans' preference, state your preference claim and attach documentation: "5-Points Veterans' Preference: DD 214 attached," or "10-Points Veterans Preference: SF-15 attached."

**SPECIAL HIRING AUTHORITY:** In addition to the above criteria, there are Special Hiring Employment authorities under which individuals who meet qualifications and evaluation criteria cited for the position may be considered. For these Special Employment programs, applicant does not have to be a current or former civilian Federal government employee. These individuals could include persons with disabilities, Peace Corps and Vista Volunteers. For these Special Employment programs, applicant must furnish required proof or certification of eligibility. Additional information on these Special Employment authorities may be obtained from the NTSB.

**The NTSB is an Equal Opportunity and Reasonable Accommodation Employer: Except where otherwise provided by law, all candidates will be considered without discrimination for any non-merit reason such as race, color, religion, gender, sexual orientation, age, national origin, political affiliation, marital status, disability, or membership or non-membership in an employee organization.**

**ALL APPLICATIONS MUST BE POSTMARKED BY THE ABOVE CLOSING DATE TO RECEIVE CONSIDERATION.**

OPTIONAL APPLICATION FOR FEDERAL EMPLOYMENT

(OF 612 -- Form Approved: OMB No. 3206-021)

You may apply for most jobs with a resume, this form, or other written format.  If your resume or application does not provide all the information requested on this form and in the job vacancy announcement, you may lose consideration for a job.

================================================================

1.  JOB TITLE IN ANNOUNCEMENT: Budget Officer
    ------------------------------------------
2.  GRADE(S) APPLYING FOR: GS-560-15
    ----------------
3.  ANNOUNCEMENT NUMBER: WA-TB-1-055
    -----------------------
4.  LAST NAME: Miller            FIRST, MIDDLE: Richard Lloyd
    --------------------         ----------------------
5.  SOCIAL SECURITY NUMBER:  241 - 80  - 7492
    ------- ---- -------
6.  MAILING ADDRESS: #304, 1515 S. Arlington Ridge Road
    ---------------------------------------------------
    CITY/STATE/ZIP:  Arlington, Virginia 22202
    ---------------------------------------------------
7.  PHONE NUMBERS (include area code)  DAYTIME:  202/314-6041
    -------------------------
                                       EVENING:  703/685-3709
    -------------------------

================================================================

8.  WORK EXPERIENCE: Describe your paid and nonpaid work experience
    related to the job for which you are applying. (Do not attach job
    descriptions)

1)  JOB TITLE (If Federal,
    include series and grade):  Financial Management Specialist/TWA Management
Coordinator
                                ---------------------------
        FROM (MM/YY): 06/99        TO (MM/YY): Present
        ------------               ------------
        SALARY: $ Daily-GS-14/10 Rate per yr.    HOURS PER WEEK: 50+
        ------------              --------       --------
        EMPLOYER'S NAME:  National Transportation Safety Board
        ---------------------------------------------------
           AND ADDRESS:  490 L'Enfant Plaza East, SW
                         Washington, D.C. 20594
                         ---------------------------------------------------
        SUPERVISOR'S NAME:  Steven Goldberg
                            ---------------------------------
                AND PHONE:  314-6210

OPTIONAL APPLICATION FOR FEDERAL EMPLOYMENT

(OF 612 -- Form Approved: OMB No. 3206-021)

You may apply for most jobs with a resume, this form, or other written
format.  If your resume or application does not provide all the
information requested on this form and in the job vacancy announcement,
you may lose consideration for a job.

==================================================================

1.  JOB TITLE IN ANNOUNCEMENT: Senior Management Analyst

2.  GRADE(S) APPLYING FOR:  GS-0343-14/15

3.  ANNOUNCEMENT NUMBER:  WA-TB-0-045

4.  LAST NAME: Miller          FIRST, MIDDLE: Richard Lloyd

5.  SOCIAL SECURITY NUMBER:  241  - 80   - 7492

6.  MAILING ADDRESS: Apartment 304, 1515 Arlington Ridge Road

    CITY/STATE/ZIP:  Arlinton, Virginia  22202

7.  PHONE NUMBERS (include area code)  DAYTIME:  202/314-6041

                                       EVENING:  703/685-3709

==================================================================

8.  WORK EXPERIENCE: Describe your paid and nonpaid work experience
       related to the job for which you are applying. (Do not attach job
       descriptions)

1)  JOB TITLE (If Federal,
    include series and grade):  Financial Management Specialist/TWA Management

    FROM (MM/YY): 06/99          TO (MM/YY): Present

    SALARY: $ GS-14              Rate  per yr.          HOURS PER WEEK: 50+

    EMPLOYER'S NAME:  National Transportation Safety Board

    AND ADDRESS:  490 L'Enfant Plaza East, SW
                  Washington, D.C. 20594

    SUPERVISOR'S NAME:  Steve Goldberg

         AND PHONE:  314-6210

----------------------------

DESCRIBE YOUR DUTIES AND ACCOMPLISHMENTS:

As member of the CFO Management Team, advised the Chief Financial Officer (CFO) on various issues including financial management, CitiBank, PriceWater House, strategic planning within the CFO organization, management issues, and accountability issues.

Produced a CFO Web page that is inclusive of most pertinent CFO information including budget, accounting, travel, travel card, purchase card and Small Purchase issues.

Developed and promoted importance of communication and accountability with Approving Officials and Office Directors. Established training for the Purchase Cards Program and the Small Purchases. Established further understanding and training for CitiBank's CitiDirect program.

Rewrote the Board's Travel Order and Purchase Card Order (currently ready for MD's review).

Simultaneously managed three complex government contracts to relocate the TWA Flight 800 Wreckage out of the main hangar at the Calverton facility in New York. These contracts entailed the movement of the largest wreckage reconstruction in the world, one which will serve as part of the primary focus for the NTSB Training Academy. This three-month field assignment involved daily liaison and coordination between state and local officials, contractors, the Investigator-In-Charge and other agency officials. As the on-site coordinating official, I was responsible for ensuring that the wreckage was relocated safely and within the contracts' schedule and budget parameters. This task required daily conferences with contractor and agency officials to ensure that the necessary actions were being taken to ensure that the wreckage was properly crated in sea containers, key components such as the reconstructed 747 and engines were retained for use at the future NTSB Training Academy, and that other wreckage components were properly documented for storage. Simultaneously managed contract on scene with a film documentary company that the Board hired to provide historical documentation of each recovered wreckage piece and film multiple interviews with the Materials Laboratory Division Chief for possible use at the TWA Board meeting. Assisted the Managing Director in developing this necessary documentation process and the statement of work. Since successfully completing these tasks, I developed the agency's procedures to bring it into compliance with the requirements of the Federal Activities Inventory Reform (FAIR) Act of 1998. Researched the statute, reviewed OMB guidelines, and analyzed compliance procedures developed by other Federal agencies. Drafted the transmittal letter to OMB for signature. These procedures were developed in coordination with the General Counsel's office and in consultation with Office Directors and the Managing Director's office. These procedures fulfilled NTSB reporting requirements under the law.

Implemented and now manage the agency federal credit card programs. Developed oversight policies and procedures for both the CitiBank Purchase Card/Convenience Checks and Travel Card Programs. Formulated the training strategy on the purchase cards and presented the majority of the training sessions given to IICs and Administrative Officers. Coordinated regional office training and conducted one-on-one training sessions with individuals responsible for complying with CitiBank Purchase Card requirements.

Assist the CFO on various budget, administrative, and board-wide management issues. Management coordinator for the CitiBank Individual Travel and

Centrally Billed Travel Cards and formulate policy guidelines and training on
card use procedures.  Evaluate the effectiveness of agency-wide financial
management initiatives and ensures integrity of the program.  Participate in the
preparation and evaluation of NTSB Requests for Proposals (RFPs) and Memorandums
of Understandings, including those issued on soliciting location sites for
Training Academy, procuring private audit services with Price Waterhouse, and VA
Cross-Servicing from other agencies.

    One of four individuals chosen to serve on the Training Academy
Development Team.  This team is charged with identifying and analyzing the
development needs of the Training Academy. Obtained, and reviewed, the available
academy documentation including six statements of work. Evaluated the proposals
to determine weaknesses and strengths. Reviewed the Board's capability to issue
an RFP, and reestablished the Board's relationship on the Training Academy with
the General Services Administration (GSA).  Assisted the Project Leader on the
development of a new statement of work and Memorandum of Understanding for GSA
to issue an RFP on the Training Academy.


  2) JOB TITLE (If Federal,
include series and grade):  Special Assistant for Budget & Programs, GS-15

     FROM (MM/YY):  03/82          TO (MM/YY):  08/88
           ------------                 ------------
     SALARY: $  56,000      per  year      HOURS PER WEEK:  +50
           ------------     --------                      --------
     EMPLOYER'S NAME:  U.S. Department of Transportation
           -------------------------------------------------------
     AND ADDRESS:      400 7th Street, S.W.
               Washington, D.C.  20590
           -------------------------------------------------------
     SUPERVISOR'S NAME:  Janet Hale
           ----------------------------------
         AND PHONE:  N/A


    DESCRIBE YOUR DUTIES AND ACCOMPLISHMENTS:


    Assisted the Assistant Secretary for Budget & Programs, and at selected
times the Deputy Secretary and Secretary, as advisor on development, review, and
presentation of the Department's budget resource requirements and on the
evaluation and oversight of the Department's programs.  Responsible for
reviewing the impact and programs in achieving their objectives, advising on
major problem areas that impede attainment of departmental program plans and
objectives, and advising on program and legislative changes necessary to resolve
them.  Responsible for coordinating the impact on departmental resources of
legislative and other proposals, establishing procedures for development of
long-range budgetary resource planning, making recommendations on the budget and
program areas, and various other financial management issues.

    As Special Assistant to the Assistant Secretary for Budget and Programs
performed a variety of high priority, sensitive and complex assignments

involving transportation policy, planning, application of economic analysis, financial management, and decision-making matters.

Developed, coordinated and reviewed materials for pending Secretarial decisions. Supported the Assistant Secretary in policy formulation and decision making in selected areas. Reviewed, assessed, and recommended policy option proposals presented to the Assistant Secretary by other Office of the Secretary (OST) offices or operating administrations. Assured that documents were well coordinated staffed out for appropriate input from all concerned parties and set stringent response deadlines. Represented the Assistant Secretary, and as assigned, the Deputy Secretary's Office in Departmental meetings involving senior officials. Managed the Department's Reception and Representation Fund for the Assistant Secretary. Prepared, coordinated and reviewed Secretarial briefing materials and Congressional testimony as well as speeches for the Assistant Secretary.

Developed and coordinated the Financial Plan for the Office of the Secretary which contributed significantly to the effective and prudent management of OST funds. Reviewed, analyzed and presented recommendation on all reprogramming of funds to the Assistant Secretary. Prepared monthly status reports on budget execution including a mid-year fiscal policy review which incorporated discussion of fiscal management implications for future spending plans. Assisted the Assistant Secretary in the development of the organizational structure, the associated grade assignments and staffing patterns and procurement contract for the two newly created OST offices—Delegation on Multilateral Pricing and Commercial Space Transportation.

Represented the Assistant Secretary on the Departmental University Research Board, Historical Black Colleges, the General Services Administration (GSA)'s Federal Field Structure Intra-Agency Working Group; served as point man and coordinator for the Assistant Secretary in his role as Chairman of the DOT Navigation Council. Represented the Chairman at Departmental, Inter-Agency and private sector meetings and reviewed inter-agency policy proposals on future navigation systems.

Prepared, reviewed and coordinated Secretarial trip briefing materials, Congressional testimony, speeches, budget justifications, and issue "one pagers" for the Secretary's 30-60-90 Day Agenda and the Secretary's General Issues Book in a timely, professional and exacting manner.

As Co-Chair of the DOT's Private Sector Initiative (Government-wide White House's Initiative) prepared, coordinated, and reviewed documents relating to the Department's program; prepared quarterly reports to the White House on these agency-wide matters. Established "Adopt a Seniors" program at Headquarters and "Adopt a School" and Volunteerism program at Headquarters and in the regional offices.

Selected to lead a management review for the Secretary of the operation of the U. S. Coast Guard, particularly its safety role with emphasis on the Search and Rescue Program.

Organized the first Federal agency day care center without using government operational funding. Analyzed financial requirements for the operation of the center and established day care fees based on that examination. A sliding fee based on income was created for the employees. Prepared, coordinated, and reviewed documents relating to the Department's private sector

initiatives and assisted in the preparation of reports for the White House on the Department's program.

9.  MAY WE CONTACT YOUR CURRENT SUPERVISOR? (If we need to        YES [x]
    contact your current supervisor before making an offer,
    we will contact you first.)                                  NO  [ ] .

    EDUCATION

10. MARK HIGHEST LEVEL COMPLETED: Some HS  [] Bachelor []HS/GED [] Master   [x]
                                  Associate []      Doctoral [ ]

11. LAST HIGH SCHOOL or GED SCHOOL:    Yadkinville High School
                                    ------------------------------------
            CITY/STATE/ZIP(if ZIP known): Yadkinville, North Carolina  27055
                                    ------------------------------------
            YEAR DIPLOMA or GED RECEIVED: 1967
                                    -------

12. COLLEGES AND UNIVERSITIES ATTENDED (Do not attach a copy of your
            transcript unless requested.)

    1)  NAME:   Southern Illinois University/Edwardsville
            ----------------------------------------------------------
            CITY/STATE/ZIP: Edwardsville, Illinois  62029
            -------------------------------------
            SEMESTER CREDITS EARNED:        MAJOR(S): Public Administration
                       (or)        ------        ----------------------

            QUARTER CREDITS EARNED:
                                 ------        ----------------------
            DEGREE (If any): MPA        YEAR RECEIVED: 1974
            --------------------------        -------

    2)  NAME:  University of North Carolina at Chapel Hill
            ----------------------------------------------------------
            CITY/STATE/ZIP:  Chapel Hill, North Carolina  27541
            ---------------------------------------------
            SEMESTER CREDITS EARNED:        MAJOR(S): English
                       (or)        ------        ----------------------
            QUARTER CREDITS EARNED:
                                 ------        ----------------------
            DEGREE (If any): BA        YEAR RECEIVED: 1971
            -------        -------

    3)  NAME:
            ----------------------------------------------------------

```
CITY/STATE/ZIP:
                   -------------------------------------------------
SEMESTER CREDITS EARNED:         MAJOR(S):
         (or)            ------           ----------------------
QUARTER CREDITS EARNED:
                         ------           ----------------------
DEGREE (If any):                          YEAR RECEIVED:
                   ------------------------          -------
```

==================================================================

OTHER QUALIFICATIONS


13. Job-related training courses (give title and year).  Job-related
    skills (other languages, computer software/hardware, tools,
    machinery, typing speed, etc.).  Job-related certificates and
    licenses (current only).  Job-related honors, awards, and special
    accomplishments (publications, memberships in professional/honor
    societies, leadership activities, public speaking, and performance
    awards).  Give dates, but do not send documents unless requested.

Training: Piedmont Triad Leadership Program Graduate (1999); Rural Economic
Development Leadership Institute Graduate (1998); Regional Appalachian Regional
Commission Leadership Institute Graduate (1998); Institute of Political
Leadership Program Graduate (1997); Various Management Courses at University of
NC-Chapel Hill's Institute of Government;

Computer Skills: Proficient in: MSWord, Excel, WordPerfect, Lotus 123, Outlook,
and Internet use.  Knowledge of: PowerPoint, Access

Memberships:  National Association of County Officials: National Transportation
& Telecommunications Steering Committee; North Carolina Association of County
Commissioners: Intergovermental Steering Committee, Long Range Strategic
Planning Steering Committee, Tax and Finance Committee; Piedmont Triad
Partnership/State Regional Economic Development; Yadkin County Public Library
Board; Northwest Regional Library Board: Finance and Nominating Committee;
Yadkin County Arts Council; Yadkin County Historical Society; Northwest Piedmont
Council of Governments; Northwest Regional Aging Council; Surry County Housing
Consortium; Community Block Grant Committee; Founder, Yadkin Heritage 2000;
Founder, Vice-Chairman Yadkin County Sesquicentennial Commission;  E-911
Committee; Smart Start Partnership

Other:  Various Public Speaking



     GENERAL:

14. ARE YOU A U.S. CITIZEN? ........................ YES [x ]  NO [  ]
    If NO, give the country of your citizenship:

                                            ----------------------

15. DO YOU CLAIM VETERANS' PREFERENCE? ............. YES [ ]  NO [x]
    If YES, mark your claim of 5 or 10 points below:
            5 POINTS [ ] -- Attach your DD 214 or other proof.
            10 POINTS [ ] -- Attach an Application for 10-Point Veterans'.

              Preference (SF 15) and proof required.


16. WERE YOU EVER A FEDERAL CIVILIAN EMPLOYEE? ..... YES [x]  NO [ ]
    If YES, for Highest Civilian Grade give:

    SERIES:  301     GRADE: 15-3     FROM (MM/YY): 1/86    TO (MM/YY): 1/90
             -------         -----                 ------                ------


17. ARE YOU ELIGIBLE FOR REINSTATEMENT BASED ON
    CAREER OR CAREER-CONDITIONAL FEDERAL STATUS? ... YES [ ]  NO [x]
    If requested, attach SF 50 proof.



APPLICANT CERTIFICATION

18.  I certify that, to the best of my knowledge and belief, all of the
     information on and attached to this application is true, correct,
     complete and made in good faith.  I understand that false or fraud-
     ulent information on or attached to this application may be grounds
     for not hiring me or for firing me after I begin work, and may be
     punishable by fine or imprisonment.  I understand that any informa-
     tion I give may be investigated.



    SIGNATURE: _____    DATE SIGNED: _____

Supplemental Information for OF 612 Application

Name: Name: Richard L. Miller
      S.S. Number: 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

Job Title: Commissioner, Yadkin County Board of Commissioners (Elected)
From: (11-96)     To: (present)     Salary: N/A   Hours per week:

Elected in the November 1996 general election to a four-year term (expires
November 2000, top vote numbers in both the primary and general election).
Provide direct budget oversight of the county's financial plans and management.
Review and approve, or disapprove, budget requests from county agencies based on
independent analysis.  Provide leadership and guidance on county administrative
policies.  Review contract submissions and approve, or disapprove, as determined
including infrastructure investments and personnel management issues.  Direct
the development of policies and practices to insure countywide compliance with
Federal and state rules and regulations.  Speak at public events on behalf of
the County, County Commissioners, and regional planning initiatives.  Serve on
numerous local, regional, state and national organizations to advance
opportunities for citizens of both the county and the region.  Focus efforts on
charting the county's transition from a rural, tobacco-dominated economy to a
fast growing high-tech environment.

Job Title:  Financial Advisor, Ministry of Finance & National Economy, Kingdom
of Saudi Arabia

From:  (9/88-1/90)     Grade: FC12/GS-15     Salary: $65,000  Hours per week: 40

Served as the principal U.S. advisor on a project in the Kingdom of Saudi Arabia
to create a systems-based, unified budget for Saudi Arabia.  Identified methods
for the Saudi Arabian government to accurately assess the short- and long-term
budget effect of infrastructure development projects and various financial
management and financial reporting systems.  Development of the budget tracking
system was necessary because Saudi oil revenues were not keeping pace with
government expenditures.  Both diplomatic tact and budget management expertise
were required in order to bring the project to its successful completion.

Job Title:  Chairman/Chief Financial Officer
From: (1989)   To: (1992)          Salary: Family Business Hours per week: 50+

Employers's name and address:  Yadkin Lumber Company
                               Yadkinville, N.C. 27055

Served as Chairman, and Chief Financial Officer, of a 40-year old lumber
company.  Initiated a complete review of the company's operating procedures and
analyzed the business' financial controls.  Met with business development
experts and market analysts.  Revived business relationships with home
contractors and developed new relationships with commercial
contractors/developers based on personal construction and economic development
experience.  Based on independent research and review, as well as many meetings
with company employees and management officials, designed and implemented a plan
to expand commercial sales and create more efficient inventory practices at the
company.  As a result of the plan's implementation, gross sales increased by 14

percent, gross profits rose by 47 percent, and net profit improved by 44 percent. These improvements were achieved despite an economic downturn in the regional economy. Introduced computers and reporting financial systems.


Supplemental Information for OF 612 Application

Name: Name: Richard L. Miller
      S.S. Number: 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


Job Title: Senior Budget Analyst
From (01/75)     To: (02/82) Salary: $40,000   Hours per week +40

Employer's name and address:   Congressional Budget Office
                               Washington, D.C. 20515

Helped develop procedures to implement the requirements of the Congressional Budget and Impoundment Act of 1974 at the newly created Congressional Budget Office. These duties included identifying difficulties committees/agencies could experience in complying with the law's fiscal year change and developing financial models to track agency budget authority and outlays. Established goals and measurable performance objectives to achieve the financial accountability requirements of the Act. Created procedures to systematically coordinate Federal budget requirements with the Office of Management and Budget, Federal Agencies, and House and Senate Budget Committees which helped enable the successful implementation of the new budget process and a smooth transition to a new fiscal year start date. Reviewed Office of Management and Budget submissions for technical accuracy and consistency while working with OMB resource management offices to resolve any identified problems. Directed an analysis of Congressional budget management information systems.


Job Title: Enterprise Agent (part-time), Micro Enterprise Lending Program
From: (1992)     To: (1994)       Salary: $8 per hr   Hours per week: 30

Employer's name address:       Yadkin Valley Economic Development
                               Boonville, N. C. 27065

Marketed, and supervised, the adoption of a program that promoted self-employment, small business expansion, and economic independence throughout a four-county area in North Carolina. Developed targeted training activities with the community college, trained groups and identified financial resources to promote local employment, business creation and economic independence for disadvantaged individuals traditionally excluded from entrepreneurial ventures. Cooperatively worked with diverse regional organizations and developed partnerships with community colleges, civil organizations, volunteers, and businesses to broaden access to the banking community for individuals who wanted to open small businesses. Succeeded in identifying financial resources for individuals to create businesses without government subsidized loans. Served on a statewide committee to develop and identify additional assistance opportunities for micro-business industries. Established a 15-member Loan Review Committee composed of bankers, successful business entrepreneurs and community leaders who made monetary commitments to finance loans. Assisted on county/regional strategic planning and economic development programs. Advised

the Director on financial management, financial reporting systems for various programs, including Head Start and Meals on Wheels.

Job Title:  Private Consultant
From:  (1995)    To: (1999)        Salary:        Hours per week: 50+

Established a private consultant company that provided strategic planning advice, financial management and communication services for small businesses.

## SELECTIVE FACTORS

1. Experience that demonstrates expert knowledge and understanding of the OMB and Congressional budget process.

2. Experience that demonstrates supervisory, managerial or leadership skill in the performance of Federal budget-related work assignments, group projects, or new initiatives.

## QUALITY RANKING FACTORS

1. Experience in an operating budget office that demonstrates the following:

   Skill in interpreting complex legislative and regulatory policy guidance to determine the effects on the organization's budget and programs.

   Ability to provide expert advice and guidance to peers and management in all phases of the OMB and Congressional budget process.

   Skill in the development and implementation of budget guidelines, strategies, and fiscal control systems for the purpose of budget formulation and execution.

   Skill in the execution, formulation and presentation of a budget for a Federal agency.

2. Experience that demonstrates expert knowledge of the operating principles, concepts, policies and interrelationships of an agency's financial management program.

3. Skill in the use of automated tools to present and analyze financial data and information.

4. Experience developing workable solutions to management, personnel and/or technical problems.

5. Experience that demonstrates the successful development of programs and/or procedures that meet the changing needs of an agency.

6. Ability to produce results through planning. Examples should reflect accountability, continuous improvement, and making timely and effective decisions.

7. Experienced that demonstrates the ability to explain, advocate, and express facts and ideas in a convincing manner, and negotiate with individuals and groups internally and externally. Examples should include oral and written communication.

## OTHER SINGIFICANT FACT

1. Candidates must demonstrate that they possess or have the potential to develop the qualities for successful supervision as indicated. Applicable experience and training must be included in the application.

2. The candidate selected for this position may be required to complete a supervisory/managerial probationary period.

ResumeBudgetOfficer

*[handwritten: Budget Office? It was not attached to 612.]*

## SELECTIVE FACTORS

1. **Experience that demonstrates expert knowledge and understanding of the OMB and Congressional budget process.**

At US DOT, served as advisor to the Assistant Secretary for Budget and Programs on the development, review, and presentation of the Department's budget and programs. Responsible for reviewing the impact and programs in achieving their objectives, advising the Assistant Secretary on major problem areas that impede attainment of departmental program plans and objectives, and advising the Assistant Secretary and Secretary on program and legislative changes necessary to resolve them. Responsible for coordinating the impact on departmental resources of legislative and other proposals, establishing procedures for development of long-range budgetary resource planning, and making recommendations on the budget and program aspects of proposals for acquisitions of major new technical systems. Reviewed, coordinated, documented budget briefing material and financial accounting reports for the Assistant Secretary, Deputy Secretary and Secretary, Office of Management and Congress justifying DOT's annual budget requests. Monitored Congressional action on appropriation and authorization legislation and advised Committee staff to ensure that the Agency's requests received positive consideration.

Managed the R & R funds for the agency, chaired an inter-agency team created by the Secretary to evaluate the effectiveness of the Coast Guard's Search and Rescue program, and co-chaired the Deputy's Task Force on Private Sector Initiatives and Volunteerism Programs. I also, while still with the Department of Transportation (DOT) developed and coordinated the Financial Plan for the Office of the Secretary which contributed significantly to the effective and prudent management of OST funds. Reviewed analyzed and presented recommendation on all reprogramming of funds to the Assistant Secretary. Prepared monthly status reports on budget execution including a mid-year fiscal policy review which incorporated discussion of fiscal management implications for future spending plans. Assisted the Assistant Secretary in the development of the organizational structure, the associated grade assignments and staffing patterns and procurement contract for the two newly created OST offices—Delegation on Multilateral Pricing and Commercial Space Transportation.

As Senior Budget Analyst, helped develop procedures to implement the requirements of the Congressional Budget and Impoundment Act of 1974 at the newly created Congressional Budget Office. These duties included identifying difficulties committees/agencies could experience in complying with the law's fiscal year change and developing financial models and systems to track agency budget authority and outlays. Established goals and measurable performance objectives to achieve the financial accountability requirements of the Act. Created procedures to systematically coordinate Federal budget requirements with the Office of Management and Budget, Federal Agencies, and House and Senate Budget Committees which helped enable the successful implementation of the new budget process and a smooth transition. Reviewed Office of Management and Budget submissions for technical accuracy and consistency while

working with OMB resource management offices to resolve any identified problems. Directed an analysis of Congressional budget management information systems and its inter-relationship with OMB databases.

2. **Experience that demonstrates supervisory, managerial or leadership skill in the performance of Federal budget-related work assignments, group projects, or new initiatives.**

Assisted the Assistant Secretary for Budget & Programs in managing agency budget operations, while with the U.S Department of Transportation (DOT). Identified potential weaknesses within the DOT budget and coordinated with the Assistant Secretary activities that resolved the identified financial problems. Prepared memorandums and associated briefing materials that the Secretary could use to assess policy and management proposals presented for funding. Reviewed and coordinated budget briefing materials, Congressional testimony and speeches for the Assistant Secretary and Deputy Assistant Secretary. Prepared documentation for the Secretary, Office of Management and Budget, and Congress justifying annual budget requests. Monitored Congressional action on appropriations and authorization legislation and worked with relevant Committee staffs to insure that the Agency's requests received successful consideration.

Chaired an inter-agency team created by the Secretary to evaluate the effectiveness of the Coast Guard's Search and Rescue program. Co-chaired the Deputy's Task Force on Private Sector Initiatives and Volunteerism Programs.

In my NTSB position as the Financial Management Specialist, I wrote a new draft Board order governing the new CitiBank Travel Card, in accordance with relevant Federal Regulations, and Approving Officials responsibilities. Surveyed the agency and provided a new process to list and review employees on Annual Travel Orders, resulting in a significant reduction of reconciled travel card expenditures to the individual authorized by the Board. Briefed and advised the CFO on all NTSB credit card programs and other financial management issues.

## QUALITY RANKING FACTORS

1. **Experience in an operating budget office that demonstrates the following: (A) Skill in interpreting complex legislative and regulatory policy guidance to determine the effects on the organization's budget and programs; (B) Ability to provide expert advice and guidance to peers and management in all phases of the OMB and Congressional budget process; (C) Skill in the development and implementation of budget guidelines, strategies, and fiscal control systems for the purpose of budget formulation and execution; and (D) Skill in the execution, formulation and presentation of a budget for a Federal agency.**

At US DOT, served as advisor to the Assistant Secretary for Budget and Programs on the development, review, and presentation of the Department's budget and programs. Responsible for reviewing the impact and programs in achieving their objectives, advising the Assistant Secretary on major problem areas that impede attainment of departmental program plans and objectives, and advising the Assistant Secretary and Secretary on program and legislative changes necessary to resolve them.

Responsible for coordinating the impact on departmental resources of legislative and other proposals, establishing procedures for development of long-range budgetary resource planning, and making recommendations on the budget and program aspects of proposals for acquisitions of major new technical systems. Reviewed, coordinated, documented budget briefing material and financial accounting reports for the Assistant Secretary, Deputy Secretary and Secretary, Office of Management and Congress justifying DOT's annual budget requests. Monitored Congressional action on appropriation and authorization legislation and advised Committee staff to ensure that the Agency's requests received positive consideration.

As member of the CFO Management Team, advised the Chief Financial Officer (CFO) on various issues including financial management, CitiBank, Price Waterhouse, strategic planning within the CFO organization and the subsequent off-site planning sessions, the selection of a new Travel Management contract, management issues, and accountability issues.

Assisted the CFO in review of the DOT IG Report and Price Waterhouse drafts in response to the IG's report and the follow-up requirements.

Developed and promoted importance of written "rules", communication and accountability with Approving Officials, Office Directors, and employees. Assisted the CFO in the preparation of a 50-page Power Point Presentation on Financial Management at the NTSB: Spending Government Funds, the DOT IG Audit and Investigation and Government Credit Cards. Twelve information/training sessions were conducted at Headquarters with video conferencing to the Regions. My role during the training was that of subject matter expert.

Selected to participate in the following professional leadership endeavors: Piedmont Triad Leadership Program Graduate (1999); Rural Economic Development Leadership Institute Graduate (1998); Regional Appalachian Regional Commission Leadership Institute Graduate (1998); Institute of Political Leadership Program Graduate (1997); Various Management Courses at University of NC-Chapel Hill's Institute of Government.

Implemented and now manage the agency federal credit card programs. Developed oversight policies and procedures for both the CitiBank Purchase Card/Convenience Checks and Travel Card Programs. In response to the DOT's IG investigations, particular concern was raised over the use of Rapid Drafts. Working with appropriate staff and program managers, I responded by designing and developing a Purchase Card Program with accompanying training. This program has grown and evolved into one of the best in the federal government. Formulated the training strategy on the purchase cards and presented the majority of the training sessions given to IICs and Administrative Office

From 1989 to 1992, while in the private sector, I served as the Chairman and Chief Financial Officer of a 40-year old lumber/building supply company. One of my most notable accomplishments in this position, was the conducting of a comprehensive review of the company's management structure. I analyzed the effectiveness of the company's financial controls and operational/personnel procedures. Based on this examination, I established enhanced financial controls in order to improve the company's inventory management and bill-paying procedures so as to reconcile delivery invoices with actual deliveries, and not for undelivered items; thereby, ensuring payments were for only actual deliveries. This examination and subsequent accounting evaluation along with ongoing consultation with the Company's accountant, we revealed approximately a $300,000 loss of supposedly-delivered lumber in one year.

I targeted new business opportunities and identified initiatives to enhance the business' economic performance. I analyzed the profitability and unique advantage of dressing pine lumber and its profit relationship to shipped lumber. I subsequently developed a multi-year marketing plan to implement the identified changes. Additionally, I conducted a review of the personnel costs, culture, management style and interrelationships between management and employees. After my financial and organizational principles were totally implemented, the company's economic performance significantly improved -- gross sales increased by 14 percent, gross profit rose by 47 percent, and net profit increased 44 percent.

The work successfully completed on the FAIR Act project at the NTSB serves as another example of my capability to negotiate complex legislative and regulatory policy guidelines. Working in partnership with the offices involved, I coordinated activities with agency personnel liaisons and negotiated with Office Directors. Quantitative information was developed in the process to document how the NTSB would accurately project which services could be performed by a commercial source. The final report was

submitted to the Managing Director and subsequently filed after relatively few changes with the Office of Management and Budget.

Recently served on the review panel for the selection of bidders under the MOBIS Supply Schedule to conduct a review and analysis of financial management controls, processes, and systems of the Board. Contributed to the preparation of the initial Statement of Work and evaluated three vendors who submitted proposals to assist the Board in conducting a close out review of the Rapidraft Payment System; evaluating current financial management processes, and identifying areas that require strengthened internal controls.

### 2. Experience that demonstrates expert knowledge of the operating principles, concepts, policies and interrelationships of an agency's financial management program.

Managed the R & R funds for the agency, chaired an inter-agency team created by the Secretary to evaluate the effectiveness of the Coast Guard's Search and Rescue program, and co-chaired the Deputy's Task Force on Private Sector Initiatives and Volunteerism Programs. I also, while still with the Department of Transportation (DOT) developed and coordinated the Financial Plan for the Office of the Secretary which contributed significantly to the effective and prudent management of OST funds. Reviewed analyzed and presented recommendation on all reprogramming of funds to the Assistant Secretary. Prepared monthly status reports on budget execution including a mid-year fiscal policy review which incorporated discussion of fiscal management implications for future spending plans. Assisted the Assistant Secretary in the development of the organizational structure, the associated grade assignments and staffing patterns and procurement contract for the two newly created OST offices—Delegation on Multilateral Pricing and Commercial Space Transportation.

After an extensive needs assessment of NTSB employees, it was determined that agency-wide training was needed on small purchases. In addition to acquiring a contractor, a Small Purchase manual was developed. The delivery modality here also included video conferencing and overseeing overall logistics.

In 1996, I was elected to serve as a County Commissioner in a small rural county that had performed under the same administration for 18 years. My general election victory is proof of my ability to work with representatives of all organizations in pursuit of a common goal. The operation of county government was conducted on the basis of "whom you knew" rather than oriented around policies and priorities. Prior to my election, there had been little, or no, training available on the proper administration of a multi-million dollar budget. For the first two years of my term, I spent 60-80 hours a week incorporating generally accepted public financial/administrative principles and budget-setting guidelines into this previously lacking county administration.

I first determined what financial planning procedures the Commissioners should follow to administer and operate county programs. I lobbied, inside and outside county

government, for the need to make financial decisions in the context of an annual budget. I discovered that county office directors were continuously able to submit many requests for additional funding to the County and have the Commissioners approve those requests as "budget amendments" outside the fiscal year planning process. This "accepted" practice was, in my opinion, completely uncontrollable. As a result of my efforts, the submission and approval of these "amendments" was made much more difficult and any additional funding requests must now be accompanied by budget justifications.

### 3. Skill in the use of automated tools to present and analyze financial data and information.

Produced a CFO Web page that is inclusive of the most pertinent CFO information including budget, accounting, travel, travel card, purchase card and Small Purchase issues. The Web site includes electronic access to the NTSB Budget, GSA's Federal Travel Regulations, necessary financial forms, Small Purchases Training Manual, and NTSB financial orders. In the planning stages are sections for the financial management systems (FMS), and frequently-asked questions

In developing a plan to bring the NTSB into compliance with reporting requirements under the Federal Activities Inventory Reform (FAIR) Act, I accessed Internet web sites to research the law's legislative background and determine how Federal agencies were implementing the statute's provisions. I manipulated several computer programs, including Microsoft Excel, Word and Outlook, to develop electronic information tools to identify NTSB activities that could be considered inherently governmental and those that could be considered commercial activities. The NTSB's submission, including the Excel spreadsheet, was sent to OMB and Congress, was published in the Federal Register, and is on the agency's web site.

At CBO, I developed reports for OMB and the Congressional committees to track the President's Budget and spending actions against the budget resolutions.

### 4. Experience developing workable solutions to management, personnel and/or technical problems.

Elected in the December 1996 general election to a four-year term (top vote numbers in both the primary and general election). Provided direct oversight for $24 million budget of the county's financial plans and management. Reviewed and approved, or disapproved, budget requests from county agencies based on independent analysis. Provided leadership and guidance on county administrative policies. Reviewed contract submissions and approved, or disapproved, as determined including infrastructure investments and personnel management issues. Directed the development of policies and practices to insure countywide compliance with Federal and state rules and regulations. Spoke at public events on behalf of the County, County Commissioners, and regional planning initiatives. Served on numerous local, regional, state and national organizations to advance opportunities for citizens of both the county and the region. Focused efforts

on charting the county's transition from a rural, tobacco-dominated economy to a fast growing high-tech environment and within the existing budget.

Simultaneously managed three complex government contracts to relocate the TWA Flight 800 Wreckage out of the main hangar at the Calverton facility in New York. These tasks were an integral component of saving the government $3 million annually. These contracts entailed the movement of the largest wreckage reconstruction in the world, one which will serve as part of the primary focus for the NTSB Training Academy. This three-month field assignment involved daily liaison and coordination between state and local officials, contractors, the Investigator-In-Charge and other agency officials. As the on-site coordinating official, I was responsible for ensuring that the wreckage was relocated safely and within the contracts' schedule and budget parameters. This task required daily conferences with contractor and agency officials to ensure that the necessary actions were being taken to ensure that the wreckage was properly crated in sea containers, key components such as the reconstructed 747 and engines were retained for use at the future NTSB Training Academy, and that other wreckage components were properly documented for storage. Simultaneously managed contract on scene with a film documentary company that the Board hired to provide historical documentation of each recovered wreckage piece and film multiple interviews with the Materials Laboratory Division Chief for possible use at the TWA Board meeting. Assisted the Managing Director in developing this necessary documentation process and the statement of work.

I led the revamping of internal financial accounting guidelines and procedures, resulting in uniform practices and savings of considerable funds. One example, exposed and corrected probable fraud and irregularities through internal audit and analysis of financial accounting systems in double counting in the federal Head Start Program, the federal/state USDA "Meals-on-Wheels" Program, senior citizen centers, and the federal/state Rural Transportation Delivery Grants.

**5. Experience that demonstrates the successful development of programs and/procedures that meet the changing needs of an agency.**

In response to the DOT's IG investigations, particular concern was raised over the use of Rapid Drafts. Working with appropriate staff and program managers, I quickly responded by designing and developing a Purchase Card Program with accompanying training. This program has grown and evolved into one of the best in the federal government.

Led the effort to bring cross-servicing into NTSB. This effort resulted in post-auditing of travel vouchers with the Department of Veterans Affairs and processing travel vouchers through the Bureau of Public Debt.

Exposed and corrected probable fraud and irregularities through internal audit and analysis of financial accounting systems in double counting in the federal Head Start Program, the federal/state "Meals-on-Wheels" program, senior citizen centers, and the federal/state Rural Transportation Delivery Grants.

Selected to participate in the following professional leadership endeavors: Piedmont Triad Leadership Program Graduate (1999); Rural Economic Development Leadership Institute Graduate (1998); Regional Appalachian Regional Commission Leadership Institute Graduate (1998); Institute of Political Leadership Program Graduate (1997); Various Management Courses at University of NC-Chapel Hill's Institute of Government.

   6. **Ability to produce results through planning. Examples should reflect accountability, continuous improvement, and making timely and effective decisions.**

With an eye towards creating community empowerment, I marketed, and supervised, the adoption of a program that promoted self-employment, small business expansion, and economic independence throughout a four-county area in North Carolina. Developed targeted training activities with the community college, trained groups and identified financial resources to promote local employment, business creation and economic independence for disadvantaged individuals traditionally excluded from entrepreneurial ventures. Cooperatively worked with diverse regional organizations and developed partnerships with community colleges, civil organizations, volunteers, and businesses to broaden access to the banking community for individuals who wanted to open small businesses. Succeeded in identifying financial resources for individuals to create businesses without government subsidized loans. Served on a statewide committee to develop and identify additional assistance opportunities for micro-business industries. Established a 15-member Loan Review Committee composed of bankers, successful business entrepreneurs and community leaders who made monetary commitments to finance loans. Assisted on county/regional strategic planning and economic development programs.

Led the effort to bring cross-servicing into the NTSB. This effort resulted in post-auditing with the Department of Veterans Affairs and travel vouchers through the Bureau of Public Debt.

Served as Chairman, and Chief Financial Officer, of a 40-year old lumber company. Initiated a complete review of the company's operating procedures and analyzed the business' financial controls. Met with business development experts and market analysts. Revived business relationships with home contractors and developed new relationships with commercial contractors/developers based on personal construction and economic development experience. Based on independent research and review, as well as many meetings with company employees and management officials, designed and implemented a plan to expand commercial sales and create more efficient inventory practices at the company. As a result of the plan's implementation, gross sales increased by 14 percent, gross profits rose by 47 percent and net profit improved by 44 percent. These improvements were achieved despite an economic downturn in the regional economy.

Established "Adopt a Seniors" program at DOT Headquarters and "Adopt a School" and Volunteerism program at Headquarters and in the regional offices. At that time, it was

noted that DOT's Volunteerism program was a model for other federal agencies; in fact, the "Adopt a School" program received the District of Columbia Award for Excellence.

> **7. Experienced that demonstrates the ability to explain, advocate, and express facts and ideas in a convincing manner, and negotiate with individuals and groups internally and externally. Examples should include oral and written communication.**

After an extensive needs assessment of NTSB employees, it was determined that agency-wide training was needed on small purchases. In addition to acquiring a contractor, a Small Purchase manual was developed. The delivery modality here also included video conferencing and overseeing overall logistics.

Furthermore, I addressed Emergency Medical Service (EMS) funding. EMS is a politically sensitive issue, which undeniably must run efficiently. Through self-initiated research, I discovered that our county's share of program expenses had increased significantly over the past few years, rising to $1 million annually. To determine how to bring those costs down, I met with other county commissioners, county managers, county and state EMS officials, and other officials on the state and federal level. I learned that the EMS program was self-supporting in other counties and that North Carolina's statewide reimbursement rates for Medicare cases were much lower than adjacent states. Through research and analysis, I brought this to the attention of our State County Commissioner's Association, where, after intense lobbying, it became one of the Association's top priorities. I next contacted several state elected representatives, the Governor's office, the State EMS Association, our National Association, three US Congressmen, and the Health Care Financing Administration. This research also led to the development of a revised billing procedure at the county level. My initiative at the local level resulted in a national review at which the Governor and state association were awarded a seat on the decision making panel at the national level. As a result, the county that I represent, and others in the state, now receive a more equitable Medicare re-imbursement rate.

The work successfully completed on the FAIR Act project at the NTSB serves as another example of my capability to negotiate with individuals at all organizational levels. Working in partnership with the offices involved and the General Counsel, I coordinated activities with agency personnel liaisons and negotiated with Office Directors. Quantitative information was developed in the process to document how the NTSB would accurately project which services could be performed by a commercial source. The final report was submitted to the Managing Director and subsequently filed after relatively few changes with the Office of Management and Budget.

Following are selected examples of professional endeavors involving leadership in management studies: Piedmont Triad Leadership Program Graduate (1999); Rural Economic Development Leadership Institute Graduate (1998); Regional Appalachian Regional Commission Leadership Institute Graduate (1998); Institute of Political

Leadership Program Graduate (1997); Various Management Courses at University of NC-Chapel Hill's Institute of Government.

As a part of my professional growth and development, I have maintained an expansive network of associations with fellow colleagues, external associates and others. Following is a selected listing of memberships and/or affiliations: National Association of County Officials: National Transportation & Telecommunications Steering Committee; North Carolina Association of County Commissioners: Intergovernmental Steering Committee, Long Range Strategic Planning Steering Committee, Tax and Finance Committee; Piedmont Triad Partnership/State Regional Economic Development; Yadkin County Public Library Board; Northwest Regional Library Board: Finance and Nominating Committee; Yadkin County Arts Council; Yadkin County Historical Society; Northwest Piedmont Council of Governments; Northwest Regional Aging Council; Surry County Housing Consortium; Community Block Grant Committee; Founder, Yadkin Heritage 2000; Founder, Vice-Chairman Yadkin County Sesquicentennial Commission; E-911 Committee; Smart Start Partnership.

ResumeBudgetOfficer

## AFFIDAVIT

WASHINGTON
DISTRICT OF COLUMBIA

I, Richard Miller, (male, DOB: 03/24/49), Financial Management Specialist, GS-501-14, Office of the Chief Financial Officer (OCFO), National Transportation Safety Board (NTSB), make the following statement freely and voluntarily to Anne E. Anderson, who has identified herself to me as an EEO Contract Investigator for the NTSB, investigating a complaint of discrimination filed by me, knowing that this statement is confidential and may be shown to only a legally interested party. I hereby solemnly swear/affirm:

1.      I have held my present position for approximately two years. I obtained this position by making application and being selected. My current first level supervisor is Steve Goldberg, Chief Financial Officer. Mr. Goldberg reports to the NTSB Chairman and Managing Director. My previous job was that of TWA Coordinator (coordinating procedures during the close-out investigation of the TWA crash off Long Island, NY and other budget/financial responsibilities including the NTSB Training Academy). This was a temporary position not to exceed one year.

2.      In the meeting with the EEO Investigator we discussed all the position vacancy announcements listed below. I allege discrimination on the basis of my age and sex occurred in the process of selection for these vacancy announcements:

>       a.  WA-TB-029   Program Coordinator-Knowledge, GS-15 4/21/00
>       b.  WA-TB-030   Administrator Coordinator, NTSB Academy, GS-14 4/21/00
>       c.  01-020          Operations Manager, NTSB Academy, GS-14, 9/12/01
>       d.  WA-TB-1-119 Operations Manager, NTSB Academy, GS-14, 9/22/00
>       e.  NA                Special Assistant Detail, GS-14, NA
>       f.  NA                Special Assistant Detail, GS-15, NA
>       g.  WA-01-010    Senior Management Analyst, GS-14, 4/25/01
>       h.  WA-01-010    Senior Management Analyst, GS-15, 4/25/01
>       i.  WA-TB-1-007 Chief Financial Officer, SES, 12/01/00
>       j.  WA-TB-1-065 Communications Specialist, GS-15, 4/24/01
>       k.  WA-TB-1-055 Budget Officer, GS-15, 5/31/01

Although we discussed all vacancy announcements listed above, it was not until a phone conversation on 9/10 that the EEO Investigator stated that Ms. Guest said not to investigate the Special Assistant Details. Ms. Guest has stated that the detail positions would be included. Which should one believe? The EEO Investigator's draft affidavit lists the following for investigation:

a. WA-TB-029      Program Coordinator-Knowledge
b. WA-01-010       Senior Management Analyst (not listed here at both GS-14 and
GS-15 grades)
c. WA-TB-1-007   Chief Financial Officer

    Initials *RM*

Richard Miller Declaration

Civil Action No. 06-01071 (GK)

Exhibit _____ 7

## AFFIDAVIT

had heard a rumor that the job had been filled prior to Ms. Beal's visit by a pre-selected candidate from GSA. The selectee William Eisenrach is five years younger than I am. I believe his selection may have had something to do with Mr. Eisenrach being a friend of Bob Gilson, Team Leader in the project to establish the training academy. Dan Campbell, Managing Director told me he had recommended my name to Ms. Beal. At the time I believed 01-020 was the position that had been filled. I did not find out WA-TB-1-119 was the job that was filled until the EEO Counselor reported the information. It seems a new announcement for a real estate person was issued within days of the first announcement. I guess months of working nights and weekends in addition to my full-time duties to pull the Academy project together means nothing. I don't know how my age compares to others on the qualifying list for both of these vacancies.

9.    Announcement No. 0-010 Senior Management Analyst GS-14/15
I was never interviewed for either of these two positions. As stated in the EEO Counselor's report, I applied at both the GS-14 and GS-15 level. I was placed on the GS-15 level certificate only. The Selectees were Barbara Czech and David Mayer. Both applied only at the GS-15 level. The counselor's report states that although both Czech and Mayer requested consideration at the GS-15 grade level only, both also were placed on the Referral and Selection Certificate at the GS-14 grade level. Barbara Czech was selected at the GS-14 level and promoted soon after. David Mayer was selected at the GS-15 level. Both Mr. Mayer and Ms. Czech are under 40 years of age. I don't know how I compare in age to others on the qualifying list at either the GS-14/15 level.

10.    Announcement No. _____ Special Assistants Detail to Managing Director GS-14-15
These two (Mayer and Czech) were selected from two competitively advertised developmental vacancy announcements before later being selected for the permanent No 0-010 positions. It was commonly known that both had been pre-selected for these detail positions, which had not been funded. The details were advertised and I applied and was not selected. A month after Ms. Czech was selected for the GS-14 level she was promoted to a GS-15 effective July 2001. I believe I was qualified for these detail development positions and a review of their applications and mine will disclose this. The counselor's report states that a copy of the announcement for these detail positions is attached but now cannot be provided. I have thus requested a copy of the announcement from HR. I don't know how I compare in age to others on the qualifying list at both the GS-14 and GS-15 levels.

11.    Announcement No. WA-TB-1-055, Budget Officer, GS-560-15
I have little knowledge of what the process was used in filling this position. The counselor's report confirms that two outside employees were brought in for interviews prior to establishment of the qualifying lists. I do not know how they compare in age/sex. I was not interviewed. I know that Sylvia Livingston was selected. She is female and younger than I am. I was told I was not qualified for the position by Bernie Moffett, Personnel Management Specialist/HR and Don Libera, Deputy Chief Financial Officer. I was very upset when I was told I was not qualified for the position of Budget Officer since most of my background is in budget. I was told you have to have experience in a



## AFFIDAVIT

"Budget shop", which I have. I believe the selectee came from a "Resource" shop at DOT rather than the "Budget Shop". I don't believe the Resource shop at DOT is the operating budget office and is quite different from the budget shop.  Previously, the DOT budget and resource shops reported to different Assistant Secretaries. Again while I do not know the qualifications and experiences of the selectee or the other thirty-three on the qualifying list, I believe a review of my qualifications and experiences will show that I should have been included in the list of 34 qualified applicants. Also, if I was denied any consideration as I was told because I didn't have budget shop experience, then the others, including the selectee should have this experience. A DOT organizational chart should show a difference between the budget and resource shops and show the functions of each. I don't believe that 34 outside applicants were more qualified than myself. The Managing Director said he would support a GS-15 at my current position in the CFO office. The Deputy CFO stated he would support a GS-15 outside the CFO office because one couldn't be a <u>non-supervisory</u> GS-15. I later learned that one on the selecting panel (Dave Burgman) received both his GS-14 and GS-15 with accretion of duties.  He also received his GS-15 just months prior and without any employees other than possibly using my name as an employee.  The letter of accretion for Burgman with back-up documentation and the 52 for his first employee should show discrimination and that he was only a supervisor on paper and it was with my name and my functions. I did not find this out until much later but take my functions and myself—just on paper—to make someone a GS-15 supervisor?? This is another example of a pattern of discrimination of age as Burgman is under 40. I also developed information on management functions for added duties but all this stopped when the Managing Director would not return my phone calls.  A list of ages when GS-15 employees in the CFO received their GS-15's would show a pattern of age/sex discrimination.

12.     Announcement WA-TB-1-065 Communications Specialist
I did not apply for this position because I have been told that I could not be a GS-15 <u>non-supervisory</u> and it was commonly known that this position was created to retain a political holdover.

13.     Announcement WA-TB-1-007, Chief Financial Officer, ES-501
The EEO Investigator has informed me that I was rated by the panel for this position as unqualified in all categories. I disagree. What was the basis for this conclusion that I was not qualified in all categories, including the SES criteria? I have submitted to the EEO Investigator the documentation and application with my qualifications and experiences to show that I should have made the qualifying list and my suitability for the position of Chief Financial Officer. I do not know how I compare in age/sex to others on the qualifying list. It is just difficult for me to believe that with 15 years of budget experience and having held various leadership positions that I would be rated "not qualified" in all categories on the qualifying list.

**No Position Description**

*189*

Initials *PM*

## AFFIDAVIT

the CFO office "temporarily" raised her to a GS-14. But she was told to become a GS-14 they would have to do a desk audit of her functions to see if they justified a GS-14. At her age she became so disgusted she gave notice of retirement in two months. Then, the CFO office must have miraculously decided the job was a GS-14 because they actually advertised it at a GS-14 and selected a much younger applicant for the job. The applicant did not take the job and now the CFO office has readvertised for a GS-14. The 37-year veteran finally was promoted to a GS-14 the week before she retired and after the job was offered to a younger person. A review of the paperwork on the Budget Analyst position and the retirement of the 37-year veteran would show a pattern of discrimination of age. Further, I was told that when coming back into the government I could be only two within grades higher than my last position and I believe that during my period of employment at NTSB, I probably am the only one who hasn't receive a within grade or promotion. It is my understanding that a recent under 40 hire (Mary Wallace) was brought on at a much higher salary ($20-30,000) than she was either making in the government or private sector. A review of this employee's previous position to her hiring salary should confirm. A review of within grades and promotions since June 1999 should confirm that other younger employees have received within grades and/or promotions but that I have not. Other examples of discrimination patterns and reprisals are included in the letter to the EEO Investigator of August 9, 2002.

**Performance Evaluation**
16.     The EEO Investigator has asked me why I believe I should have been rated as "Outstanding" instead of "Excellent." I state I was responsible for a large percentage of the financial correction work in the CFO office. I have provided the EEO investigator with an email from the former CFO which states what an integral part my functions were of what he accomplished and of what he received as an SES bonus. I have also provided the Investigator with copies of letters the NTSB Chairman sent to Congress on the numerous improvements to internal controls at NTSB. I have been a "key" player or led in most of these improvements.

I have not been interviewed for any of these vacancy announcements.

I have read the above statement consisting of seven pages and it is true and complete to the best of my knowledge and belief. I understand that the information I have given is to be considered confidential and that it may be shown to only a legally interested party.

EEOAFF
_____

Signature: _____

Date: _____ 9/16/02

Subscribed and sworn to before
me at _____
on the _____ day of _____ 2002

_____
_____

190

Jacqueline Celcis
Notary Public, District of Columbia
My Commission Expires 08-31-2006

Richard Miller Declaration

Civil Action No. 06-01071 (GK)

Exhibit ___8___

# Discrimination Complaint Process (29 CFR 1614)

**[1]**

## Discrimination Complaint Process (29 CFR 1614)

### Basis for discrimination



- Race
- Color
- National Origin
- Religion
- Sex
- Age
- Disability
- Reprisal/Retaliation
- Sexual Orientation*

Can you identify the issue of Alleged Discrimination?

**IF YES**

* Complaints based on Sexual Orientation cannot be the subject of either a hearing before an Administrative Judge of the EEOC or an appeal to EEOC

**[2]**

**If Yes =** You must contact the EEO office for an EEO Counselor within **45 calendar days** of alleged incident or effective date of the action.

**[3]**

### Counseling

- **30 calendar days**
- with an additional **60 calendar days** if extension is granted or complainant request mediation

**[4]**

### Resolution

- In the event of resolution, the EEO Counselor or mediator will draw up a settlement agreement

### Dispute Resolution

- If no resolution →

**[5]**

The EEO Counselor will conduct....

- Final interview to close out informal process

**AND**

- Inform the complainant of the right to file a formal complaint within **15 calendar days**

**[6]**

### NTSB has 180 calendar days from the date of the filing to....

- Accept or dismiss the complaint
- Conduct investigation and develop an investigative summary
- Issue the Report Of Investigation (ROI) to complainant

**180**

**[7]**

### Choose

within 30 Days from receipt of ROI

**180**
- Hearing (to be held within 180 days) with an EEOC Administrative Judge (AJ)

**OR**

**60**
- Immediate Final Agency Decision (FAD) (to be given within 60 days)

**[8]**

### NTSB Decision



FOR          AGAINST

- Final Decision by NTSB (no hearing) within **60 days**

**OR**

- Final Order (hearing) issued within **40 days** of receipt of AJ's Decision

**[9]**

### Appeal



- To EEOC within **30 days** of receipt of FAD (in writing)
- To US District Court within **90 days** of receipt of FAD

Richard Miller Declaration

Civil Action No. 06-01071 (GK)

Exhibit ___9___

*Exhibit I*

**Miller Richard**

| | |
|---|---|
| **From:** | Guest Fara |
| **Sent:** | Friday, March 26, 2004 9:38 AM |
| **To:** | Miller Richard |
| **Subject:** | RE: |

I don't know.

> -----Original Message-----
> **From:** Miller Richard
> **Sent:** Friday, March 26, 2004 9:26 AM
> **To:** Guest Fara
> **Subject:** RE:
>
> I realize that you talk to many people--but the question here is what are the dates that we discussed the first EEO complainant? Richard
>
> > -----Original Message-----
> > **From:** Guest Fara
> > **Sent:** Thursday, March 25, 2004 3:13 PM
> > **To:** Miller Richard
> > **Subject:** RE:
> >
> > Are you talking about 2002? I don't keep records of conversations/discussions because I have many discussions with different people at different times on any given day/month/calendar year.
> >
> > > -----Original Message-----
> > > **From:** Miller Richard
> > > **Sent:** Thursday, March 25, 2004 3:06 PM
> > > **To:** Guest Fara
> > > **Subject:** RE:
> > >
> > > So we didn't talk about the 1st EEO case until January, 02?????
> > >
> > > > -----Original Message-----
> > > > **From:** Guest Fara
> > > > **Sent:** Thursday, March 25, 2004 2:58 PM
> > > > **To:** Miller Richard
> > > > **Subject:** RE:
> > > >
> > > > I have no record of you contacting me in Nov. or Dec.
> > > >
> > > > > -----Original Message-----
> > > > > **From:** Miller Richard
> > > > > **Sent:** Thursday, March 25, 2004 10:44 AM
> > > > > **To:** Guest Fara
> > > > > **Subject:**
> > > > >
> > > > > Fara,
> > > > > In follow-up to our conversation this morning, could you look in the file and let me know when I first contacted you on the first EEO cases. Did we have any meetings in Nov-December? Thanks. Richard

Exhibit F-47



**National Transportation Safety Board**
Washington, D.C. 20594

October 15, 2001

Mr. Richard L Miller
Apt. 304 1515 Arlington Ridge Road
Arlington, VA 22202

Dear Mr. Miller:

This is to inform you that we received your recent application for consideration for the position of Operations Manager, WA-TB-1-020, with the National Transportation Safety Board. We will now start the process of reviewing all applications to determine the appropriate qualifications and grade level(s). This review process can sometimes be lengthy, however, you will be notified as soon as possible concerning the status of your application.

We thank you for your interest in the work of the Safety Board.

Sincerely,

*Marquee' L. Holmes*

Marquee' L. Holmes
Human Resources Representative

Richard Miller Declaration

Civil Action No. 06-01071 (GK)

Exhibit _10_

# Unknown

**From:**      Guest Fara
**Sent:**      Wednesday, September 11, 2002 2:28 PM
**To:**        Miller Richard
**Subject:**   RE:

What is the announcement #??

-----Original Message-----
**From:**      Miller Richard
**Sent:**      Wednesday, September 11, 2002 10:27 AM
**To:**        Guest Fara
**Subject:**

Fara,
The investigator tells me that you have removed the two detailee Special Assistant positions from my EEO complaint.
Please tell me why they have been removed.  Richard

1

Richard Miller Declaration

Civil Action No. 06-01071 (GK)

Exhibit  _11_

**Miller Richard**

| | |
|---|---|
| **F      n:** | Guest Fara |
| **Sent:** | Thursday, March 07, 2002 10:15 AM |
| **To:** | Miller Richard |
| **Cc:** | 'CFisher403@aol.com' |
| **Subject:** | RE: |

The counselor I assigned an expert fact-finder with over 30 years experience.  However, he cannot evaluate facts that simply do not exist and are missing.  I conclude that the fact finding he conducted is through and complete  since we are only attempting to do  limited inquiry at the informal stage.  I think that the report is relevant to the issues you addressed in your complaint which center around your non-selection and/or non-referral for senior-level positions at the NTSB.  In order to explain your questions that lead to more questions,  it would require a more in-depth explanation of merit promotion/selection principles that are available on the OPM website and through training at the USDA training school.  As for who made a decision about age and sex being excluded for the budget job,  a review of the interview with the selecting official on page 14 **did address** age and sex and why you were not referred for selection.  If you think the feedback is a pretext,  you have the burden of proving that you were not referred/selected because of your age/sex and not the stated reasons.   In anycase, if you elect to file a formal complaint, you can ask the investigator to address any unanswered questions that you feel were not addressed during counseling.  The independent investigator will make a decision as to whether or not those questions are relevant to a complaint of disparate treatment based on age/sex.  At that time, the answers will involve sworn statements taken from witnesses under oath.  Meanwhile I will forward your concerns to Chester.


Thanks

Fara

-----Original Message-----
**From:**       Miller Richard
**Sent:**       Wednesday, March 06, 2002 9:33 AM
**To:**         Guest Fara
**Subject:**

Fara,
After our conversation last night, I am very concerned that really I don't know much more now than before this fact finding.  Particularilly, on the budget position, who made the decision to only include age and not include sex discrimination or referral?  On this one and the Academy, they seem to say it was done their way and stop.  Why didn't Chester evaluate the referral and on the Academy position why weren't further questions ask on reason for two lists?
Richard

Richard Miller Declaration

Civil Action No. 06-01071 (GK)

Exhibit _12_

**Miller Richard**

| | |
|---|---|
| **From:** | Guest Fara |
| **Sent:** | Wednesday, June 15, 2005 1:04 PM |
| **To:** | Miller Richard |
| **Cc:** | 'SFloyd7812@aol.com' |
| **Subject:** | RE: EEO |



FORMAL
'LAINT OF DISCRIM

You are now in receipt of your counselors report that was initiated on November 17, 2005. I contacted the contractor to find out the exact date she issued the Notice of Right to File Formal.   Attached is the NTSB formal complaint form.

With reference to the email below, please send me the updated claims of alleged discrimination/retaliation that we discussed today.  After I receive your email I will notify you of the administrative decision I made with reference to your request.

following:

Director, Office of Administration (WA-TB-5-008)
Chief Technical Advisor (Strategic and Intergovernmental Affairs) (SL-0301-00)
Special Assistant (WA-TB-5-007)
Supervisory Contract Specialists (05-009)
Accounting Officer (1720-CFO-2005-0004)

Richard Miller Declaration

Civil Action No. 06-01071 (GK)

Exhibit  /3

Case 1:06-cv-01071-GK   Document 22-2   Filed 11/19/2007   Page 105 of 183




**Free E-mail Newsletter | About Us | Contact Us | Index | Search**



Home
Technology
Pay & Benefits
Per Diems & Travel
Jobs & Careers
Procurement
Defense
Homeland Security
A-76 & Outsourcing
GPRA & Results
Bill Tracker
Calendar

### Daily Briefing

Printer Fri
version

April 22, 2002

## EEOC launches new Web page on alternative dispute resolution

By Kellie Lunney
klunney@govexec.com

Federal employees can see how some government agencies resolve discrimination complaints on a new Web page launched last week.

The Equal Employment Opportunity Commission has created a Web page with information on the federal alternative dispute resolution process, ranging from frequently asked questions about the program to the types of ADR techniques agencies use to handle discrimination complaints.

"This new federal sector ADR Web page will serve as a valuable online resource for federal managers, employees and applicants alike," said EEOC Chair Cari Dominguez. "It will assist federal agencies in implementing and improving their internal ADR programs."

Agencies have used alternative dispute resolution programs since the mid-1990s to cut the time and cost of traditional administrative and legal procedures used to resolve personnel and contractual disputes. Regulations requiring agencies to put ADR in place took effect in November 1999. ADR includes a wide range of techniques, such as mediation, fact-finding and arbitration.

The page provides users with basic information on the ADR program, such as when agencies can offer it, whether employees can withdraw after enrolling and contact names and numbers. It also describes the types of resolution techniques offered by agencies, including mediation, peer review and settlement conferences.

The EEOC also provides information on the appeals process

EEOC
Sector
Dispu
page

Relate
• Pos
EEOC
partne
exped
discri
disput
• Om
helpin
workp
(05/29/
• Air
alterna
resolu
(04/19/
• EE(
new tr
federa
proces
• Hou
create
resolu
(10/26/



and ADR training for managers and mediators.

The new Web page is part of the EEOC's broad effort to encourage the use of alternative dispute resolution in discrimination cases at federal agencies. Earlier this month, the EEOC and the Postal Service announced the first national alternative dispute resolution partnership between two federal agencies. Under the program, EEOC administrative judges will send nearly all requests for hearings in discrimination cases filed by Postal Service employees back to the agency for mediation to help foster faster settlements.

Administrative judges now settle discrimination cases in hearings and issue decisions within 180 days, but the new Postal Service-EEOC program promises to cut the time in half.

For more information on ADR, go to EEOC's Web site or contact the agency by e-mail at fed.adr@eeoc.gov or by phone at 202-663-4599.

Now is the Time...

...To Heighten Awareness

**Richard Miller Declaration**

**Civil Action No. 06-01071 (GK)**

Exhibit  *14*

## Miller Richard

**From:** AFGE2211
**Sent:** Wednesday, October 27, 2004 6:32 PM
**To:** Guest Fara
**Cc:** Hughes Hank; Lepson Cynthia
**Subject:** In search of "Stealth" policies?

Fara,

In looking for guidance in order to respond to the request, below, I note that Board Order 1230, paragraph 7.a.2. provides for official time for the purpose indicated; however, there is no reference or mention anywhere in the Board Order to the "mandatory form" that I was required to use. I find this very surprising, given that I was forced to use annual leave after being accused of not following the Board "policy" regarding official time for EEO.

Since there does not seem to be an established "policy," I would first like to know what the procedure is for allowing me to appeal the (improper) denial of official time, and restoration of the leave I was required to take. If there is another policy, other than Board Order 1230, I would appreciate a copy of it, for my personal use-- as well as for the Union's purposes, so that Hank and I can properly advise employees regarding the procedures they must follow.

Cynthia, please consider this a request pursuant to 5 U.S.C. 7114(b)(4) for a copy of any and all existing "policies," "rules," "regulations," "guidelines" or any "such thing" (for lack of a better term) of similar intent or purpose, that is applicable to bargaining unit employees and that may in any way restrict, control, limit, or otherwise direct the actions or influence the rights and entitlements of bargaining unit employees. The Union requires this information to process a potential grievance, and to prepare for our upcoming negotiations. In terms of upcoming negotiations, the Union must be cognizant of all "such things" that affect the conditions of employment, in order to have a full understanding of the issues to be negotiated.

Thanks,
Paula

*"...I go and look at a stonecutter hammering away at his rock, perhaps a hundred times without as much as a crack showing in it. Yet, at the hundred and first blow it will split in two, and I know it was not that last blow that did it, but all that had gone before."*
--Jacob A. Rus

-----Original Message-----
**From:** REDACTED
**Sent:** Friday, October 22, 2004 9:53 AM
**To:** AFGE2211
**Subject:**

Paula,
It is my understanding that employee can ask to time to work on such EEOC as discoveries. I have about 24 questions to answer, 15 document requests; have people here asked for such time to prepare agency discovery request and if so how much do they ask--hour a question or what. Thanks.

1

# National Transportation Safety Board
## ORDER
**Office of the Managing Director**
**Washington, D.C.**

> **NTSB 1230**

**10/23/95**

**SUBJECT**:  EQUAL EMPLOYMENT OPPORTUNITY AND COMPLAINTS OF DISCRIMINATION IN SAFETY BOARD EMPLOYMENT PRACTICES

## TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| 1. | PURPOSE | 1 |
| 2. | CANCELLATION | 1 |
| 3. | AUTHORITIES AND REFERENCES | 1 |
| 4. | SUMMARY OR SYSTEM FOR PROCESSING DISCRIMINATION COMPLAINTS | 1 |
| 5. | RESPONSIBILITIES | 3 |
| | a. Chairman or his Designee | 3 |
| | b. Equal Employment Opportunity Director | 3 |
| | c. Equal Employment Opportunity Counselor | 4 |
| | d. Legal Counsel | 5 |
| | (1) Agency Representation | 5 |
| | (2) Advice in EEO matters | 5 |
| | e. Management Officials | 5 |
| | f. Employees, Including Managers | 5 |
| 6. | PRE-COMPLAINT PROCESSING AND REQUIREMENTS | 6 |
| | a. General | 6 |
| | b. Role of the EEO Counselor | 6 |
| | c. Relationship to Compliant Process | 7 |

---

DISTRIBUTION:  Chairman
Vice Chairman
Members
All Employees

OPI: AD

7.  FILING OF COMPLAINTS . . . . . . . . 8
    a.  General . . . . . . . . . 8

TABLE OF CONTENTS (cont.)

    b.  Who May File. . . . . . . . 8
    c.  When to File . . . . . . . . . 8
    d.  What to File . . . . . . . . . 8
    e.  Where to File . . . . . . . . . 9

8.  ACCEPTANCE OF COMPLAINTS . . . . . . . 9

9.  DISMISSAL OF COMPLAINTS . . . . . . . 9

10. NTSB INVESTIGATION OF COMPLAINTS . . . . . 10

11. EEOC HEARINGS . . . . . . . . . 11

12. CONDUCT OF THE HEARING . . . . . . . 12

13. FINAL DECISION OF THE SAFETY BOARD . . . . . 13

14. MIXED CASE COMPLAINTS . . . . . . . . 14
    a. Procedures . . . . . . . . . 14
       (1) Standing . . . . . . . . 14
       (2) Appealable Matters . . . . . . . 14
    b.  Election . . . . . . . . . 15
    c.  Dismissal . . . . . . . . . 16
    d.  Procedures for Safety Board processing of mixed case complaints . 16

15. RECONSIDERATION BY EEOC OF ITS DECISIONS . . . . 17

16. SPECIAL PROVISIONS APPLICABLE TO PARTICULAR TYPES OF COMPLAINTS . . 18
    a.  Age Discrimination in Employment . . . . . . 18
    b.  Equal Pay Act . . . . . . . . . 18

ATTACHMENT 1
ATTACHMENT 2
ATTACHMENT 3

DISTRIBUTION:    Chairman                                                          OPI: AD
                 Vice Chairman
                 Members
                 All Employees

1. <u>PURPOSE</u>. One of the major civil rights responsibilities of the Safety Board is to provide equal employment opportunity to all employees and applicants for employment. This Order establishes NTSB procedures for processing complaints of discrimination on the basis of race, color, religion, sex, national origin, age, handicap or equal pay (sex-based) filed by employees of, or applicants for, employment with the National Transportation Safety Board. This Order provides general guidance only. Therefore, anyone who believes they have suffered discriminatory actions should also review 29 C.F.R. Part 1614 and EEO Management Directive MD-110. All employees are charged with knowledge of this order. Questions should be directed to the Board's EEO Officer.

2. <u>CANCELLATION</u>. This Order cancels NTSB Order 1000.2, dated 7/29/94.

3. <u>AUTHORITIES AND REFERENCES</u>.

   a. <u>Statutes</u>:  Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000(e) et seq.; Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. 633(a); Equal Pay Act of 1963, 29 U.S.C. 206(d); Rehabilitation Act of 1973, 29 U.S.C. 791.

   b. <u>Regulations</u>:  29 C.F.R. Part 1614, Federal Sector Equal Employment Opportunity.

   c. <u>Other</u>:  Equal Employment Opportunity Management Directive, MD-110.

4. <u>SUMMARY OF SYSTEM FOR PROCESSING DISCRIMINATION COMPLAINTS</u>.

   a. The system for processing complaints of discrimination in employment on grounds of race, color, religion, sex, national origin, age, handicap or equal pay (sex-based) provides for consideration of the complaint within the Safety Board, an appeal to the Equal Employment Opportunity Commission (EEOC) and certain rights to seek relief in the Federal courts. In addition, no person including EEO personnel, shall be subject to retaliation for participating in any stage of the EEO process.

   b. The major features of the processing of complaints of discrimination at the Safety Board are:

      (1) Counseling of a potential complainant by an EEO counselor of the Safety Board who is not under the jurisdiction, directly or indirectly, of the head of that Office of the Board in which the complaint arose, and who is disassociated from the formal complaint process. The purpose of counseling is to clarify the specifics of the

complaint and to try informally to resolve the matter that gave rise to the belief that the aggrieved person had been discriminated against;

(2)    Opportunity for the aggrieved person to be represented during counseling and at every stage of the complaint proceedings;

(3)    Investigation of the complaint by the NTSB, and development of a factual record;

(4)    A hearing, if requested, before an EEOC administrative judge, who will issue findings of fact and conclusions of law on the merits of the complaint. The administrative judge's decision shall be issued within 180 days of the receipt of a request for a hearing; and

(5)    Decision by the Chairman of the NTSB or his/her designee. If a hearing was held, the Chairman or his/her designee must adopt, reject, or modify the administrative judge's recommended decision within 60 days, with an explanation to the complainant of the reasons for rejection or modification of the recommended decision.

c.    Appeals to the EEOC. When the NTSB's decision does not resolve the complaint to the complainant's satisfaction, and if the complainant has not filed a civil action (see below), he/she may file an appeal of the NTSB's final decision, or dismissal of all or a portion of a complaint, within 30 days of receipt of the NTSB's determination. The appeal must be filed with the Director, Office of Federal Operations, Equal Employment Opportunity Commission, P.O. Box 19848, Washington, D.C. 20036.

d.    Right to File a Civil Action. A complainant may file a civil action in an appropriate United States Federal District Court:

(1)    Within ninety (90) days of receipt of the NTSB's final decision on an individual or class complaint if no appeal to the EEOC has been filed;

(2)    After one hundred and eighty (180) days from the date of filing an individual or class complaint if an appeal to the EEOC has not been filed and a final decision has not been issued by the NTSB;

(3)    Within ninety (90) days of receipt of the EEOC's final decision on appeal; or

(4)    After one hundred and eighty (180) days from the date of filing an appeal with the EEOC if there has been no final decision by the EEOC.

e. Reconsideration. A party may request reconsideration of any decision issued by the EEOC's Office of Federal Operations within 30 days of receipt of a decision, or within 30 days of receipt of another party's timely request for reconsideration.

5. RESPONSIBILITIES. Equal employment opportunity is the responsibility of all managers. It is the manager who is ultimately responsible for the success or failure of the program. The Equal Employment Opportunity program must have the personal involvement of the head of each office. Program responsibility is shared, however, by every line manager and supervisor in the Safety Board.

   a. Chairman or his Designee. The Chairman -- or his designee in consultation with the Chairman -- shall make the final decision on complaints of discrimination. Such corrective measures considered necessary to resolve complaints and to promote a positive and continuing program of non-discrimination may be ordered, including such disciplinary action as is warranted by the circumstances when an employee has been found to have engaged in a discriminatory practice or failed to cooperate in an EEO investigation.

   b. Equal Employment Opportunity Director. The EEO Director is under the immediate supervision of the agency head, and shall assure the implementation of this Order, appoint such equal employment opportunity counselors and program coordinators as necessary and take the following actions:

      (1) Provide for counseling, by an EEO counselor, of any employee or applicant for employment who complains of discrimination because of race, color, religion, sex, national origin, age, handicap, or equal pay (sex based) and work to resolve the matter informally before a formal complaint of discrimination is filed. In addition provide counseling to anyone involved in the EEO process who complains of retaliation because of their involvement;

      (2) Provide initial and refresher training for EEO counselors;

      (3) Publicize the identity of EEO counselors among all employees;

      (4) Work to ensure that all management officials, supervisors, and employees cooperate fully with the EEO counselors;

      (5) Provide for the appropriate supervisory training on the role and responsibilities of EEO counselors and the operation of the complaint process;

(6)    Provide EEO counseling facilities that afford appropriate privacy;

(7)    Ensure that all management officials, supervisors, and employees are aware that EEO counselors and persons seeking counseling shall be free from restraint, interference, coercion, discrimination, or reprisal in connection with counseling activities;

(8)    Ensure that EEO counselors have sufficient duty time to perform the counseling function within the prescribed time limits;

(9)    Ensure that persons who are working in personnel management positions, and others who might otherwise be in a position of real or apparent conflict of interest, shall not serve as EEO counselors;

(10)    Provide EEO counselors' supervisors timely written evaluations of their performance related to their voluntary duties as a counselor;

(11)    Provide for the receipt and investigation of complaints of discrimination within the Safety Board.  Provide for development of a complete and impartial factual record upon which to make findings on the matters raised by the written formal complaint.  The investigator may use an exchange of letters or memoranda, interrogatories, investigations, fact-finding conferences or any other fact-finding methods that efficiently and thoroughly address the matters at issue;

(12)    Oversee and monitor EEO program implementation, evaluate the sufficiency of Board procedures, and develop and recommend such additional policies, programs and procedures as may be required to ensure compliance with applicable laws and regulations; and

(13)    Prepare all required reports on EEO activities.

c.    Equal Employment Opportunity Counselors are Safety Board officials designated and trained to counsel employees who believe they have been discriminated against, and to attempt informal resolution of the matter prior to the filing of a formal complaint of discrimination.  A counselor serves a term of two years and shall not represent or counsel an individual from his/her office.  The names and addresses of all EEO counselors will be listed in the NTSB telephone directory and periodically in the agency newsletter.  The EEO counselor has six clearly defined duties that must be performed for each completed counseling action.  The six duties are:

(1) Provide information about the EEO complaint process under 29 C.F.R. Part 1614 and possible election requirements;

(2) Determine/clarify the issue(s) and basis(es) of the potential complaint;

(3) Conduct a limited inquiry for the purposes of furnishing information for settlement efforts and determining jurisdictional questions if a written formal complaint is filed;

(4) Seek a resolution of the matter at the lowest possible level;

(5) Document any resolution of the matter (at the informal counseling stage) by preparing a written agreement, or advise the complainant of his/her right to file a formal discrimination complaint if resolution fails; and

(6) Prepare a report sufficient to determine and document that required counseling actions have been taken and resolve any jurisdictional questions that may arise. (This report will be submitted to the EEO Director only if a written formal complaint of discrimination is filed.)

d. Legal Counsel.

(1) Agency Representation. The General Counsel's Office is responsible for representing the agency's position in EEO and personnel matters before the EEOC, the MSPB, and in court.

(2) Advice in EEO matters. An attorney in the General Counsel's office has been designated to serve as a legal advisor to the EEO Director, to EEO Counselors, and to other agency officials involved in handling EEO complaints. In order to maintain the independence and integrity of the EEO process, this attorney is neither supervised nor evaluated by the General Counsel with respect to this EEO advisory function. This attorney is bound by all applicable rules of confidentiality, and is specifically prohibited from discussing the substance of any EEO matter with other members of the General Counsel's Office. This attorney shall not provide legal advice (other than responding to inquiries about procedural requirements) to EEO complainants.

e. Management Officials. Personnel and training officials and other management officials shall provide such technical advice and information to EEO counselors, investigators, and the EEO Director as required to assure full implementation of this Order. This includes EEO counselors' access to employee personnel files. Board policy is to assist a person who believes he or she has been discriminated against by furnishing

appropriate information to that person or his or her representative regarding Board policies, regulations and practices, that have a bearing on the matter at issue.

f. Employees, Including Managers. All employees and supervisors shall cooperate fully with EEO counselors and persons designated to investigate complaints and provide such technical advice, records, documents such as official personnel folders, promotion records, etc., as they may request in the course of their efforts to determine facts and resolve complaints, provided that tendering such information does not violate any law, including the Privacy Act. Material in official personnel folders shall not be removed or reproduced without consultation with the appropriate records custodian. Failure to cooperate in the EEO process may result in disciplinary action against the employee or in an adverse inference against the uncooperative party pursuant to 29 C.F.R. 1614.108(c)(3).

6. PRE-COMPLAINT PROCESSING AND REQUIREMENTS.

a. General.

(1) An employee or applicant for employment with the Safety Board who believes that he or she has been discriminated against because of race, color, religion, sex, national origin, age, handicap or equal pay (sex based) must contact an EEO counselor within 45 days of the date the individual knew, or should have known, about the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action. In addition, any person who is involved in this EEO process who believes he or she has suffered retaliation related to participation in the EEO process must contact an EEO counselor within 45 days of the date the individual knew, or should have known, about the alleged retaliation.

(2) In consulting with the EEO counselor, the employee or applicant bringing the complaint charge shall be free from restraint, interference, coercion, discrimination or reprisal and shall have the right to be accompanied, represented, and advised by a representative of his or her own choosing (other than a Safety Board EEO official or office colleague).

(3) When there is no EEO counselor at the geographic location of the place of work of an employee who is to be counseled, the Board will, if necessary, provide for a counselor to travel to that location to interview the employee, rather than have the employee travel to the geographic location of the counselor's office.

b. Role of the EEO Counselor.

(1) The EEO counselor shall provide the aggrieved person written notice of his or her rights, time limitations of the EEO process and, if applicable, alternate filing procedures. The flow and time frames for the counseling process are included at Attachment 1.

(2) The EEO counselor must determine the issue(s) (alleged discriminatory actions) and basis(es) (alleged reasons for those actions) of the potential complaint. **ALL ISSUES MUST BE RAISED WITH THE EEO COUNSELOR.** The agency will dismiss an issue that has not been discussed with the counselor.

(3) The EEO counselor shall make whatever inquiry is deemed necessary into the matters raised and the general environment in which they arose; seek a resolution of the matter on an informal basis; and counsel the aggrieved person concerning the facts gathered during this informal process.

(4) Until a written formal complaint is accepted by the EEO Director, the EEO counselor will refrain from revealing the name of the aggrieved person except when authorized in writing by the aggrieved person. Complainants are hereby advised (and should be so advised by the EEO counselor) that failure to authorize disclosure to the extent required for meaningul review may minimize the usefulness of the counseling process.

(5) The counselor must conduct a final interview with the aggrieved person within 30 days of initial contact, unless the aggrieved person and the agency through the EEO Director or his/her designee, agree in writing to an extension of counseling for up to an additional 60 days. (The EEO counselor does not have the authority to unilaterally grant extensions.)

(6) The counselor must provide the aggrieved person with a written notice of final interview at the conclusion of counseling. The notice will provide instructions on how to file a format complaint and specify that such complaint must be filed within fifteen (15) calendar days of receipt of a notice of final interview.

(7) If counseling continues beyond thirty (30) days, the counselor must inform the complainant that he/she has the right to file a formal complaint after thirty (30) days in counseling, regardless of whether counseling has been completed.

(8) Within fifteen (15) days after notification by the EEO Director to the counselor that a formal complaint of discrimination has been filed, the counselor will submit to the EEO Director a written report of inquiry.

(9)    The EEO counselor shall be free from restraint, interference, coercion, discrimination, or reprisal in the performance of his/her EEO duties.

c.    Relationship to Complaint Process.  **The complainant must consult with an EEO counselor before a formal complaint of discrimination may be accepted by the EEO Director.**

7.  FILING OF COMPLAINTS.

a.  General

(1)    In presenting a formal complaint, the complainant shall be free from restraint, interference, coercion, discrimination, or reprisal, and shall have the general (but not wholly unrestricted) right to be accompanied and advised by a representative of his own choosing.  After a formal complaint of discrimination is filed, no adverse action shall be initiated and no change shall be made in the duties, assignments, or supervision of any employee without prior consultation with the EEO Director.  The flow and time frames of the formal complaint process are included at Attachment 2.

(2)    If the complainant is an employee of the Safety Board, he or she shall have a reasonable amount of time, if otherwise on duty, to prepare and present his or her formal complaint and to respond to agency requests for information.  If the complainant is an employee of the agency and he/she designates another employee of the agency as his/her representative, the representative shall have a reasonable amount of official time, if otherwise on duty, to prepare the complaint and respond to agency requests for information.

b.  Who May File.  Any employee or applicant for a position in the Safety Board who believes that he or she has been discriminated against because of race, color, religion, sex, national origin, age, handicap or equal pay (sex-based), or a representative who has been designated in writing by the complainant, may file a complaint.  Also, a complaint may be filed by someone who has participated in the EEO process or opposed practices made unlawful by the laws referenced in paragraph 4.a of this Order who believes he/she has been retaliated against because of protected activities.

c.  When to File.

(1)    An individual complaint must be submitted in writing within fifteen (15) calendar days of receipt of a notice of final interview from the EEO counselor.

(2)    A complaint is deemed filed (for the purpose of determining time limits) on the date

it is delivered to a Board official designated to receive complaints, or, if mailed to such an official, on the postmark date. If the postmark is not legible, it will be deemed timely if it is received by mail within five days of the expiration of the applicable filing period.

d. <u>What to File</u>. The complainant must complete the Formal Complaint of Discrimination form (Attachment 3) and provide a written statement sufficiently precise to identify the action(s) or practice(s) that form the basis of the complaint.

e. <u>Where to File</u>. Formal complaints may be filed with the Safety Board EEO Director or the Chairman of the Board. If filed with the Chairman of the Board, the complaint will be immediately forwarded to the EEO Director so there will be no delay in processing.

8. <u>ACCEPTANCE OF COMPLAINTS</u>.

a. Complaints will be accepted by the Safety Board EEO Director only if the matter was previously brought to the attention of an EEO counselor, if it was raised within the specified 45 day time limit, and if the complaint itself was timely filed.

b. A complaint must contain a signed statement from the aggrieved person or that person's representative. This statement must be sufficiently precise to identify the aggrieved individual and identify the action(s) or practice(s) that form the basis of the complaint. The complaint must also contain a telephone number and address where the complainant or the representative can be contacted.

c. The EEO Director will acknowledge receipt of a complaint in writing and inform the complainant of the date on which the complaint was filed. Such acknowledgement will also advise the complainant that: (1) he or she has the right to appeal the final decision or dismissal of all or a portion of a complaint; and (2) the agency is required to conduct a complete and fair investigation of the complaint within 180 days of the filing of the complaint, unless the complainant agrees in writing to extend the period.

9. <u>DISMISSAL OF COMPLAINTS</u>. The EEO Director will dismiss a complaint or a portion of a complaint:

a. That fails to state a claim or states the same claim that is pending before or has been decided by the agency or EEOC;

b. That fails to comply with applicable time limits, unless the EEO Director extends the time limits in accordance with regulations, or that raises a matter that has not been brought to the attention of an EEO counselor and is not like or related to a matter that

has previously been brought to the attention of a counselor;

c. That is the basis of a pending civil action in a United States District Court in which the complainant is a party, provided that at least 180 days have passed since the filing of the administrative complaint, or that was the basis of a civil action decided by a United States District Court in which the complainant was a party;

d. Where the complainant has raised the matter in an appeal to the Merit Systems Protection Board (MSPB), and the complainant has elected to pursue the MSPB process;

e. That is moot or alleges that a proposal to take a personnel action, or other preliminary step to taking a personnel action, is discriminatory;

f. Where the complainant cannot be located, provided that reasonable efforts have been made and the complainant has not responded within 15 days to a notice of proposed dismissal sent to his or her last known address;

g. Where the agency has provided the complainant with a written request to provide relevant information or otherwise proceed with the complaint, and the complainant has failed to respond to the request within 15 days of its receipt or the complainant's response does not address the agency's request, provided that the request included a notice of the proposed dismissal; or

h. If, prior to the issuance of the agency's notification to the complainant that the agency's investigation is complete, the complainant refuses within 30 days of receipt of an offer of settlement to accept an agency offer of full relief containing a certification from the agency's EEO Director, General Counsel or a designee reporting directly to the EEO Director or the General Counsel that the offer constitutes full relief, provided that the offer gave notice that failure to accept would result in dismissal of the complaint.

10. NTSB INVESTIGATION OF COMPLAINTS. The investigation of complaints shall be conducted by or for the Safety Board, and the Board will develop a factual record upon which to make findings on the matters raised by the written complaint. The agency may use an exchange of letters or memoranda, interrogatories, fact-finding conferences, or any other fact-finding methods that efficiently and thoroughly address the matters at issue. The Safety Board investigation shall comply with the requirements that follow.

a. The investigation shall be completed within 180 days of the date of filing of a complaint or in accordance with time period set forth in EEOC orders. By written agreement within those time periods, the complainant and the Safety Board may

voluntarily extend the time period for not more than an additional 90 days.

b.  The EEO Director shall issue to the person conducting the investigation a written authorization to:

    (1)   Investigate all aspects of complaints of discrimination;

    (2)   Require all employees of the Safety Board to cooperate in the conduct of the investigation;

    (3)  Require employees of the Safety Board having any knowledge of the matter complained of to furnish testimony under oath, affirmation, or by written statement, under penalty of perjury; and

    (4)  Interview all persons knowledgeable of facts or issues raised, i.e., personnel specialist re:  personnel issues, regulations and procedures.

c.  The complainant shall receive a copy of the completed complaint file.  Also, the Safety Board may disclose information and documents to a witness where the investigator determines that the disclosure of the information or documents is necessary to obtain information from the witness.  Under EEOC regulations, agency official(s) alleged to have discriminated against the complainant are not entitled to receive a copy of the complete complaint file, but will be given access to case materials to the extent necessary to respond to allegations and give evidence.  See MD-110 '5-12 VII A.3.  The EEO Director will determine which materials are necessary for agency officials to respond to allegations and give evidence.

d.  Within the time periods stated in 29 C.F.R. 1614.108(f), or EEOC orders, the EEO Director will notify the complainant that the investigation has been completed, shall provide the complainant with a copy of the investigative file, and shall notify the complainant that, within 30 days of receipt of the investigative file, the complainant has the right to request a hearing before an EEOC administrative judge, or may receive an immediate final decision from the agency.  Should the agency fail to provide the required notice, the complainant may request a hearing at any time after 180 days has elapsed from filing of the complaint.

11. EEOC HEARINGS.  If a complainant believes that further development of the record is warranted, he/she has the right to a hearing conducted by an administrative judge of the EEOC.  The administrative judge from the EEOC adjudicates claims of discrimination and issues findings and conclusions.  It is the obligation of the parties to obtain and enter

into the record any evidence necessary to such an adjudication.

a.  When a complainant requests a hearing, the Safety Board shall request that the EEOC appoint an administrative judge to conduct a hearing.  Where the administrative judge determines that the complainant is raising or intends to pursue issues like or related to those raised in the complaint, but which the agency has not had an opportunity to address, the administrative judge shall remand any such issue for counseling or for such other processing as ordered by the administrative judge.

b.  The administrative judge shall notify the parties of the right to seek discovery prior to the hearing and may issue discovery orders as are appropriate pursuant to 29 C.F.R. Part 1614.109.

c.  An administrative judge will conduct a hearing on the merits of a complaint unless: the parties mutually resolve the complaint and the hearing request is withdrawn; the hearing request is otherwise voluntarily withdrawn; the complaint is remanded for failure to prosecute; or the administrative judge decides to issue findings and conclusions without a hearing.

12. **CONDUCT OF THE HEARING.**

a.  The Safety Board is responsible for arranging for an appropriate room in which to hold the hearing, and for ensuring that all approved witnesses who are Federal employees are notified of the date and time of the hearing and the approximate time that their presence will be required.  The Safety Board will make available as witnesses those employees requested by the administrative judge.

b.  Hearings are closed to the public.  Access to the hearing room and the record of the hearing shall be restricted in accordance with the EEOC's regulations and policies and the discretion of the administrative judge.

c.  The Safety Board shall arrange and pay for a verbatim transcript of the hearing proceedings.

d.  The complainant, the Safety Board, or any employee of a Federal agency shall produce such documentary and testimonial evidence as the administrative judge deems necessary.  All documents submitted to and accepted by the administrative judge at the hearing shall be made part of the record of the hearing.

e.  Administrative judges are authorized to administer oaths.  Statements of witnesses shall be made under oath or affirmation or, alternatively, by written statement under

penalty of perjury.

f. When the complainant, or the Safety Board, or its employees fail without good cause shown to respond fully and in a timely fashion to requests for documents, records, comparative data, statistics, affidavits, or the attendance of witness(es), the administrative judge may, in appropriate circumstances:

    (1)   Draw an adverse inference that the requested information, or the testimony of the requested witness, would have reflected unfavorably on the party refusing to provide the requested information;

    (2)   Consider the matters to which the requested information or testimony pertains to be established in favor of the opposing party;

    (3)   Exclude other evidence offered by the party failing to produce the requested information or witness;

    (4)   Issue a decision fully or partially in favor of the opposing party; or

    (5)   Take such other actions as appropriate.

g. Unless the administrative judge makes a written determination that good cause exists for extending the time for issuing findings of fact and conclusions of law, the administrative judge shall issue findings of fact and conclusions of law on the merits of the complaint, and shall order appropriate relief where discrimination is found with regard to the matter that gave rise to the complaint within 180 days of a request for a hearing being received by the EEOC. The administrative judge shall send copies of the entire record, including the transcript, and the findings and conclusions to the parties by certified mail, return receipt requested.

h. Within 60 days of receipt of the findings and conclusions, the Safety Board may reject or modify the findings and conclusions or the relief ordered by the administrative judge and issue a final decision. If the Safety Board does not, within 60 days of receipt, reject or modify the findings and conclusions of the administrative judge, then the findings and conclusions of the administrative judge and the relief oredered shall become the final decision of the Safety Board and the Safety Board shall notify the complainant of the final decision.

13. <u>FINAL DECISION OF THE SAFETY BOARD</u>.  Within 60 days of receiving notification that a complainant has requested an immediate decision from the Safety Board, within 60 days

of the end of the 30-day period for the complainant to request a hearing or an immediate final decision where the complainant has not requested either a hearing or a decision, or within 60 days of receiving the findings and conclusions of an administrative judge, the Safety Board shall issue a final decision. The final decision shall consist of findings by the agency on the merits of each issue in the complaint and when discrimination is found, appropriate remedies and relief. The final decision shall contain notice of the right to appeal to the EEOC, the name and address of the agency official upon whom an appeal would be served, notice of the right to file a civil action in Federal district court, the name of the proper defendant in any such lawsuit, and the applicable time limits for appeals and lawsuits.

14. <u>MIXED CASE COMPLAINTS</u>. A mixed case complaint is a complaint of employment discrimination filed with the Safety Board based on race, color, religion, sex, national origin, age, handicap or equal pay (sex based) related to or stemming from an action that can be appealed to the Merit Systems Protection Board (MSPB). The complaint may contain only an allegation (including retaliation by any person involved in the EEO process) of employment discrimination, or it may contain additional allegations that the MSPB has jurisdiction to address. This section is not meant to be all inclusive of a mixed case complaint. Please refer to 29 C.F.R. Part 1614.302.

A mixed case appeal is an appeal filed with the MSPB that alleges that an appealable agency action was effected, in whole or in part, because of discrimination on the basis of race, color, religion, sex, national origin, handicap or age.

   a. <u>Procedures</u>. EEOC regulations provide for processing discrimination complaints on matters which are otherwise appealable to the MSPB. Two determinations must be made to decide if the mixed case regulations apply. The employee must have standing to file such an appeal with the MSPB, and the matter which forms the basis of the discrimination complaint must be appealable to the MSPB.

      (1) <u>Standing</u>. The following employees generally have a right to appeal to the MSPB and, therefore, to initiate a mixed case complaint or appeal:[1]

         (a) competitive service employees not serving a probationary or trial period under an initial appointment;

---

[1] This is not an all-inclusive list of those employees who have standing to appeal to the MSPB, and questions that arise in this area should be referred to the personnel office or the MSPB.

(b) career appointees to the Senior Executive Service;

(c) non-competitive service preference eligible employees with one or more years of current continuous service; and

(d) non-preference eligible excepted service employees who have completed their probationary period or with two or more years of current continuous service.

(2) Appealable Matters. Most appealable matters fall into the following six categories:[2]

(a) reduction in grade or removal for unacceptable performance;

(b) removal, reduction in grade or pay, suspension for more than 14 days, or furlough for 30 days or less for cause that will promote the efficiency of the service;

(c) separation, reduction in grade, or furlough for more than 30 days, when the action was effected because of a reduction in force;

(d) reduction-in-force action affecting a career appointee in the Senior Executive Service;

(e) reconsideration decision sustaining a negative determination of competence for a general schedule employee; and

(f) disqualification of an employee or applicant because of a suitability determination.

b. Election. An aggrieved person may initially file a mixed case complaint with the Safety Board pursuant to this part or an appeal on the same matter with the MSPB, but not both. The following steps will be taken:

(1) The Safety Board shall inform every employee who is the subject of an action that is appealable to the MSPB and who has either orally or in writing raised the issue of discrimination during the processing of the action of the right to file either a mixed

---

[2] This is not an all-inclusive list and questions that arise in this area should be referred to the personnel office or the MSPB.

case complaint with the agency or to file a mixed case appeal with the MSPB.

(2) The aggrieved person shall be advised that he or she may not initially file both a mixed case complaint and an appeal on the same matter and that whichever is filed first shall be considered an election to proceed in that forum.

(3) If a person files a mixed case appeal with the MSPB instead of a mixed case complaint with the Board and the MSPB dismisses the appeal for jurisdictional reasons, the Safety Board shall promptly notify the individual in writing of the right to contact an EEO counselor within 45 days of receipt of this notice and to file an EEO complaint. The date on which the person filed his or her appeal with MSPB shall be deemed to be the date of initial contact with the counselor.

(4) If a person files a timely appeal with MSPB from the agency's processing of a mixed case complaint and the MSPB dismisses it for jurisdictional reasons, the agency shall reissue a notice giving the individual the right to elect between a hearing before an administrative judge and an immediate final decision.

c. Dismissal. The Safety Board may dismiss a mixed case complaint for the reasons contained in, and under the conditions prescribed in, 29 C.F.R. Part 1614.107. a Safety Board decision to dismiss a mixed complaint on the basis of the complainant's prior election of the MSPB procedures shall be made as follows:

(1) Where neither the Safety Board nor the MSPB administrative judge questions the MSPB's jurisdiction over the appeal on the same matter, the Safety Board shall dismiss the mixed case complaint pursuant to 29 C.F.R. Part 1614.107(d) and shall advise the complainant that he or she must bring the allegations of discrimination contained in the rejected complaint to the attention of the MSPB, pursuant to 5 C.F.R. 1201.155. The dismissal of such a complaint shall advise the complainant of the right to petition the EEOC to review the MSPB's final decision on the discrimination issue. A dismissal of a mixed case complaint is not appealable to the EEOC except where it is alleged that 29 C.F.R. Part 1614.107(d) has been applied to a non-mixed case matter.

(2) Where the Safety Board or the MSPB administrative judge questions the MSPB's jurisdiction over the appeal on the same matter, the Safety Board shall hold the mixed case complaint in abeyance until the MSPB's administrative judge rules on the jurisdictional issue, notify the complainant that it is doing so, and instruct him or her to bring the allegations of discrimination to the attention of the MSPB. During this period of time, all time limitations for processing or filing under Part 1614 will be tolled. A Safety Board decision to hold a mixed case complaint in

abeyance is not appealable to EEOC. If the MSPB's administrative judge finds that MSPB has jurisdiction over the matter, the Safety Board shall dismiss the mixed case complaint pursuant to 29 C.F.R. Part 1614.107(d), and advise the complainant of the right to petition the EEOC to review the MSPB's final decision on the discrimination issue. If the MSPB's administrative judge finds that MSPB does not have jurisdiction over the matter, the agency shall recommence processing of the mixed case complaint as a non-mixed case EEO complaint.

d. Procedures for Safety Board processing of mixed case complaints. When a complainant elects to proceed initially under Part 1614 rather than with the MSPB, the procedures for agency processing of EEO complaints shall govern the processing of the mixed case complaint with the following exceptions:
(1) At the time the Safety Board advises a complainant of the acceptance of a mixed case complaint, it shall also advise the complainant that:

    (i)    If a final decision is not issued within 120 days of the date of filing of the mixed case complaint, the complainant may appeal the matter to the MSPB at any time thereafter as specified at 5 C.F.R. 1201.154(a) or may file a civil action as specified at 29 C.F.R. 1614.310(g), but not both; and

    (ii)    If the complainant is dissatisfied with the Safety Board's final decision on the mixed case complaint, the complainant may appeal the matter to the MSPB (not EEOC) within 20 days of receipt of the Safety Board's final decision.

## 15. RECONSIDERATION BY EEOC OF ITS DECISIONS.

a. Within a reasonable period of time, the EEOC may, in its discretion, reconsider any decision issued under 1614.405(a) notwithstanding any other provisions of Part 1614.

b. A party may request reconsideration of any EEOC decision issued under 1614.405(a) provided that such request is made within 30 days of receipt of a decision of the Commission or within 20 days of receipt of another party's timely request for reconsideration. Such request, along with any supporting statement or brief, shall be submitted to the Office of Federal Operations and to all parties with proof of such submission. All other parties shall have 20 days from the date of service in which to submit all other parties, with proof of submission, any statement or brief in opposition to the request.

c. The request or the statement or brief in support of the request shall contain arguments or evidence that tend to establish that:

(1) New and material evidence is available that was not readily available when the previous decision was issued; or

(2) The previous decision involved an erroneous interpretation of law, regulation or material fact, or misapplication of established policy; or

(3) The decision is of such exceptional nature as to have substantial precedential implications.

d. A decision on a request for reconsideration by either party is final and there is no right by either party to request further reconsideration by the EEOC.

16. SPECIAL PROVISIONS APPLICABLE TO PARTICULAR TYPES OF COMPLAINTS. Complaint procedures for these categories are different, and this Order may not apply.

a. Age Discrimination in Employment (ADEA, see C.F.R. Part 1614.201):

(1) As an alternative to filing a determination complaint at the Safety Board and/or MSPB, an aggrieved individual may immediately file a civil action in a United States District Court under the ADEA against the head of the Safety Board after giving the EEOC not less than 30 days' notice of the intent to file such an action. Such notice must be filed in writing with EEOC, Federal Sector Programs, P.O. Box 19848, N.W., Washington, D.C. 20507 within 180 days of the occurrence of the alleged unlawful practice.

(2) The EEOC may exempt a position from the provisions of the ADEA if the EEOC establishes a maximum age requirement for the position on the basis of a determination that age is a bona fide occupational qualification necessary to the performance of the duties of the position.

(3) When an individual has filed an administrative complaint with the Safety Board alleging age discrimination that is not a mixed case, administrative remedies will be considered to be exhausted for purposes of filing a civil action:

(i) 180 days after the filing of an individual complaint if the Safety Board has not issued a final decision and the individual has not filed a timely appeal, or 180 days after the filing of a class complaint if the agency has not issued a final decision;

(ii) After the issuance of a final decision on an individual or class complaint if

**NTSB 1230**                                                                **Page 19**
**10/23/95**

the individual has not filed a timely appeal; or

    (iii)    After the issuance of a final decision by the Commission on an appeal, or 180 days after the filing of an appeal if the Commission has not issued a final decision.

b.  <u>Equal Pay Act (see 29 C.F.R. Parts 1614.202 and 409)</u>.  In the case of an alleged violation of the Equal Pay Act, a complainant may file a civil action within 2 years or -- if the violation is willful, within 3 years -- of the date the alleged violation, regardless of whether the complaint was pursued administratively.

Kenneth U. Jordan
Managing Director

*EXH.B.1*

## Miller Richard

| | |
|---|---|
| **From:** | Miller Richard |
| **Sent:** | Friday, March 26, 2004 9:24 AM |
| **To:** | D'Avella Denise |
| **Subject:** | RE: EEO |

Denise,
I will look forward to seeing the procurement order and Fara's affidavit. To be accurate and rather than to be more accurate than January 14th, Fara's affidavit should be of the dates complainant made contact with her, not the date the procurement order form was signed to hire an outside counselor. Then it can be determined how soon after being contacted by the complainant, Fara ordered the counseling. From NTSB employees I have talked with, it would not be said that the EEO Director orders the counseling quite soon after being contacted by the complainant. lRichard

-----Original Message-----
| | |
|---|---|
| **From:** | D'Avella Denise |
| **Sent:** | Thursday, March 25, 2004 12:57 PM |
| **To:** | Miller Richard |
| **Subject:** | RE: EEO |

Richard,

January 14, 2002 is mentioned in Ex. F29 as the date you received your performance evaluation. I thought it was also mentioned in the counselor's report. I also looked at the procurement order form to hire the counselor for your informal complaint. That form is dated 1/14/02. It is the EEO Director's practice to order the counseling quite soon after being contacted by a complainant, something I can ask her to attest to in an affidavit. I suppose to be most accurate, the statement should read that you contacted the EEO Director *on or about* Jan. 14, 2002. I will submit a clarification to the administrative judge and a copy of the procurement order form.

For the time limits that were and are at issue, however, a matter of a few days would not have made a difference, as the 45 day period from the act or occurrence in each instance had expired long before Jan.1, 2002.

Denise
-----Original Message-----
| | |
|---|---|
| **From:** | Miller Richard |
| **Sent:** | Wednesday, March 24, 2004 9:50 AM |
| **To:** | D'Avella Denise |
| **Subject:** | RE: EEO |

thanks

-----Original Message-----
| | |
|---|---|
| **From:** | D'Avella Denise |
| **Sent:** | Wednesday, March 24, 2004 9:37 AM |
| **To:** | Miller Richard |
| **Subject:** | RE: EEO |

Richard,
I thought it was in the counselor's report or elsewhere in the ROI, but I will take a look and let you know.

Denise

-----Original Message-----
| | |
|---|---|
| **From:** | Miller Richard |
| **Sent:** | Tuesday, March 23, 2004 11:00 AM |
| **To:** | D'Avella Denise |
| **Subject:** | EEO |

Denise,
In our conversation with Judge Brown on Thursday, I questioned the background of the January 14, 2002 date in your Motion to Dismiss Complaint, In Part. I believe that you said it was either in the Counselor's Report or

1

referenced in your first Motion to Dismiss.  I cannot find it in either of these documents.   Where is this date mentioned?  Thanks.  Richard



# National Transportation Safety Board

## *Office of General Counsel*

490 L'Enfant Plaza East, S.W.                          202/314-6080
Washington, D.C. 20594-2001                       FAX 202/314-6090

March 26, 2004

Kathryn Brown
Administrative Judge
U.S. Equal Employment Opportunity Commission
Washington Field Office
1400 L Street, N.W., Suite 200
Washington, D.C. 20005

      Re:   Richard Miller v. NTSB, EEOC No. 100-2003-07898X

Dear Judge Brown:

      This letter is written to clarify an issue raised by Mr. Miller during our conference call last week. Specifically, he asked me to point to a document in the ROI that states that he initially contacted the agency's EEO Director on January 14, 2002.

      I went back to the counselor's report and found that, while it states the date of his initial interview was January 23, 2002, it does not speak to complainant's contact with the EEO Director. Ex. B1. The procurement order for the counseling services, however, is dated January 14, 2002. Under the EEO Director's standard practice, a procurement order for EEO counseling is placed typically from a few days to a week after an employee initiates contact with her and expresses the intention to begin the EEO process by requesting a counselor. Please see the enclosed declaration and attachment.

      Therefore, the Agency wishes to clarify the statement of facts in its Motion to Dismiss. Specifically, that complainant contacted the EEO Director on or about January 8-14, 2002. It is of note that, for the time limits that were and are at issue, a matter of a few days would not have made a difference, as the 45-day period from the act or occurrence in each instance had expired long before Jan.1, 2002.

      Please let me know if there is further information that you require.

                          Sincerely,

                          Denise M. D'Avella
                          Agency Representative
                          Telephone (202) 314-6086

Enclosures

CERTIFICATE OF SERVICE

On March 26, 2004, the foregoing letter of clarification was sent via facsimile and regular mail to:

Kathryn Brown
Administrative Judge
U.S. Equal Employment Opportunity Commission
Washington Field Office
1400 L Street, N.W., Suite 200
Washington, D.C. 20005

Fax: (202) 275-0076

And regular mail to:

Richard Miller
1515 Arlington Ridge Road, Apt. 304
Arlington, VA 22202

for Denise M. D'Avella
Agency Representative

Richard Miller Declaration

Civil Action No. 06-01071 (GK)

Exhibit _15_

March 29, 2004


Kathryn Brown
Administrative Judge
U. S. Equal Employment Opportunity Commission
Washington Field Office
1400 L Street, NW, Suite 200
Washington, D.C. 20005

Re: Richard Miller v. NTSB.EEOC No. 100-20033-07898X

Dear Judge Brown:

In follow-up to our conference discussion last week, I was unable to finish the attached
information and get it in the mail on Friday due to the Agency's supposedly changing
the date of contact with the EEO Counselor.   I still don't have a final answer on this date
but wanted to get this information down to you.  I will hand-carry the information.

I  appreciate you giving me a chance to comment on these agency requested dismissals. ℸ

Please let me know if there is further information you require.  My phone number is 202-
314-6041 and my email is millerr@ntsb.gov.

Sincerely,

Richard L. Miller

Richard Miller,

EECO No.
100-2003-0788X

v.

Agency No. 100-AO-2011

Ellen Engleman Conners, Chairman          AJ:KB
National Transportation Safety Board

## MOTION TO RECONSIDER THE DISMISSED CLAIMS AND MOTION TO DENY MOTION TO DISSMISS COMPLAINT, IN PART PART BASED ON INACCURATE AND MISLEADING INFORMATIN SUPPLIED BY THE AGENCY AND LATER AVAILABLE INFORMATION AND OPPOSITION TO AGENCY'S MOTION TO DISMISS COMPLAINTS AND MOTION TO REQUEST CLARIFICATION OF INFORMATION/PROCEDURES

The Agency has filed two Motions for Partial Dismissal and two Requests for Extensions

to Discovery for pending motion to dismiss. The first motion was Motion for Partial

Dismissal and Opposition to Expansion of the Issues beyond those previously accepted

for investigation or was in reality, request for denial of all issues originally filed by

complainant. The second motion is Motion To Dismiss Complaint, In Part, concerning

Academy positions. The Administrative Judge also 1) ordered the Agency to produce

certain documents and other evidence; and 2) dismissed the position description and

nonselections/positions in the Order Defining Claims to Be Adjudicated. The Motion To

Dismiss, In Part should be denied and there should be reconsideration of the dismissed

issues based on inaccurate, misleading, false provided by the agency in the Motions to

Dismiss and later available information provided herewith.

The Agency has made incomplete, false and intentionally misleading statements in their

request of partial dismissals---Motion To Dismiss Complaint, In Part (later to be referred

to as Dismiss 2) and Motion to Dismiss Complaint, In Part, and Opposition to Expansion

of Issues Beyond Those Accepted for Investigation (later to be referred to as Dismiss 1).



I know you have spent a lot of time on the review and your analysis is based on the Agency providing wrong and conflicting information.   The Agency makes broad statements, occasionally with a cititation, and generally with no supporting documents. In fact,  Exhibit E of the ROI, "Appellate Activity Documentation" and Exhibit D, "Informal Resolution" are empty.  Thus, the Agency has provided very little information, it seems some Merit Promotion files do not exist, and what information the Agency has provided has been selected questioning of selected Agency officials.

The  timeliness/aggrieved issues were never questioned previously.

The Agency has intentionally provided little if no information, wrong information, misleading information, or false information to the judge to limited and dismiss the complainant.  The agency has actually provided little or nothing and confused the issues/positions.  The Agency should not be allowed to make claims that are false and thus serve as the bases for dismissal of claims in their Motions for Partial Dismissal or as a base for the Administrative Judge analysis in the Order Defining Claims to be Adjudicated.  The Agency Judge should request clarification from the Agency on these issues.  Following is a list of the Agency's incomplete, false and intentionally misleading statements:

Item 1:  The Agency states in Dismiss 2 :  Dismissal of issue one is warranted because, with respect to the filling of the Operations Manager/Academy Position, complainant failed to contact Equal Employment Opportunity (EEO) counselor within 45 days of the alleged act of discrimination, as required by 29 C.F. R. sec. 1614.105(a) (Page 2).  In the Argument section, the Agency states: Under the EEOC regulations, a complainant has 45 days from the alleged discriminating act, or from the time he learned of the act, to contact

an EEO Counselor. (p. 4)  However, he did not contact the EEO Director until January 14, 2002, to request to meet with a counselor, which he did on January 23, 2002 (p. 4-5). Complainant initially contacted the EEO Director on January 14, 2002, to request to meet with a counselor, which he did on January 23, 2002 (p. 4-5) .

The Agency also states in Dismiss 1:  The reason for the dismissal are that, regarding several allegations, the complainant failed to contact an Equal Employment (EEO) counselor within 45 days of the alleged act of discrimination, as required by 29 C. F. R. sec. 1614.105 (a) (1); (Page 1) In the Argument section, the Agency states:  Under the EEOC regulations, a complainant has 45 days from the alleged discriminating act, or from the time he learned of the act, to contact an EEO counselor.  In all five vacancy (this is incorrect) vacancy announcements/job applications described above, complainant failed to meet this requirement.    Therefore, each of the five allegations, and the underlying claim of nonselection on the basis of age and sex should be dismissed. (p. 4) In the conclusion:  For the above stated reasons, the complaint should be dismissed, as appropriate, for failure to state a claim and failure to state a claim and failure to contact an EEO Director or counselor within 45 days of the alleged unlawful discrimination.    In the Statements of Facts:  Complainant initially contacted the EEO Director on January January 14, 2002, to request to meet with a counselor, which he did on January 23 (p. 4-5).

When complainant questioned the January 14, 2002 date during the conference call with the Administrative Judge and the agency representative last week, the representative said the back-up for the date was either referenced in Dismiss 2, if not in Dismiss 1, or in the Counselor's report.  In follow-up to my email, the representative thought it was in the

counselor's report or elsewhere in the ROI. The next email says it was the date

complainant received his performance evaluation and the date of the procurement form.

The emails are marked as F45 (Attached and labeled F 45) with complainant's belief if

agency uses this as an explanation on the issue:

"I will look forward to seeing the procurement order and Fara's (Fara Guest, EEO

Director) affidavit.   To be accurate and rather than to be more accurate that the January

14th, Fara's affidavit should be of the dates complainant made contact with her, not the

date the procurement order form was signed to hire an outside counselor. Then it can be

determined how soon after being contacted by the complainant, Fara ordered the

counseling. From NTSB employees I have talked with, it would not be said that the EEO

Director (Fara Guest) orders the counseling quite soon after being contacted by the

complainant." The Agency has not responded but I would add now that the "quite soon"

to order counseling report could be weeks as with the way the EEO process works at

NTSB.   First, it is the NTSB EEO Director, and then the EEO Director makes the

decision when to hire a contracted counselor. Further, I followed up with the EEO

Director and F46 (Attached and labeled F 46) states, "I don't know" in response to "I

realize that you talk to many people—but the question is what are the dates that we

discussed the first EEO complainant."

Thus, it seems the January 14th date is incorrect and intentionally misleading and the

Agency really doesn't know when the EEO Director/counselor was contacted.

Personally, I can't understand this as the agency representative and EEO Director is only

a couple of offices apart.   I also believe this violates 1614.106 (d).



Item 2:   In Dismiss 2, the Agency says Juliana Beal, Director of the Academy, told complainant that he had not been selected for the Operations Manager position, and informed him who had been selected (pp 3-4).   However, Ms. Beal's Affidavit (F36) doesn't mention that she talked to complainant and Investigator did not even inquire about this statement to Ms. Beal who is Director of the Academy.   Ms. Beal also states that she is aware of prior EEO complaints---I am not aware of prior EEO Complaints and this statement needs to be explained.

Item 3:   The Agency has supplied wrong and misleading information in their supplemental information in response to the Administrative Judge's Request—and especially on the timeliness and aggrieved issues.

Item 4:  The Agency has not answered items 5 & 6. Exhibit F 35 (# 7, 8) concern the filing of the Academy Position.  In item 8, Ms. Butler states there is no documentation in the case file showing any other notification of announcement or non-selection.  However, the Counselor (Attachment G) dated January 23, 2002 the counselor asks:  (#6) Were the applicants provided written notification of the disposition of their applications, and if so when was this notification sent to them?  Response (Kim Butler): "The applicants will be notified by letter when the vacancy case file is closed.   Complainant did receive notification on October 15, 2001 but the notification was "This is to inform you that we received your recent application for consideration for the position of Operations Manager, WA-TB-1-020, with the National Transportation Safety Board.  We will now start the process of reviewing all applications to determine the appropriate qualifications and grade level(s).  This review process can sometimes be lengthy, however, you will be



notified as soon as possible concerning the status of your application." (Attached as F 47).

Item 5:  Agency is supplying announcements that do not match.

Exhibit F-37, the Position Vacancy Announcement 01-020 and supplied in request to the Judge's request does not match the one the Agency finally supplied complainant on December 7, 2001. It was labeled WA-TB-01-020 for Operations Manager, GS-14, Date Opened: 9/07/01 and closing date of 9/13/01.

Item 6: The Referral and Selection Certificates for VA 01-020 do not match. Exhibit F 42 is not the same as the one supplied in Exhibit F2-10.

Item 7: The Agency uses differing Referral and Selection Certificates exhibits. Exhibit F 42 is signed both by the Director of the Academy and the Managing Director. Although the Referral and Selection Certificate for 01-020 (Ex F 41) does have "This certificate was not used; selection made from WA-TB-119-14" the Selection Certificate for VA 119 (Exhibit F 42) has neither "This Certificate was used for selection" or "This Certificate was not used was not used; selection made from _____ _____."

Item 8:  Complainant is still uncertain to how many vacancy announcements there were for the Academy and how the selections were authorized and selected.  Complainant doesn't know how may applications there can be for one position.  The Statement of Facts in Motion to Dismiss Complaint, discusses Agency positions WA-TB-1-110 and 01-020-- where there seem to be two versions, and WA-TB-119 (p. 2). It states that 01-020 was within the academy. Further footnote two on page three says VA WA-TB-1-119 in effect duplicated 1-020, except that it had a broader area of consideration. How was complainant notified? The ROI has the vacancy announcement and other information on

(6)

VA-119.  Then there is also discussion from the Managing Director on a Real Estate person.  Additionally, the Administrative Coordinator position is very similar to these positions.

Item 9:  It is nice to share pictures of the Academy, its mission, and courses (Attachment 2 of Dismiss 2) but it would have been more helpful if the Agency had supplied pertinent information.  I do note that the Safety Board's Managing Director chairs the Academy Curriculum Development Committee.  Such pertinent information should have included that the NTSB Chairman appointed an Academy Team which Mr. Miller was a member.

Item 10:  Attachment 3 dated October 2, 2003 in Dismiss 2 is informative as to the change of the duty station.  However it has nothing to do with an EEO complainant filed in January, 2002.  At least two of the names were not with the Academy.

Item 11:  Timeliness and aggrieved issues were never questioned. by EEO Director, EEO Contracted Counselor, EEO Contractor Investigator, or NTSB Management.

Item 12:  The Agency neither specifically dismissed nor accepted certain nonselections as stated in Item 3 of the Order Defining Claims to Be Adjudicated (p. 2)  Either neither dismissing nor accepting complaints allows the Agency to avoid revealing anything (including in the Counselor's Report and ROI) but certainly makes it hard on the complainant.

Item 13:  It is also untrue and very misleading in Dismiss 1 (p. 9 and other) that Complainant is also unable to make a credible argument for acceptance of the allegations under a continuing violation.  There certainly is an analogous theme and harm uniting the various acts into a continuous pattern. The theme is that although complainant has applied for approximately eight positions in the small agency—and is well qualified—



complainant is never contacted by the Agency and it seems in most cases doesn't make

the qualifying list (or the Agency doesn't have the qualifying lists). These actions are

based on sex and age. Vacancy announcements involve positions in different offices,

different selecting officials, and selectees reporting to differ rent supervisors (Dismiss, p.

9). It is also untrue that the nonselection allegations are separate and discreet, unrelated

to either his performance appraisal or performance standards or position description. It is

untrue that "Thus, a continuing violation claim as to the vacancy announcements cannot

be bootstrapped onto the allegations regarding appraisal standards, or position

descriptions. And, these actions have an analogous theme uniting the various acts into a

continuous pattern (Dismiss 1, p. 9).

The Managing Director (Dan Campbell) both authorizes approval to hire (the vacancy

announcement) and the 52s. (See Exhibit F 42 on signature of the Managing Director)

The two detailees and the two Special Assistants (Managing Director was also the

Selecting Official) report directly to the Managing Director (See Campbell's Statement).

The Knowledge Coordinator was withdrawn because the person worked for the

Chairman/Managing Director. The Budget Officer (VA-055) and the Chief Financial

Officer (VA-007) are both in the CFO Office which reports to the Managing

Director/Chairman. The Administrative Coordinator VA-029), Operations Manager

positions report to the Director of the Academy. The Managing Director has been

involved in working with the Academy Management Team, running the academy, very

involved in selecting the Director, and is Chairman of the Curriculum (Dismiss 2,

Attachment 2, p. 2). It is now my understanding that the person who only applied for the

Senior Management Analyst at the GS-15 level and not at the GS-14 level but got it at the

(8)

GS-14 level (See Counselor's report) and then was promoted to the GS-15 level is now

out at the Academy. The Managing Directors states that he agreed to a budget person but

not the real estate person. Further, complaint can't believe there are many employees that

would spend as much time with the emails/information (F2). The Complainant has

discussed these issues with two Managing Directors (Campbell and Goeltz). He held

these discussions as late as December 12. Complainant cannot see the timeliness and

aggrieved issues being rejected.


Although several times the complainant attempted to clarify and straighten out (See

Miller Affidavit at F2) the original positions consulted with the EEO Director, the EEO

Director herself clarified the positions inaccurately—as labeled at the top of Exhibit A,

page 6: EEO'S Directors Clarification of Issues. Also the F2-2 at 1 was the EEO

Directors version----the two questions here were twofold, not just the statement on page 2

of Dismiss 1.

Item 14: The Agency's statement on page 7 of Dismiss 1 that complainant has not

suffered harm or loss with respect to a term, condition, or privilege of employment

regarding the Program Coordinator (Knowledge Management) position is incorrect.

WA-TB-029 that Mr. Miller applied for was withdrawn because the Program

Coordinator's position was withdrawn. It doesn't make a difference if "no one was

chosen for the position and the announcement was never reposted." Actually the WA-

TB-029 was reposted, as it was very similar to both positions as the Operations Manager

positions at the Academy. It doesn't make any difference that she was political—this is

only what was reported by the union.

(7)

Similarly, it is untrue that Complainant has not indicated how he has suffered any harm or loss on the lack of a Position Description during this period.  Dimiss 1, (pp. 8-9). Emails in F2- 5 through 8 provide most of the information needed to dispute all these rejections and dismissals.  Position Description, standards, and appraisals are extremely important and tied to most promotions and applying to any positions—NTSB and elsewhere.  I believe applicants generally include their last appraisal when applying to NTSB.

Item 15:  On the Budget Officer's position, VA-055, Mr. Moffett's comment on page 4 Dismiss One is evasive.  The complainant still does not have the list with ages of the applicants.  Even the Managing Director says in his affidavit (see F6) that complainant should have made the referral list on the Budget Officer's position.  In Attachment E of Counselor's Report summary of interview with Bernie Moffett, Mr Moffett can only say "Based on my recollection of Mr. Miller's application for this position, he was rated "Not Qualified…...in response to "However, neither his application nor a rating sheet documenting the results of the review of his qualifications is in the merit promotion folder."  (Exhibit B, p. 14)

However during the counseling, the complainant received letter saying he did qualify. There seems to be no record of the agency providing the dates of birth for the Certificates.  There are two Referral and Selection Certificates with different dates.  The Referral and Selection Certificate (F24) says at the top that it is annotated with the Date of Birth and sex (gender) of each applicant referred for consideration.  The sex is noted of the referral list and guess complainant is suppose to assume the note at the bottom saying the Date of Birth (DOB) not available for these candidates overrides?  Similarly,



complainant questioned the EEO Director on the issues and was basically told in an email

not to question the EEO Counselor. Does this means that either the agency doesn't have

the dates of birth on the 15 candidates on the referral lists or that the agency just doesn't

want to provide the requested information. And there are only 15 names on this list and I

was told 34 were on the list. The date of the when the selectee started to work would be

the only appropriate date to use. The agency seems to be basing their opinion on a letter

that the agency couldn't supply (and it was undated) from the two selecting officials.

More importantly, neither Mr. Moffett, Mr. Burgman, or Mr. Libera were asked this

question in the affidavits.

Item 16: For the CFO Position (WA-TB-1-007), saying someone arrives as your boss is

about the lamest EEO reasoning. The agency has been very uncooperative on this

position and only provided information on the selectee. Since complainant didn't even

make the qualifying list, this is what agency should provide—not comparison to the

selectee and he reports work and to supervise the complainant. In F21 the agency has

only provided SES rating sheet of Mr. Miller which doesn't rate him on the Executive

Core Qualifications and NQ on the Mandatory Professional/Technical Qualifications.

The Counselor's Report says the Merit Promotion File did not exist. No Referral and

Selection Certificate or Eligible Status of Candidates (as in Budget Officer position) was

provided.

Item 17: Detailees--Two Positions (00-008A) The Agency has provided little if no

information on these positions. The Agency finally did find the announcements in Fall,

2002. The Agency doesn't seem to be able to find or want to find these Merit Promotion

files.

*(11)*

Item 18: In Dismiss 2, the Agency has under Failure to State a Claim uses this in order to intentionally mislead the Administrative Judge. This probably was based on a typo—but the Agency and the same Investigator (Mrs. Anderson) that was used for the ROI, used WA-TB-21-110, Program Support Assistant (Office Automation, GS-303-5. Exs F35, sec. 6 and F43 for the job announcement. Most of my EEO complaint is lack of nonselection at the GS14/15 and SES level. The Agency knew it was incorrect that I would apply for a GS-5 position with promotion potential to GS-7 (F35, #6 and F43. I believe that was used in an attempt to confuse the Judge on the other Academy position, WA-TB-030, Administrative Coordinator, NTSB Academy. I also believe it was intentional and a real slap in the face to the complainant. I really don't know why complainant would be going through all this to apply for a GS-5.

Item 19: The agency is also misleading as it is doing its request for dismissal in a piece mill fashion. The present Motion (Dismiss 2) now only ask to dismiss the Academy positions.

Item 20: In Exhibit 36, item 2 Ms. Beal states incorrectly that "prior EEO Complaints were reasons for his nonselection". Complainant is not aware of any prior EEO complaints.

SUMMARY

These are prime examples of agency not following EEO rules. It seems that even Merit Promotion files do not even exists in some cases. The Counselor told me that Merit Promotion folders did not exist in some cases. —I don't know how anyone could make such confusion and delays in providing information on nonselections.



I respectively request the Administrative Judge to reconsider the dismissals in the order Defining Claims to be Adjudicated and reject the dismissals requested in Dismiss 2 based on the Agency supply inaccurate and misleading information and the later available information. If this is not done, no one will be able to find out anything. The complainant believes this could change how the Agency operates it EEO program. The Agency is/has been totally uncooperative: Exhibit D, "Informal Resolution Documentation" is empty and the Agency has failed to make any good faith effort to resolute. Please note missing agency information in tabs that are completely empty in the ROI mentioned earlier. The Agency is only providing their misguided interruption mostly on information that I have provided or their selected questioning to selected agency officials.

The complaint further requests the Administrative Judge request the EEOC to review in order to see that 1614.104 (b) is being followed at NTSB. I think this is a prime example that needs the EEOC to review procedures to ensure that an agency makes reasonable efforts to resolve complaints informally, to process complaints in a timely manner, to develop adequate factual records, to issue decisions that are consistent with acceptable legal standards, to explain the reasons for its decisions, and to give complainants adequate and timely notice of their rights.

(13)

## CERTIFICATION OF SERVICE

On March 29, 2004, the forgoing was hand delivered to:

Kathryn Brown
Administrative Judge

U. S. Equal Employment Opportunity Commission
Washington Field Office
1400 L Street, NW, Suite 200
Washington, D.C. 20005

FAX: (202) 275-0076

And regular mail to:

Denise M. D'Avella
Agency Representative
National Transportation Safety Board
490 L'Enfant Plaza, SW
Washington, DC 20594

Richard L. Miller
Complainant

March 29, 2004

Kathryn Brown
Administrative Judge
U. S. Equal Employment Opportunity Commission
Washington Field Office
1400 L Street, NW, Suite 200
Washington, D.C. 20005

Re: Richard Miller v. NTSB.EEOC No. 100-20033-07898X

Dear Judge Brown:

(14)

Richard Miller Declaration

Civil Action No. 06-01071 (GK)

Exhibit  *16*

MSN Home | My MSN | Hotmail | Shopping | Money | People & Chat          Web S

msn. Hotmail          Today | Mail | Calendar | Contacts

rmiller29@hotmail.com

🕿 R~~ly~~ | 🕿 Reply All| 🕿 Forward| ✗ Delete| ✉ Junk| 🕿 Put in Folder ▾| 🖨 Print View| ✉ Save Addres~~s~~

Inbox
Sent Messages
Drafts
Trash Can
Bush
Jeff
Keepers
Resume
trainman
Report Junk E-Mail
Report and Block Sender

Sign in

New Instant Message
Add Messenger Contacts

| From : | Miller Richard <milr@ntsb.gov> | ⬆ | ⬇ | ✗ | ✉ Inbox |
|---|---|---|---|---|---|
| Sent : | Monday, September 12, 2005 3:56 PM | | | | |
| To : | <rmiller29@hotmail.com> | | | | |
| Subject : | EEO RESPONSE | | | | |

### EEO RESPONSE (9/05)

This response has been delayed as it has been an extremely busy time, am having to work under the Performance Improvement Plan, had serious eye, sinus, and ear infections, and had been on business travel.

**03 Performance:** I was discriminated against when I received a performance rating of Minimally Satisfactory rather than a performance rating of Outstanding. I was discriminated against because of continuous retaliation/disparate treatment when I received a performance rating of Minimally Satisfactory rather than a performance rating of Outstanding. I was discrimination against because of continuous retaliation/disparate treatment when I received a performance rating of Minimally Satisfactory for the rating period that ended on May 30, 2003. This action was taken by Don Libera and Steve Goldberg.

**Position Duties:** I was discriminated against when I was told the Chairman had decided to take the Purchase Card Program from me and transfer it to Lola Ward. I was told the day-to-day operations would be reassigned but not the policy and attempted to obtain clarification to no avail from Bill Mills, Don Libera, Steve Goldberg, Lola Ward, David Mayer, Joe Osterman and the Chairman. This change in position duties was part of continuous retaliation/disparate treatment. I was discrimination against because of continuous retaliation/disparate treatment during the period of February 04 to present, including being blocked out of any meetings/decisions on the Purchase Card Program although I was the Agency Coordinator until April/May 05. This action was taken by Don Libera, Bill Mills, Steve Goldberg, Lola Ward, David Mayer, and Chairman Engleman.

**Reassignment:** I was discriminated against when I was reassigned from the CFO to the Deputy CFO and then to the Accounting Division. I was discriminated against because of continuous retaliation/disparate treatment when I was reassigned downward from the CFO/Deputy CFO to the Accounting Division. Both I and the Purchase Card Program were discriminated against because of continuous retaliation/disparate treatment when we were reassigned downward during the last two years. This action was taken by Don Libera, Bill Mills, and Steve Goldberg.

**Work Assignments:** I was discriminated against when I received lower level assignments rather than higher-level assignments such as Etravel and credit card redistribution by CitiBank. I was discriminated against because of continuous retaliation/disparate treatment when higher-level assignments were taken away and replaced by lower level assignments. The higher-level Purchase Card Program was supposed to transfer September 28, 2004 and the lower level assignments were supposed to replace the Purchase Card Program. In fact, the Purchase Card Program did not transfer until May of 2005. I was discriminated against because of continuous retaliation/disparate treatment with these assignments in the period from February 2004 to the present. These actions were taken by Don Libera, Bill Mills, and Steve Goldberg.

**Computer:** I was discriminated against when I was denied equal and the full spectrum of computer access and assistance rather than the working access and assistance that other

employees received. I was discriminated against because of continuous retaliation/disparate treatment when I was denied computer access and assistance that other employees received. I was discriminated against because of continuous retaliation/disparate treatment when this assistance and access was denied. I was discriminated against because of continuous retaliation/disparate treatment when this denial occurred from the beginning to the present. These actions were taken by Don Libera, Bill Mills, and Steve Goldberg.

Position Description: I was discriminated against when I finally received my Position Description in October 2004. I was discriminated against because of continuous retaliation/disparate treatment when the Position Description was either intentionally not given to me until September or intentionally backdated to 5/30/04. I was discriminated against because of continuous retaliation/disparate treatment when this delay occurred. I was discriminated against because of continuous retaliation/disparate treatment when this intentional delay occurred in October 2004. And then it was not signed. These actions were taken by Don Libera, Bill Mills, and Steve Goldberg.

Non-Selections: I was discriminated against when I was non-selected in the positions for which I attempted to apply. These non-selections include those mentioned in the Counselor's Report and those added subsequently: Director Office of Administration (WA-TB-5-008), Chief Technical Advisor (Strategic and Intergovernmental Affairs) (SL-0301-00), Special Assistant (WA-TB-5-007), Supervisory Contract Specialist (05-009), Accounting Officer (1720-CFO-2005-0004), and Deputy, Office of Administration. I was discriminated against because of continuous retaliation/disparate treatment when these non-selections occurred. I was discriminated against because of continuous retaliation/disparate treatment when these non-selections were made in the period of the fall of 2004 to the present. These non-selection actions were taken by the Managing Director and other management officials at NTSB and the Academy.

Detail Opportunities: I was discriminated against when I was denied access to apply for all the detail assignments rather than being allowed the same access as the selected detailees. These include details previously mentioned (Barbara Check, Alan Pollack, Steve Bennett, Pat Cerise, Donald Chop, David Clark, Alan Kosher, Patrick McCarthy, Paul Scud, Deb Smith, Brenda Yeager) and the Deputy Detail in the Office of Administration, Deputy Detail at the NTSB Academy, Silbaugh detail to the Academy, the recent Atlanta Highway Detail to TDA, and the recent Detail in the Managing Director's Office. I was discriminated against because of continuous retaliation/disparate treatment when these details were selected. I was discriminated against because of continuous retaliation/disparate treatment when these non-selections were made in the period of the fall of 2004 to the present. These non-selection actions were taken by the Managing Director and other management officials at NTSB and the Academy.

**Harassment and Hostile Work Environment:** I was discriminated against when I suffered harassment and hostile work environment in various areas, including unneeded, unclear and changing assignments to intentionally confuse, mislead and take time away from regular duties, post-audit and denial of DOI Contract, denial of supervisor's comments on FEMIA risk assessment, late or non-existence of FEMIA notification, work schedule, denial of annual leave, placing focus/priority on projects such as Safety Review and Citibank statements requested for 5 years, and office move. Management designed work to derail dong job. I was discriminated against because of continuous retaliation/disparate treatment with this harassment. I was discriminated against because of continuous retaliation/disparate treatment with this harassment in the period of the fall of 2004 to the present. This harassment and hostile work environment was by Bill Mills, DOI, Don Libera, Steve Goldberg and CFO employees.

**Warning Letter:** I was discriminated against when I was issued a Warning Letter rather than being treated equally as other employees. I was discriminated against because of continuous retaliation/disparate treatment with being issued this warning letter. I was discriminated against because of continuous retaliation/disparate treatment with this harassment in the period from January 2005 to the present. These actions of the warning letter were taken by the Bill Mills, Don Libera, Steve Goldberg and the Managing Director.

**03 Performance Questions:** I was discriminated against when I was asked 38 questions on my performance. I was discriminated against because of continuous retaliation/disparate treatment when I had to answer these questions. I was discrimination against because of continuous retaliation/disparate treatment when I was asked these questions for the rating period that ended on May 30, 2004. This action was taken by first and second level supervisors—Don Libera and Steve Goldberg.

**04 Mid-Point:** I was discriminated against when I did not receive a Mid-Point rating. I was discriminated against because of continuous retaliation/disparate treatment when I did not receive the Mid-Point rating. I was discrimination against because of continuous retaliation/disparate treatment when I did not receive a Mid-Point rating for the period that ended mid-point of the annual rating cycle that ended on May 30, 2004. This action was taken by first, second and third level supervisors—Bill Mills, Don Libera, and Steve Goldberg.

**04 Performance:** I was discriminated against when I received a performance rating of Unacceptable rather than a performance rating of Outstanding. I was discriminated against because of continuous retaliation/disparate treatment when I received a performance rating of Unacceptable rather than a performance rating of Outstanding. I was discrimination against because of continuous retaliation/disparate treatment when I

received a performance rating of Unacceptable for the rating period that ended on May 30, 2005. This action was taken by first, second and third level supervisors—Bill Mills, Don Libera, and Steve Goldberg.

**04 Performance Standards:** I was discriminated against when I received my Performance Standards. I was discriminated against because of continuous retaliation/disparate treatment on these Performance Standards. I was discrimination against because of continuous retaliation/disparate treatment when I received my Standards for the rating period that ended on May 30, 2004. First and second level supervisors—Don Libera and Steve Goldberg, took this action.

**05 Performance Standards:** I was discriminated against when I received my Performance Standards. I was discriminated against because of continuous retaliation/disparate treatment on these Performance Standards. I was discrimination against because of continuous retaliation/disparate treatment when I received my Standards for the rating period that will end on May 30, 2005. This action was taken by Bill Mills, Don Libera and Steve Goldberg.

**Purchase Card Transition:** I was discriminated against when I was given unclear, unsubstantiated, and non-defined assignment to write the Purchase Card Transition Plan. Supervisor told the union in the fall of 2003 that I could now write my own job description (this was to get the union's approval of the realignment). This realignment was intentionally designed to promote Lola Ward to SES, Keith O'Neill to GS-15, and Jim Arena to an SL. I was discriminated against because of continuous retaliation/disparate treatment on this Purchase Card Transition. I was discrimination against because of continuous retaliation/disparate treatment when I couldn't obtain clear and unchanging direction during the period of January 2004 to present. This action was taken by first, second and third level supervisors—Bill Mills, Don Libera, and Steve Goldberg and other management officials.

**PIP:** I was discriminated against when I was issued a Performance Improvement Plan (PIP) rather than being treated equally as other employees. (Couldn't answer the question and would not tell me what the other items were) I was discriminated against because of continuous retaliation/disparate treatment with being issued this PIP. I was discriminated against because of continuous retaliation/disparate treatment with this harassment in the period from June 2005 to the present. These actions of the warning letter were taken by the Bill Mills, Don Libera, Steve Goldberg and the Managing Director.

**Blocked Out of DOT Audits of my programs:** I was discriminated against when I was blocked involvement in both the Purchase and Travel Card Audits by the DOT IG, although I am the Agency Program Coordinator for these card programs. I was discriminated against because of continuous retaliation/disparate treatment with this block out. I was discrimination against because of continuous retaliation/disparate treatment with this blockage in the period from the fall 2004 to present. I was discriminated against because of continuous retaliation/disparate treatment with this blockage in the period from June 2005 to the present. These actions of the warning letter were taken by the Bill Mills, Don Libera, Steve Goldberg and the Managing Director.

**Training:** I was discriminated against when I received far less training than other employees. This agency has not spent one dollar on any course registration for me; however per the Chairman's direction, the average training should be $2000 per employee. While other receive Career Development Course and Leadership training, I have been denied any such training. This year projects were assigned that blocked any participation in training. I was discriminated against because of continuous retaliation/disparate treatment with this denial of training. I was discrimination against because of continuous retaliation/disparate treatment with this denial from the beginning at NTSB to present. These actions were taken by Bill Mills, Don Libera, and Steve Goldberg.

**EEO Process: Inappropriate EEO Counseling and Unexplained Delay:** Requested Counselor November 17, 2004; continuous delays; only telephonic counseling; poor and shoddy and late counseling report; counselor would not interview management that knew about particular claims but interviewed the wrong management officials that didn't know claims. No job folders provided as in previous cases and in some cases couldn't identify the selecting official. Did not identify any informal resolution attempts. Counselor wouldn't ask for the Booz Allen Study. HR said they would only deal with EEO officials on Arena's advertisement and EEO official agreed but did not follow-up and obtain Arena's advertisement.

☎ | ☎ | ☎                                                              ◆ | ▼ | ✕ | ✉ Inbox

Get the latest updates from MSN

MSN Home | My MSN | Hotmail | Search | Shopping | Money | People & Chat                Fe

© 2005 Microsoft TERMS OF USE  Advertise  TRUSTe Approved Privacy Statement  Anti-Spam Polic

Richard Miller Declaration

Civil Action No. 06-01071 (GK)

Exhibit ___17___



**NTSB**

**National Transportation Safety Board**
490 L'Enfant Plaza, SW
Washington, DC  20594-0001
www.ntsb.gov

*Office of General Counsel*

December 18, 2006

Robert A. Taylor, Jr., Esq.
Law Offices of Robert Taylor
107 Fardale Street
Vienna, Virginia 22180

RE:    National Transportation Safety Board Internal Investigation Regarding
Forwarding of CA-2 Form to Department of Labor

Dear Mr. Taylor:

As you know, the Safety Board received your request in a letter dated April 28, 2006, for an investigation of the timeliness of the forwarding of Mr. Richard Miller's CA-2 form and accompanying records to the United States Department of Labor's Office of Workers' Compensation Programs.  In your letter, you asked the Safety Board to notify you of the results of the Safety Board's investigation into this matter.

Pursuant to your request, the Safety Board's Managing Director arranged for an independent, internal investigation regarding the Safety Board's forwarding of Mr. Miller's CA-2 form and the documents associated therewith.  Please find enclosed a narrative report that summarizes the details and conclusions of this investigation.  The Safety Board is releasing this report to you in full, in response to your request and in the interest of informing you that the Safety Board arranged for a thorough investigation of all aspects of this matter.

Please feel free to contact me at the above address if you have questions regarding the enclosed document.

Sincerely,

*Gary L. Halbert*

Gary L. Halbert
General Counsel

Enclosure

FOR OFFICIAL USE ONLY

# BACKGROUND

On May 5, 2006, the National Transportation Safety Board (hereinafter "the agency") received from Robert Taylor, Jr., Esq., a letter, dated April 28, 2006, on behalf of Richard L. Miller, who was, at all relevant times, an agency employee. That letter pertained to the agency's processing of a workers' compensation claim submitted by Mr. Miller in October 2005, and related that "[t]his matter was originally referred to the United States Department of Justice, Public Integrity Section. That [o]ffice has recommended that Mr. Miller's allegations first be investigated by your office for any criminal wrong doing and, should the same be found, that a referral of this matter be made by your office to the Criminal Division of the U.S. Department of Justice."[1]

The basis for this complaint — as fully stated by Mr. Taylor in a January 20, 2006, letter to the Public Integrity Section of the Department of Justice (a copy of which was attached to his April 28, 2006, letter) — is that the agency "willfully refused" to properly process and forward Mr. Miller's workers' compensation claim to the Department of Labor (DOL), by failing to transmit his claim form (DOL Form CA-2) and supporting documentation to DOL's Office of Workers' Compensation Programs (OWCP) within 10 working days of its receipt of the claim, as is required by 20 C.F.R. § 10.110, and that, as a result, the agency and/or one or more of its employees may have violated 18 U.S.C. § 1922.

Subsequently, on May 22, 2006, the agency's Managing Director appointed me to conduct an investigation into the following matters:

1) The delay, if any, and whether such delay was improper, in the processing and forwarding of a worker's compensation claim filed by NTSB employee Mr. Richard L. Miller; and

2) If there was an improper delay, whether said delay appears to have been intentional, willful, or otherwise intended to deprive Mr. Miller of any right, privilege, or benefit under applicable worker's compensation statutes and regulations.

# APPLICABLE LAW

20 C.F.R. § 10.110 provides (emphasis added):

§ 10.110 What should the employer do when an employee files a notice of traumatic injury or occupational disease?

(a) The employer shall complete the agency portion of Form CA-1 (for traumatic injury) or CA-2 (for occupational disease) no more than 10 working days after receipt of notice from the employee. The employer

---

[1] The agency office to which Mr. Taylor's April 28, 2006, letter was addressed was "Office of the Inspector General." Because the agency does not have an Inspector General, it was referred to the Managing Director, who has the inherent authority to order internal agency investigations of personnel misconduct of the type alleged therein.

1

FOR OFFICIAL USE ONLY

shall also complete the Receipt of Notice and give it to the employee, along with copies of both sides of Form CA-1 or Form CA-2.

(b) The employer *must complete and transmit the form to OWCP within 10 working days after receipt of the notice from the employee* if the injury or disease will likely result in:

    (1) A medical discharge against OWCP;

    (2) Disability for work beyond the day of shift or injury;

    (3) The need for more than two appointments for medical examination and/or treatment on separate days, leading to time loss from work;

    (4) Future disability;

    (5) Permanent impairment; or

    (6) Continuation of pay pursuant to 5 U.S.C. 8118.

(c) The employer *should not wait for submittal of supporting evidence before sending the form to OWCP.*

(d) If none of the conditions set forth in paragraph (b) of this section applies, the Form CA-1 or CA-2 shall be retained as a permanent record in the Employee Medical Folder in accordance with the guidelines established by the Office of Personnel Management.[2]

18 U.S.C. § 1922 provides as follows:

§ 1922.  False or withheld report concerning Federal employees' compensation

Whoever, being an officer or employee of the United States charged with the responsibility for making the reports of the immediate superior specified by section 8120 of title 5, willfully fails, neglects, or refuses to make any of the reports, or knowingly files a false report, or induces, compels, or directs an injured employee to forego filing any claim for compensation or other benefits provided under subchapter I of chapter 81 of title 5 or any extension or application thereof, or willfully retains any notice, report, claim, or paper which is required to be filed under this subchapter or any extension thereof, or regulations prescribed thereunder, shall be fined under this title or imprisoned not more than one year, or both.

    A Westlaw search disclosed scant relevant case law applying either the regulation or the statute. I found no cases involving a situation in which a federal employee sought redress against an employer agency for failing to timely transmit a workers' compensation claim to DOL under 20 C.F.R. § 10.110. The only case of an analogous nature that I found is *Beckner v. Department of Labor*, 797 F.Supp. 850 (D.Colo. 1992), in which a former federal employee brought a mandamus action against DOL, OWCP and officials thereof, alleging that OWCP had violated her due process

---

[2] In this matter, it is not posited that none of the conditions set forth in 20 C.F.R. § 10.110(b) apply.

FOR OFFICIAL USE ONLY

FOR OFFICIAL USE ONLY

rights by delaying the processing of her workers' compensation claim. In granting a motion by the defendants for summary judgment, the court found that there was no evidence that requests made by OWCP for additional medical evidence pertaining to a diagnosis of reflex sympathetic dystrophy (which was one of the disorders on which the plaintiff's workers' compensation claim was based) and the suitability of a dorsal column stimulator implant for its treatment were "based on bad faith, a dilatory motive or a lack of evenhandedness." 797 F.Supp at 853-54. In connection with that determination, the court observed that the medical records before OWCP at the time such requests were made "support the OWCP's contention that the additional evaluations were ordered to resolve inconclusive and conflicting assessments of [the plaintiff]'s condition. [Her] claim has never lain fallow. It received consistent attention from the OWCP." *Id.* at 854.

I found no case law involving allegations of a violation of 18 U.S.C. § 1922 by a Federal officer or employee for willfully failing, neglecting or refusing to make a report under, or willfully retaining a notice, report, claim or paper required to be filed under, 5 U.S.C., Chapter 81, Subchapter I (which pertains to compensation for the work-related injury, illness or death of Federal employees).

## FACTS AND CIRCUMSTANCES

I.

At all pertinent times, Mr. Miller was employed in the position of Financial Management Specialist in the agency's Office of Chief Financial Officer (OCFO). Donald P. Libera, Jr., the agency's Deputy Chief Financial Officer, was his immediate supervisor through May 2004. In June 2004, William J. Mills, the Chief of OCFO's Accounting Division, became his immediate supervisor.

Mr. Miller claimed entitlement to workers' compensation benefits for "[d]epression and anxiety disorder; and aggravation of depression and anxiety disorder," of which he first became aware in December 2000, and which he first realized was caused or aggravated by his employment in December 2002, on a DOL Form CA-2 ("Notice of Occupational Disease and Claim for Compensation") dated October 24, 2005. The agency, through Mr. Mills, received Mr. Miller's claim package, comprised of the CA-2 and supporting material, on October 26, 2005.[3] Accordingly, the agency's 10 business day timeframe for transmitting that claim to DOL under 20 C.F.R. § 10.110 ended on

---

[3] Mr. Miller attempted to have his claim delivered to Mr. Mills through a third party on the afternoon of October 25, 2006. When that individual appeared at the agency's security station, he related to the security guard only that he had a package for Mr. Mills. Although that individual identified himself, Mr. Mills did not recognize his name, and upon questioning, he failed to either state the nature of his business or disclose the package's contents. As a result, Mr. Mills declined receipt of the package for security reasons. Said individual then attempted, without success, to have other agency officials accept the package. Subsequently, on October 26, 2006, Mr. Mills received, by overnight delivery service, a package from Mr. Miller, which contained the CA-2 and supporting material. Ex. 9 at 1. *See also* Exs. 14, 16.

3

FOR OFFICIAL USE ONLY

November 9, 2005. The agency did not, however, forward the claim to DOL until January 30, 2006. It is this delay that gave rise to Mr. Miller's complaint, which triggered this investigation.

In connection with the investigation, I sought to identify, interview, and obtain relevant documents and records from those individuals at the agency who had involvement with Mr. Miller's claim. In addition to Mr. Mills and Mr. Libera, the individuals I so identified were Cynthia G. Lepson, a Human Resources Specialist (Employee Relations-Labor Relations) in the Human Resources Division (HRD) of the agency's Office of Administration; Frances G. Croom, a contract Human Resource Benefits Specialist attached to HRD; and Denise M. D'Avella, an Attorney Advisor in the agency's Office of General Counsel (OGC) whose duties in OGC include acting as agency counsel in personnel matters. I also contacted Mr. Taylor to inform Mr. Miller of the investigation, invite Mr. Miller to be a witness-interviewee, solicit any relevant documents that were not previously included with the complaint letter, and request citations of any administrative or judicial case law they considered supportive of the complaint.[4] However, Mr. Taylor did not provide any further documents or citations of case law on Mr. Miller's behalf, and Mr. Miller declined to be interviewed.[5]

II.

My witness interviews and the pertinent documentary evidence reveal that the agency's delay in forwarding Mr. Miller's claim to DOL arose principally from its decision to oppose, or "contravene," the claim, and the fact that it took until late January 2006 for the agency's written response in contravention of the claim to be completed. There are, in turn, a number of factors that contributed to the length of this delay.

To begin with, in addition to the medical information and other pertinent documentation he submitted with his CA-2 form, Mr. Miller included an 11-page supporting statement, in which he asserted that his depression and anxiety disorder developed, and/or was aggravated by, the stress of: (1) on-the-job physical injuries;[6] (2) high-visibility projects; (3) a lack of support, direction and information; (4) unrealistic deadlines; (5) insufficient help; (6) excessive work; and (7) a lack of adequate training. He detailed numerous specific factors and events occurring over a period of several years in furtherance of those assertions, and the agency disputed, and felt compelled to contest, practically all of his characterizations of such factors and events, on virtually a paragraph-by-paragraph basis.[7] Ms. Lepson, who was at the time advising OCFO on personnel issues concerning Mr. Miller, took primary responsibility for the coordination and development of the agency response. Ms. D'Avella's participation in the matter

---

[4] See Ex. 6.

[5] See Ex. 7.

[6] Those purported work-related injuries occurred in May and July 2004, and were the subjects of prior workers' compensation claims filed by Mr. Miller. In connection with the subject illness claim, he asserts that he was adversely affected mentally by the pain and suffering such injuries caused him.

[7] Compare, in Ex. 3, Mr. Miller's supporting statement and the agency's response thereto.

FOR OFFICIAL USE ONLY

FOR OFFICIAL USE ONLY

emanated from her involvement as counsel in pending personnel matters and litigation in which Mr. Miller was engaged with the agency. Ms. Croom had the technical responsibility for the processing of Mr. Miller's claim for HRD.

The process of developing a comprehensive agency response initially required Mr. Mills and Mr. Libera to provide Ms. Lepson with preliminary descriptive replies addressing the factors and events detailed by Mr. Miller that pertained to OCFO. (The vast majority of the stress-inducing factors and events identified by Mr. Miller in his supporting statement related directly to his duties at OCFO.) Mr. Mills' preliminary response was 16 pages long,[8] and Mr. Libera's was 56 pages in length.[9] In a significant number of places in those preliminary responses, there were indications that additional details were needed in order to adequately address Mr. Miller's factual representations. Such further details needed to be researched and verified. In addition, relevant supporting documentation was required to be identified and retrieved for the agency response. OCFO's preliminary responses to Mr. Miller's factual assertions were followed by ongoing exchanges of questions, information and documentation among Mr. Mills, Mr. Libera, Ms. Lepson and Ms. D'Avella, which continued through the week of January 23-27, 2006.[10]

Mr. Miller 's supporting statement also contained factual representations as to his role in the accident investigation/reconstruction-related documentation, inventorying and packing up of parts obtained from the wreckage of TransWorld Airlines Flight 800, which needed to be reviewed and addressed by David Mayer, the agency's Deputy Managing Director, who had the lead responsibility for that project,[11] and with respect to his part in the creation of the NTSB Academy, for which Robert Gilson, a former agency employee who was in charge of that endeavor, needed to be consulted.[12]

During this process, the agency personnel who were involved with the claim also had other duties that required their attention. Mr. Libera and Mr. Mills were obligated to attend to their day-to-day-responsibilities as Deputy Chief Financial Officer and Chief of OCFO's Accounting Division, respectively.[13] Between late October 2005 and late January 2006, Ms. Lepson was, in addition to being responsible for the coordination and development of the agency's response to Mr. Miller's claim, working on numerous personnel matters, including two proposed removal actions (one of which involved Mr. Miller), four disciplinary actions, three medical-related reasonable accommodation requests (including one by Mr. Miller), and the planning and convening of a Performance Review Board to review a disputed performance rating.[14] She was also

---

[8] See Ex. 14. Mr. Mills provided Ms. Lepson with his preliminary response one or two days after it was requested. Ex. 9 at 1.
[9] See Ex. 13. Mr. Libera's preliminary response was transmitted to Ms. Lepson on November 9, 2006. See id.
[10] See Ex. 13.
[11] See Ex. 10 at 2; Ex. 12 at 3; Ex. 13.
[12] See Ex. 10 at 2-3; Ex. 12 at 3; Ex. 13.
[13] See Ex. 8.
[14] Ex. 12 at 3.

5

FOR OFFICIAL USE ONLY

FOR OFFICIAL USE ONLY

required to attend to several labor-management issues and the re-bidding of the agency's Employee Assistance Program (EAP) contract during that period.[15]

III.

Coupled with the aforesaid circumstances are the training and practical experience of Ms. Lepson and Ms. Croom.  Ms. Croom, who retired from Federal service in 1995 with more than 30 years' experience in the area of human resource benefits, has processed "hundreds" of workers' compensation claims as both a Federal employee and a contractor.[16]  She has attested that her "longstanding practice" in cases where the employer agency contravenes a claim "has been to gather all of the information necessary for the agency's response in contravention of the claim, and to have the response in its completed form before forwarding the . . . claim package to DOL."[17]  In her experience, Ms. Croom has found that workers' compensation illness claims typically require more medical information than do injury claims; that, in illness cases, the employee-claimant often fails initially to furnish adequate medical information to support the claim; and that, when this appears to be the case, her practice has been to retain the employee's claim package until sufficient medical information is received.[18]  In addition, "[i]t has always been [her] practice to wait until the claim package is complete before transmitting it to DOL . . . [because] the package first goes to a DOL office at 800 North Capital Street, Washington, D.C., and is then shipped to another DOL facility in London, Kentucky, for data entry.  Eventually, a claim number is assigned.  If an incomplete package is sent out, any additional material transmitted to DOL would have nothing to attach to prior to the assignment of a claim number.  Thus, the submission of an incomplete claim could have the unintended consequence of lengthening the time for the ultimate disposition of the claim by DOL."[19]

Ms. Lepson is a long-term Federal employee who began processing workers' compensation claims in 1990.  Prior to taking her current position with the agency, Ms. Lepson worked at the Food and Drug Administration (FDA) for approximately 12 years, during which she managed FDA's workers' compensation program, overseeing the processing of headquarters and field claims, and supervising a staff of three personnel assistants.[20]

Ms. Lepson has attested that she received workers' compensation training from DOL in the early 1990's (in basic and advanced claims processing), during which the 10-day timeframe for the submission of claims to DOL, and the difficulties employer agencies experience in meeting that timeframe, were discussed.[21]  She noted that, while the attendees at such training were instructed to strive to meet the deadline in all

---

[15] Id.
[16] Ex. 11 at 1.
[17] Id.
[18] Id.
[19] Id. at 1-2.
[20] See Ex. 12 at 1.
[21] Id.

6

FOR OFFICIAL USE ONLY

FOR OFFICIAL USE ONLY

cases, they were also advised that it was acceptable to hold incomplete claim forms beyond the 10-day period pending the receipt of further relevant documentation or information.[22] She further attested that she subsequently received similar advice in discussions with individual DOL claims examiners.[23] Ms. Lepson indicated that it was her understanding that the purpose of such advice was to preclude the return of incomplete claims to employer agencies, and to lessen the possibility that the information sent to DOL at a later date would be lost or misplaced at DOL — an occurrence she noted she had experienced "on several occasions" in her workers' compensation claims processing and program management positions.[24]

This is consistent with information Ms. Lepson gave me about her training during an informal conversation I had with her at the time she provided me with copies of the completed claim package that the agency transmitted to DOL, together with other pertinent material from HRD relating to the subject claim, in late June 2006, when I noted that the principal concern of the investigation was why the agency did not forward Mr. Miller's claim to DOL within 10 business days of its receipt, despite the provisions of 20 C.F.R. § 10.110.[25]

Ms. Lepson also concurred with Ms. Croom that the processing time for illness-based workers' compensation claims generally tends to be longer than injury-related claims. In this vein, she has observed that, in the case of claimed occupational illnesses, "it is often difficult to gather the required information and submit the claim within the 10-day regulatory timeframe."[26]

In addition, Ms. Lepson has attested to having experience during her tenure at FDA which indicated to her that an erroneous workers' compensation award made on the basis of incomplete information is unlikely to be reversed by DOL.[27] Specifically, she related that there was a case in which a DOL coordinator who acknowledged that an FDA worker's claim had been erroneously approved told her that, once a claim has been approved by DOL, it is extremely difficult, if not impossible, to get the decision overturned.[28] As a result of that experience, Ms. Lepson has "since, always, tried to ensure that complete agency information is provided with the initial claim filing."[29]

Such experience is significant, in light of the potential costs to an employer agency that can result from a workers' compensation award made on the basis of incomplete or erroneous information. This is because, although DOL makes workers'

---

[22] *Id.*

[23] *Id.*

[24] *Id.*

[25] *See* Ex. 18 at 1 & n.1.

[26] Ex. 12 at 2.

[27] *Id.* at 1.

[28] *Id.* Similarly, Ms. D'Avella has observed that "[i]t is my understanding that, once DOL renders a decision granting a workers' compensation claim, it is very difficult to have the decision reversed." Ex. 10 at 2.

[29] Ex. 12 at 1.

7

FOR OFFICIAL USE ONLY

compensation benefit payments directly to the beneficiary, the employer agency must reimburse DOL through a "chargeback" process.[30]  For this reason, Ms. D'Avella has noted that "it is consistent with the responsible marshalling of agency funds to assure that the agency's response in contravention of a claim be considered before a decision on the claim is rendered by DOL."[31]

IV.

On July 7, 2006, between the above-referenced informal conversation I had with Ms. Lepson in late June 2006 and my witness interview with her on August 30, 2006, I spoke by telephone with Allison Lattu, who was a communications specialist at OWCP's Division of Federal Employees' Compensation, District 25.  Ms. Lattu's telephone number appeared in a November 10, 2005, e-mail from Mr. Miller to Mr. Mills (which was copied to Ms. Croom), in which Mr. Miller related that "Alicyn" at DOL had informed him that the agency was required to comply with the 10-day timeframe for forwarding his claim to DOL, and could provide a statement along with the claim that it had further material it intended to submit at a later date.[32]  In addition, Ms. Lepson had identified Ms. Lattu as a source for information at DOL during our informal conversation.[33]

After receiving assistance from Ms. Lattu in locating certain information I was seeking on DOL's website, I asked her if she was aware of any DOL training in which employer agency personnel were advised to delay transmitting workers' compensation claims beyond the 10-day timeframe of 20 C.F.R. § 10.110 in order to assure that claim packages would be received in complete form, rather than on a piecemeal basis.  She emphatically stated that she had no knowledge of any such training by DOL in the last 28 years, and noted that, upon receipt of a claim form, DOL could create a case file and get a case number and examiner assigned, let the employee and employer agency know what information was still needed, and ask them when such outstanding information could be expected.[34]  Subsequently, in preparing for my interview with Ms. Croom, I noticed a reference to "Allison" in an e-mail from Ms. Lepson to her, which suggested to me that Ms. Lattu had some role in DOL's processing of the subject claim. I later confirmed this during my interview with Ms. Croom.  I therefore telephoned Ms. Lattu on July 28, 2006, to inquire as to whether she had any information relating to the subject claim that might be helpful to the investigation, but I received a voice mail message that she had retired on July 21.[35]  I then attempted to determine if there was anyone else at that office who might be able to provide pertinent information, and I was ultimately directed to Linda DeCarlo, who is the District Director.[36]

---

[30] See 5 U.S.C. § 8147.

[31] Ex. 10 at 2.

[32] A more detailed description of that e-mail appears at p. 10, infra.

[33] See Ex. 18 at 1.

[34] Id. at 2.

[35] Id.

[36] Id.

8

FOR OFFICIAL USE ONLY

I subsequently spoke by telephone with Ms. DeCarlo on July 31, 2006, and related to her the nature of this investigation and the gist of my prior conversation with Ms. Lattu. I informed her that I attempted to contact Ms. Lattu for information specific to Mr. Miller's claim, but had learned that she recently retired, and I asked Ms. DeCarlo whether she could pass my contact information along to Ms. Lattu, so that Ms. Lattu could contact me. Ms. DeCarlo declined that request, and, in so doing, indicated that Privacy Act considerations precluded DOL from providing me with case-specific information.[37] Ms. DeCarlo also reiterated Ms. Lattu's observations concerning DOL training and claims processing practices.[38] In a subsequent telephone conversation I had with Ms. DeCarlo, she further revealed that DOL typically assigns a claim number within three days of receiving a claim package in paper form, and renders a decision on the claim within the following 60 to 90 days.[39] She also connoted that OWCP does not, as a practice, wait to receive additional material that a party has indicated it intends to submit before rendering a decision, when it already has what appears to be sufficient material available for a decision to be reached.[40] Ms. DeCarlo indicated that DOL will consider reversing a decision it has made on a workers' compensation claim where new factual evidence that was previously unavailable is presented, or where it is shown that the decision in question was erroneous.[41]

During my witness interview with Ms. Lepson, after I had questioned her about her workers' compensation training, I informed her of my conversation with Ms. Lattu. Ms. Lepson strongly reaffirmed to me what she had previously stated about the training she received from DOL, as detailed above at pages 6-7.

## V.

Against the aforesaid background are a series of e-mail communications between Mr. Miller and Mr. Mills, pertaining to the processing of the subject claim.[42] In the first such e-mail, Mr. Mills advised Mr. Miller on October 26, 2005, that "I received your package with the CA-2 form and the attachments. . . . We are processing it and will forward it to DOL when it is complete." Subsequently, on October 29, 2005 (which was a Saturday), Mr. Miller informed Mr. Mills that "I would like to be informed by email when this package is forwarded to DOL and I would like to have a copy of the DOL submittal. You will note that the package is suppose[d] to be forward[ed] to DOL within 10 days." Mr. Mills subsequently replied on October 31 that a copy of the package would be provided when it is forwarded to DOL. On November 9, Mr. Miller e-mailed that he had not yet received confirmation that the package had been forwarded to DOL, and asked Mr. Mills to "[p]lease advise as the 10 days have expired." The following day, Mr. Mills replied that "[y]our CA-2 package provided a great deal of information for

---

[37] *Id.* Ms. DeCarlo confirmed this in a July 31, 2006, letter, which is attached to Ex. 18.
[38] Ex. 18 at 2.
[39] *Id.* at 3.
[40] *Id.*
[41] *Id.*
[42] These e-mails appear in Ex. 14. (Copies of some or all of these e-mails may also be found in Exs. 2, 15, 16 and 17.)

9

FOR OFFICIAL USE ONLY

DOL that we must respond to as part of our submission on the CA-2 Form. It will take us some time to accomplish that. Any delay on our part in meeting the 10 day deadline will not impact on DOL's decision on your claim. We will let you know when the package is sent to DOL and we will provide you with a copy."

Later on November 10, in an e-mail to Mr. Mills that was copied to Ms. Croom, Mr. Miller stated:

> Please be advised that there is no extension on the deadline, YOU must by law' send it to OWCP" I spoke with Alicyn [sic (i.e., Ms. Lattu); telephone number omitted] . . . she instructed me to call you and Francis [sic] Croom to instruct you to do so . . . .

> She (Alicyn with OWCP) explained that you must by Law comply 'with the deadline' and you may attach a note/statement saying that you did not have enough time to include all of your Supervisor/statement within the deadline, where you must fill out Items 19 thru 34' and you will be able to send an attachment/whatever you did not have time to do' at a later date.

> .*                    *                    *

> [I]f you fail to do so, OWCP has advised me to file a[n] EEO Claim/ and to contact the DOTIG, etc in your non-compliance to do so and violation of the law. . . .

> Thank you both in Advance for your cooperation in this matter, any questions please feel free to contact me or Ailcyn 'at OWCP'

There was no agency reply to that e-mail. Mr. Miller next e-mailed Mr. Mills on December 20, 2005, noting that it had been almost 60 days since he submitted his claim to the agency and asking, "What is the hold-up on forwarding my claim to DOL?" Mr. Mills replied later that day that the agency was in the process of finishing the preparation of its portion of the package, and that it should go out soon. Subsequently, in a lengthy January 17, 2006, e-mail that addressed a series of issues, Mr. Mills advised Mr. Miller that he and Mr. Libera had furnished information regarding the claim to HRD, that "[t]he response is being prepared by HRD for our review," and that he would be provided a copy upon its completion and release to DOL.

Several days later, on January 20, 2006, Ms. Lattu contacted Ms. Lepson by telephone, and indicated to Ms. Lepson that Mr. Miller and/or Mr. Taylor had contacted her regarding the agency's delay in transmitting Mr. Miller's claim to DOL.[43] In discussing the matter with Ms. Lattu, Ms. Lepson noted the considerable number and complexity of the allegations Mr. Miller had made in his supporting statement, which, she related, the agency believed were unfounded and felt compelled to address in its response in contravention of the claim.[44] Ms. Lepson noted that the agency was working diligently on the response, and indicated that she expected that the response, and, hence, the claim package, would be completed and forwarded to DOL in

---

[43] Ex. 12 at 4.
[44] Id.

FOR OFFICIAL USE ONLY

approximately a week.[45]  Ms. Lepson also recounted that Ms. Lattu asked her when she last had training on the processing of workers' compensation claims, and that, when she stated that her most recent training had been in the early 1990's, Ms. Lattu informed her that DOL's philosophy had changed in recent years, and that employer agencies were now being encouraged to submit whatever claim material they had — even if incomplete — within the regulatory 10-day timeframe, and then send in any additional information as it became available.[46]  According to Ms. Lepson, when she informed Ms. Lattu that the completion of Mr. Miller's claim package was imminent, Ms. Lattu requested that it be submitted as soon as possible.[47]  The claim package was subsequently transmitted to DOL by courier on January 30, 2006.[48]

Several noteworthy events occurred after the claim package was submitted to DOL.  In early February 2006, Ms. Lepson and Ms. Croom sought to locate the claim on the DOL database, to confirm that it had been entered into the system.[49]  The claim did not appear on the database, and followup with Ms. Lattu at first suggested that the claim package had been returned to the agency because Mr. Miller did not provide complete information in Blocks 11 and 12 of the CA-2; however, the agency did not, thereafter, receive the claim package back from DOL.[50]  Ms. Croom nevertheless e-mailed Mr. Miller to request the information that Ms. Lattu had indicated was omitted by him, and, when Mr. Miller did not respond within several days, she again e-mailed him in a second attempt to obtain such information.[51]  In the meantime, Ms. Croom arranged for a copy of the package to be sent to DOL's Kentucky facility so that it could serve as a substitute for the original claim package, the precise whereabouts of which remained uncertain.[52]  It was ultimately discovered that the claim package had not been returned to the agency, but had gone to a DOL claims examiner, who had sent a letter to Mr. Miller on March 9, 2006, in which he was asked to provide additional medical and other information to aid in the evaluation of his claim.[53]

VI.

Certain other factors appertain.  First, as is noted above (*see* page 4 and note 6, *supra*), prior to the claim that is the subject of this investigation, Mr. Miller filed two workers' compensation claims with the agency, for work-related injuries he claimed were sustained in May and July 2004.  HRD forwarded the first of those claims to DOL 19 working days after its receipt, and six working days following its resubmission to HRD after it had been returned to Mr. Miller for reasons that are not disclosed in HRD's

---

[45] *Id.*

[46] *Id.*

[47] *Id.*

[48] *See* Ex. 4; Ex. 10 at 3; Ex. 11 at 2; Ex. 12 at 4.

[49] Ex. 12 at 4.

[50] *See* Ex. 11 at 2; Ex. 12 at 4.  *See also* Ex. 16.

[51] *See* Ex. 16.

[52] Ex. 11 at 3; Ex. 15.

[53] *See* Ex. 11 at 2-3; Ex. 12 at 4; Ex. 16.

11

records.[54]  The second such claim was transmitted to DOL within seven working days of its receipt.[55]

Insofar as the potential economic impact of the delayed submission of the subject claim is concerned, it is noteworthy that Mr. Miller was in receipt of his full salary for the entire period of time from the agency's receipt of his claim on October 26, 2005, to its submission of the claim to DOL on January 30, 2006.[56]  It is also significant that any award of workers' compensation benefits to which he would ultimately be deemed entitled would be retroactive.[57]

VII.

Statistics on workers' compensation claims processing timeliness by Federal agencies, as reported on DOL's website at www.dol-esa.gov/share,[58] also bear a mention.  Those statistics show a general upward trend of timely submissions of claims to DOL by Federal employer agencies from fiscal year (FY) 2000 to FY 2003.  The website provides somewhat more detailed statistics on timeliness for FY 2005 and the first three quarters of FY 2006, with FY 2003 as a comparative baseline.  Such statistics reveal that the government-wide timeliness rate for FY 2003 was 63.0 percent.  Not including the Postal Service (which traditionally receives a large number of claims and consistently has higher-than-average timeliness compliance), that rate was 49.6 percent.  The government-wide timeliness rate for FY 2005 was 79.4 percent, and was 70.9 for agencies other than the Postal Service.  FY 2006 quarterly timeliness rates were: *first quarter*, 80.2 percent government-wide and 69.9 percent for agencies other than the Postal Service; *second quarter*, 81.0 percent government-wide and 71.7 percent for agencies other than the Postal Service; *third quarter*, 82.0 percent government-wide and 73.3 percent for agencies other than the Postal Service; *cumulative* through three quarters, 81.1 percent and 71.6 percent for agencies other than the Postal Service.  Thus, there is a steadily upward timeliness trend government-wide, both including and not including Postal Service performance.  Viewing it another way, the rate of untimely workers' compensation claims submissions to DOL by Federal agencies other than the Postal Service have dropped from 50.4 percent in FY 2003 to 28.4 percent in the first three quarters of FY 2006.[59]

---

[54] Ex. 11 at 2.

[55] *Id.*

[56] *See* Ex. 10 at 2; Ex. 12 at 4.

[57] *See id.  See also* 20 C.F.R. Part 10, Subpart E.

[58] Such data appears in the record at Ex. 20.

[59] A March 2004 Program Effectiveness Study that was developed for OWCP by ICF Consulting (pertinent excerpts from which appear in the record at Ex. 21) also shows a general upward trend for the timely processing of workers' compensation claims by selected Federal agencies from FY 2002 to 2003.  In that study report, it is noted that, "[i]n addition to complying with the regulations, timely and accurate forms submission is integral to effective program management. It allows OWCP to pay benefits promptly and reduces the likelihood of undue financial hardship for the [affected] employee while he or she awaits payment.  *This is especially true when the employee is in a leave without pay status.*"  Ex. 21 at 73 (emphasis added).  As is noted above

12

FOR OFFICIAL USE ONLY

## ANALYSIS AND CONCLUSIONS

1. *Was there a delay in the agency's processing and forwarding of Mr. Miller's October 2005 workers' compensation claim to DOL, and, if so, was the delay improper?*

Clearly, there was a delay. Mr. Miller's claim was received by the agency on October 26, 2005. Thus, the agency needed to transmit the claim to DOL by November 9, 2005, in order to comply with 20 C.F.R. § 10.110. The claim was not, however, forwarded to DOL until January 30, 2006.

As to the propriety of the delay, it is noteworthy that Mr. Miller was persistent in advising the agency of his desire to have the claim forwarded to DOL within the 10-day timeframe provided for in 20 C.F.R. § 10.110, and expressing his dissatisfaction about the agency's delay in submitting the claim to DOL. It is also of consequence that he specifically informed Mr. Mills and Ms. Croom by e-mail on November 10, 2005, that he had spoken with Ms. Lattu at DOL, and that she had advised him to inform the agency that it "must by [l]aw comply . . . with the deadline," and could submit supplemental information "at a later date." However, the agency neither responded to that e-mail nor contacted Ms. Lattu, whose telephone number Mr. Miller had provided. Although the information Mr. Miller related Ms. Lattu had outlined did not comport with Ms. Croom's or Ms. Lepson's training or practice — or perhaps *because* it did not comport with such training and practice — the agency, which, in addition to HRD personnel, had counsel involved in the matter, should have inquired of Ms. Lattu (or someone at DOL/OWCP) as to whether what were thought to be accepted procedures by DOL still pertained.[60] Had the agency done so, it likely would have been made clear that, regardless of what claims processing advice DOL may or may not have given in the past, its *current* view on the matter is for employer agencies to transmit whatever claim information is available within 10 working days of receiving a workers' compensation claim, and to submit further relevant information as it becomes available. At the very least, this would have sparked a discussion as to the complexity of the issues raised by Mr. Miller, the necessity for the agency to address the myriad of factual assertions he made in support of his claim with adequate specificity, and the potential drawbacks of the piecemeal submission of material referable to a claim (*e.g.*, material getting lost or misplaced at DOL; the erroneous approval of a claim based on incomplete information with little or no practical chance of reversal) approximately two months before such a dialogue actually occurred, when Ms. Lattu telephoned HRD, apparently in response to Mr. Miller's continued complaints about the agency's delay in forwarding his claim to DOL.

---

(p. 12), Mr. Miller was receiving his full salary throughout the time his claim was being processed by the agency.
[60] The DOL statistics on workers' compensation claims processing timeliness suggest that DOL is now emphasizing adherence to the 10-day regulatory timeframe more stringently than it had in the past, without regard to whatever practical advice may or may not have been dispensed about strict compliance with 20 C.F.R. § 10.110 at DOL training sessions in years gone by.

13

FOR OFFICIAL USE ONLY

FOR OFFICIAL USE ONLY

Accordingly, it would appear that the agency's delay in processing the subject claim was improper.

2. *Does the agency's improper delay in the processing of the claim appear to have been intentional, willful or otherwise intended to deprive Mr. Miller of any right, privilege or benefit under applicable workers' compensation statutes and regulations?*

The primary reason for the agency's delay in submitting Mr. Miller's claim to DOL until January 30, 2006, appears to be that it believed that the claim was not legally valid, and required that amount of time to produce a thorough response in contravention of the claim. There were a number of factors that contributed to the length of time spent on the composition of that response to the claim, including: (1) the depth and breath of the information Mr. Miller provided in the supporting statement accompanying his CA-2; (2) the sheer multitude of facts and documentation that was required to be gathered to adequately refute Mr. Miller's contentions; (3) the number of agency and former agency personnel who were involved in the process of compiling and analyzing such critical information; and (4) the time limitations those individuals' other work-related obligations placed upon their ability — both individually and collectively — to devote to this process. The evidence reflects that significant work was being done on the agency response through the week of January 23-27, 2006. Thus, the matter was not, to paraphrase the court in the *Beckner* civil case (*see* page 3, *supra*), "lain fallow" by the agency between the time of its receipt of Mr. Miller's claim and its transmission of the claim package to DOL on January 30, 2006.

As to why the portion of the claim package that Mr. Miller submitted to the agency was not forwarded to DOL either by November 9, 2005 (the last day of the regulatory timeframe), or before January 30, 2006, without the agency response, it seems clear that that this was not the result of any attempt by the agency to deprive Mr. Miller of, or even delay his receipt of, any worker's compensation benefits to which he may have been legally entitled. Rather, based on the training and experience of agency personnel (chiefly that of Ms. Lepson), the claim package was retained by the agency until its response was completed in order to assure that the response would be fully considered by DOL, along with Mr. Miller's supporting material, in evaluating the merits of the claim. In this regard, it is noteworthy that Ms. DeCarlo of DOL has indicated that DOL will typically render a decision on a claim within between 60 and 90 days of its receipt of the claim, and that it does not, as a practice, wait for additional material that a party has related it intends to submit before rendering a decision when it already has what appears to be sufficient material available for a decision to be reached. In short, the agency believed it had a *valid legal basis* for opposing Mr. Miller's claim, and that it needed to submit its response to the claim along with the claim in order to assure that its legitimate assertions in contravention of the claim would be given full consideration by DOL. Applying the standard utilized by the court in *Beckner*, the agency's actions in delaying the processing of the subject claim did not stem from "bad faith, a dilatory motive or a lack of evenhandedness."

14

FOR OFFICIAL USE ONLY

FOR OFFICIAL USE ONLY

Furthermore, certain facts that occurred after the agency completed its response tend to belie the notion that it acted with malevolence toward Mr. Miller's claim. First, the agency transmitted the completed claim package to DOL by courier, so as to expedite its receipt by DOL. Second, when it appeared that the claim package may have been returned to the agency because Mr. Miller had omitted some information from his CA-2, Ms. Croom twice e-mailed him in an attempt to obtain the information that was thought to be missing, and, while awaiting receipt of the purportedly returned package, arranged to have a substitute copy sent to DOL's Kentucky facility, in order to lessen any delay occasioned by the omission.

Some significance should also be attached to the agency's treatment of his prior, injury-based, workers' compensation claims. Those claims, which were not as inherently complex as the subject illness claim, were processed by the agency in fairly short order — one within 19 working days of its original receipt by the agency and six working after it was resubmitted to HRD, and the other within seven working days of its receipt. Such treatment of those earlier claims would appear to support a conclusion that the length of the agency's delay in processing the subject claim was attributable to the amount of time it needed to develop an adequate response to that particular claim, rather than any animus toward Mr. Miller.

It is also noteworthy that Mr. Miller was receiving his full salary throughout the time his claim was being processed by, and remained with, the agency. This suggests that the agency's delay in processing his claim did not cause Mr. Miller undue hardship. Also, because any award stemming from his claim would entitle him to workers' compensation benefits on a retroactive basis, the agency's delay could not have resulted in a diminution of such benefits to him.

As a result, it does not appear that the agency's delay in processing the subject claim was motivated by an intent to deprive Mr. Miller of any right, privilege or benefit to which he may be legally entitled under applicable workers' compensation statutes and regulations.

FOR OFFICIAL USE ONLY

Richard Miller Declaration

Civil Action No. 06-01071 (GK)

Exhibit  _18_

Exhibit F #7



**National Transportation Safety Board**
Washington, D.C. 20594

October 15, 2001

Mr. Richard L Miller
Apt. 304 1515 Arlington Ridge Road
Arlington, VA 22202

Dear Mr. Miller:

     This is to inform you that we received your recent application for consideration for the position of Operations Manager, WA-TB-1-020, with the National Transportation Safety Board. We will now start the process of reviewing all applications to determine the appropriate qualifications and grade level(s). This review process can sometimes be lengthy, however, you will be notified as soon as possible concerning the status of your application.

     We thank you for your interest in the work of the Safety Board.

Sincerely,

*Marquee' L. Holmes*

Marquee' L. Holmes
Human Resources Representative

## Miller Richard

| | |
|---|---|
| **From:** | Moffett Bernie |
| **Sent:** | Friday, December 07, 2001 3:51 PM |
| **To:** | Miller Richard |
| **Subject:** | RE: Academy Operations Manager |

Let me check with Kim and see what happened to this announcement.

-----Original Message-----
**From:**     Miller Richard
**Sent:**     Friday, December 07, 2001 3:48 PM
**To:**       Moffett Bernie
**Subject:**  RE: Academy Operations Manager

Bernie,
What is the difference in these two?  It doesn't seem to be NTSB only versus outside.  It seems to be Federal
employees versus US citizens.  Bill was with GSA so wouldn't he have been in the same group as me?

-----Original Message-----
**From:**     Moffett Bernie
**Sent:**     Friday, December 07, 2001 3:41 PM
**To:**       Miller Richard
**Subject:** Academy Operations Manager

These seem to be the two announcements for the Academy Operations Manager:

<< File: 01-020.doc >>          << File: wa-tb-01-020.doc >>

1

**Miller Richard**

| | |
|---|---|
| **From:** | Libera Don |
| **Sent:** | Wednesday, November 07, 2001 9:52 AM |
| **To:** | Miller Richard |
| **Cc:** | Goldberg Steven |
| **Subject:** | RE: PD |

Richard -

I briefly have discussed your situation with Steve.  You are a valuable asset to the CFO organization.  In order that you and the other members of this organization know what is expected and receive proper credit for the work that is accomplished, it is of primary importance that you and the others have current PDs and performance elements.  This is not an easy undertaking and must come before any serious discussion of the possibility of a "build-up" position in the CFO office can take place.

I'm sorry that your budget experience was not a proper match for the Budget Officer position.  We did our best to be fair to all of the candidates and to select the best qualified for the job.

As I indicated to you in our earlier conversations, the possibility of a GS-15 non-supervisory position in our office is remote.  Although I would not say that it would never happen, I did say that such a position would require functions sufficiently complex that it would warrant a grade 15 on its own merit without the supervisory functions, duties which the other GS-15s in the office have.  Anything less would be a disservice to you and to the other members of the staff.  I suggested to you that such a non-supervisory position, possibly one overseeing various non-financial Board-wide programs (not covered by someone else), might more likely be established in the MD's office.  That option is for you to work out with Dan.

We do appreciate all that you do.

Thanks.

Don

-----Original Message-----

| | |
|---|---|
| **From:** | Miller Richard |
| **Sent:** | Tuesday, November 06, 2001 3:08 PM |
| **To:** | Libera Don |
| **Cc:** | Goldberg Steven |
| **Subject:** | FW: PD |

Don,

I have thought about our brief conversation this morning in response to this email.  I must be confused.  You told me that doing the PD is the first step before any "build-up" or whatever it is called.  How is this?  I thought you were still working on Dave's PD so this didn't seem to impede his movement to a GS-15.  Am I wrong on this?  As you offered, have you discussed the possibility/options with Steve?

I met with Dan on Friday to follow-up on the Budget Officer's and Academy positions.  Dan shared a memo to the file signed by you and Dave which I didn't receive a copy.  This is a bad week with the packing and all  but I will respond separately to this memo to the file.

We also discussed options.  He doesn't presently have a position in MD but may have a couple later on.  It is my understanding that any such position will now have to be signed off by the Chairman.  As we discussed, it also may be advantageous that this be done prior to an Executive Director coming on board.  We discussed other options in the CFO office or possibly in combination with the MD's office.  Dan said he would agree and support to the Chairman a build-up that the CFO and HR provided.

-----Original Message-----

| | |
|---|---|
| **From:** | Miller Richard |
| **Sent:** | Tuesday, November 06, 2001 9:07 AM |
| **To:** | Libera Don |
| **Cc:** | Goldberg Steven |
| **Subject:** | FW: PD |

1                                         *138*

Any progress??

-----Original Message-----
**From:**     Miller Richard
**Sent:**     Thursday, November 01, 2001 4:10 PM
**To:**       Libera Don
**Cc:**       Goldberg Steven
**Subject:**  RE: PD

Thanks.
Within CFO, it was my understanding that you were going to talk to Steve. Has this been done? I have provided 4-5 thoughts/options on this but you and Steve may have other thoughts. Is there something else I need to be doing?

Yes, you are right that I along with many others do not want to work for Arena and it does limit any options in MD.
Richard

    -----Original Message-----
    **From:**    Libera Don
    **Sent:**    Thursday, November 01, 2001 8:48 AM
    **To:**      Miller Richard
    **Cc:**      Goldberg Steven
    **Subject:** RE: PD

    Not sure about what might be possible in either case. Your not wanting to work for Arena limits the possibilities there, but it might be worth checking with Dan to see if there are any agency-wide programs under his purview that are not covered by David or Barbara that might be sufficient to warrant another GS-15 non-supervisor.

        -----Original Message-----
        **From:**    Miller Richard
        **Sent:**    Wednesday, October 31, 2001 4:50 PM
        **To:** Libera Don
        **Cc:** Goldberg Steven
        **Subject:**     RE: PD

        Don,
        Nothing on what your idea was in the MD's office or progess in CFO?

            -----Original Message-----
            **From:**    Libera Don
            **Sent:**    Wednesday, October 31, 2001 4:26 PM
            **To:**      Miller Richard
            **Cc:**      Goldberg Steven
            **Subject:** RE: PD

            Richard -
            Our first step is to get you a current PD and performance appraisal. Not sure what can be done about last year's if Bernie can't find one.
            Regarding Dan ... When you said that "Dan was suppose to be looking into this" I thought "this" meant a GS-15 in his office. (Not sure what Deb Smith has to do with it?)
            Thanks.
            Don

                -----Original Message-----
                **From:**    Miller Richard
                **Sent:**    Wednesday, October 31, 2001 3:25 PM
                **To:**      Libera Don
                **Cc:**      Goldberg Steven
                **Subject:** RE: PD

                Don,
                Is this PD for both year's appraisals (assuming Bernie doesn't find an appraisal for last year)? I basically did these accomplishments from an application and off the top of my head and will let you know if any others come to mind.

                All I know about Dan is that he is waiting on information from personnel. I wouldn't think he is looking for a GS-15 in the MD's office. I am not Deb Smith. I have not seen him to discuss this possibility,

On the possible build up options, I have had these thoughts.

1. Going back to the original plan where you would assume 20% of Sue's job; Why couldn't I do this instead of you? This original option seems to be the most efficient, quickest option and would save the government approximately $400,000 over 3 years.

2. The proposals we discussed at and after the off-site where the positions in Dave and Bill's shops would be combined into one. Mitch seemed to like this combination after the off-site.

3. It seems that the addition of Oversight to Dave's position was very helpful in him obtaining his 15. Couldn't some of these oversight duties be moved?

4. Management Reports--I did this at CBO;

5. There was a sheet that Mitch discussed and handed out (I believe) at the off-site on a number of proposals that I could be involved in. I am looking for this information. Would you happen to have a copy of this?

My preference would be to have this done as quickly as possible. The build up option is much more important to me than the appraisals. Are we sure that no appraisal was done for me last year?

Let me know if you have any questions. Should I talked to Dan on the build up option?

<< File: bullets.doc >>

## Miller Richard

| | |
|---|---|
| **From:** | Libera Don |
| **Sent:** | Tuesday, November 20, 2001 4:32 PM |
| **To:** | Miller Richard |
| **Cc:** | Goldberg Steven |
| **Subject:** | RE: |

My recollection is that you were going to put together a list of the activities/functions such as the Fair Act, the President's Management Initiatives, etc., that may not be covered adequately (or not at all) now, and which, taken together, could support a GS15 non-supvy. position in Dan's office. I seem to recall that we discussed whether or not Pam should be involved before Dan in reviewing the proposal, but did not reach a conclusion on the best approach.

-----Original Message-----
| | |
|---|---|
| **From:** | Miller Richard |
| **Sent:** | Tuesday, November 20, 2001 4:09 PM |
| **To:** | Libera Don |
| **Cc:** | Goldberg Steven |
| **Subject:** | RE: |

Don,
We have discussed probably 10 options before the management initiatives and I believe you said that Steve and you had discussed 2-3 other options outside the CFO office.   What kind of proposal is needed? I thought the purpose of going to Pam was to see which one/ones would needed to be added for a 15 outside the CFO office.

-----Original Message-----
| | |
|---|---|
| **From:** | Libera Don |
| **Sent:** | Tuesday, November 20, 2001 2:55 PM |
| **To:** | Miller Richard |
| **Cc:** | Goldberg Steven |
| **Subject:** | RE: |

Richard -
I thought you were going to put a proposal together for a possible position in the MD's office.(?)
Don

-----Original Message-----
| | |
|---|---|
| **From:** | Miller Richard |
| **Sent:** | Tuesday, November 20, 2001 1:06 PM |
| **To:** | Libera Don |
| **Cc:** | Goldberg Steven |
| **Subject:** | FW: |

Don,
I don't show a reply on this--are you talking to Pam?

-----Original Message-----
| | |
|---|---|
| **From:** | Miller Richard |
| **Sent:** | Wednesday, November 14, 2001 12:35 PM |
| **To:** | Libera Don |
| **Cc:** | Goldberg Steven |
| **Subject:** | RE: |

Don,
I have a copy. What do we need to do to get this moving? Are you talking to Pam?

-----Original Message-----
| | |
|---|---|
| **From:** | Libera Don |
| **Sent:** | Wednesday, November 14, 2001 9:04 AM |
| **To:** | Miller Richard |
| **Cc:** | Goldberg Steven |
| **Subject:** | RE: |

1   141

Let me know and I'll bring in my copy of the President's Management Initiatives for you to review for some ideas.

-----Original Message-----
**From:**     Miller Richard
**Sent:**     Friday, November 09, 2001 6:19 PM
**To:**       Libera Don
**Cc:**       Goldberg Steven
**Subject:**

Don,

I have thought about our conversation yesterday and it seems a lot simpler to add a duty/duties in CFO as was done with Dave's promotion (addition of oversight) . I have been doing all my stuff alone so it does not need to be supervisory.

I have not been able to find the information from the off-site meeting--have you? Have you heard anything on the guidelines? I email Mitch today to see if he remembers anything about a write-up.

On your request to add to the items you and Steve discussed outside CFO, I haven't had a lot of time today to work on this but wanted to get back to you in case they take the computer down.

Other than the Workforce Reform, OMB has/or should have issued guidance on Management Initiatives (71-page book), audits and performance reports, GPRA, and outsourcing.

142

## Miller Richard

| | |
|---|---|
| **From:** | Miller Richard |
| **Sent:** | Wednesday, November 07, 2001 12:18 PM |
| **To:** | Libera Don |
| **Cc:** | Goldberg Steven |
| **Subject:** | RE: PD |

Don,
I agree with you of the importance of current PDs, performance elements, and annual appraisals and that they should have been in place long ago. Unfortunately for me, it seems that other 14-15s in the CFO Office received appraisals last year and unless Bernie finds something in response to your request, I suppose I didn't.

I know this is not an easy task; however, I do not agree that they "must come before any serious discussion of the possibility of a 'build-up' position in the CFO office can take place." Again, was all this in place before Dave's "build-up" and resulting promotion?

The idea of the "build-up" was your original idea and I think it is a good idea and certainly has occurred agency-wide and with-in the CFO office. As in the past, I have attempted to do anything needed. I certainly understand that it would require functions sufficiently complex to warrant a grade 15 on its own merits. I thought you offered to discuss this possibly and options with Steve. It seems to me that with the options I provided, options discussed in the two-day off-site and subsequent proposal (still looking), along with the proposal and various options suggested by Dan, there would at least be some discussion within the CFO office. Are you telling me that this discussion within CFO will not happen or will not happen until the PD, appraisals are in place and then it is only a remote chance? Dan mentioned that non-supervisory GS-15s are not generally the case but that there are several at NTSB. Dan has said he may have a position in the MD's office later on, but not now and suggested that CFO and HR get together with a proposal (supposedly something similar to what was done for Dave) that he will take to the Chairman.

-----Original Message-----
| | |
|---|---|
| **From:** | Libera Don |
| **Sent:** | Wednesday, November 07, 2001 9:52 AM |
| **To:** | Miller Richard |
| **Cc:** | Goldberg Steven |
| **Subject:** | RE: PD |

Richard -

I briefly have discussed your situation with Steve. You are a valuable asset to the CFO organization. In order that you and the other members of this organization know what is expected and receive proper credit for the work that is accomplished, it is of primary importance that you and the others have current PDs and performance elements. This is not an easy undertaking and must come before any serious discussion of the possibility of a "build-up" position in the CFO office can take place.

I'm sorry that your budget experience was not a proper match for the Budget Officer position. We did our best to be fair to all of the candidates and to select the best qualified for the job.

As I indicated to you in our earlier conversations, the possibility of a GS-15 non-supervisory position in our office is remote. Although I would not say that it would never happen, I did say that such a position would require functions sufficiently complex that it would warrant a grade 15 on its own merit without the supervisory functions, duties which the other GS-15s in the office have. Anything less would be a disservice to you and to the other members of the staff. I suggested to you that such a non-supervisory position, possibly one overseeing various non-financial Board-wide programs (not covered by someone else), might more likely be established in the MD's office. That option is for you to work out with Dan.

We do appreciate all that you do.

Thanks.

Don

-----Original Message-----

145



**National Transportation Safety Board**
Washington, D.C. 20594

February 25, 2002

Mr. Richard L Miller4
1515 S. Arlington Ridge Road
Arlington, VA 22202

Dear Mr. Miller4:

In accordance with your request, your application was considered in filling the position vacancy announcement Budget Officer, WA-TB-1-055, Washington, D.C..

The vacancy announcement has been cancelled. We must keep all applications on file.

✓ You were among the qualified candidates; however, another applicant was selected.

You were among the candidates referred to the selecting official; however, another applicant was selected.

You failed to meet the minimum qualifications as stated in the vacancy announcement, including selective factors.

We have received your application after the first cutoff date. A selection have been made.

We thank you for your interest in employment with the Safety Board. If you have any questions or need any additional information, you may contact me on (202) 314-6230.

Sincerely,

*Shawne Boddie*

Shawne Boddie
Human Resources Representative